Timothy J. Preso
Earthjustice
313 East Main Street
Bozeman, MT 59715
(406) 586-9699
Fax: (406) 586-9695
tpreso@earthjustice.org

*Attorney for Plaintiffs*

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DEFENDERS OF WILDLIFE, NATURAL RESOURCES DEFENSE COUNCIL, SIERRA CLUB, CENTER FOR BIOLOGICAL DIVERSITY, <br><br> Plaintiffs, <br><br> vs. <br><br> KEN SALAZAR, Secretary of the Interior; DAN ASHE, U.S. Fish and Wildlife Service Director; and UNITED STATES FISH AND WILDLIFE SERVICE, <br><br> Defendants. | CASE NO. _____ <br><br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

**INTRODUCTION**

1.      This case challenges the decision of the U.S. Fish and Wildlife Service ("FWS") to delist the Wyoming portion of the northern Rocky Mountain gray wolf distinct population segment ("DPS"), despite the existence of significant threats to the wolves' survival.  77 Fed. Reg. 55,530 (Sept. 10, 2012) (the "Delisting Rule").

2.      More than 350,000 gray wolves once inhabited the American West, but the last viable wolf populations were reported to have been eradicated from the Western landscape in 1925, through poisoning, trapping, and shooting.  Gray wolves were among the first species to be listed by the Secretary of the Interior as endangered when, alarmed by the pace of species' decline, Congress in 1973 enacted the Endangered Species Act ("ESA"), 16 U.S.C. § 1531, <u>et seq.</u> —"the most comprehensive legislation for the preservation of endangered species ever enacted by any nation."  <u>Tennessee Valley Auth. v. Hill</u>, 437 U.S. 153, 180 (1978).

3.      Under protection of the ESA from killing by humans, gray wolves began to return from Canada to their native landscapes in northwestern Montana.  Beginning in 1995, gray wolf recovery took a giant leap forward as FWS reintroduced 66 gray wolves into Yellowstone National Park and central Idaho.  Since that reintroduction, the northern Rockies wolf population grew to approximately 1,774 as of the end of 2011, the last official count.  As a top predator and "keystone" species, the wolf's return has restored a more natural balance to the northern Rockies ecosystems.  Among other effects, the reintroduction of wolves has lead to healthier riparian vegetation along streams, as elk no longer over graze trees and shrubs in valley bottoms.  The reintroduction has also brought substantial economic benefits to the region.  Many thousands of visitors flock to Yellowstone National Park from around the world to see and hear wolves in the wild, contributing at least $35 million to the local economy each year.

4.    Although the restoration of wolves to the northern Rockies is a success story, it remains a vulnerable one.  At 1,774 wolves, the population still has not achieved the size or connectivity between the region's core recovery populations that independent scientists have determined essential to wolves' long term survival.

5.    After several attempts to delist all or a portion of the Northern Rocky Mountains ("NRM") wolf DPS, all of which were determined to be illegal under the ESA, the wolves of Montana and Idaho were removed from federal protection by an act of Congress in 2011.  Under that law, management of wolves was turned over to the states, with the exception of Wyoming. Since delisting, Montana and Idaho have adopted more aggressive wolf management, including longer wolf-hunting seasons, lifting of statewide hunting quotas, and the allowance of trapping. As a result, the northern Rockies wolf population is expected to decrease.  Montana has committed to a minimum wolf population of 150 wolves.  Idaho has committed to 15 packs. Both commitments represent substantial reductions from those states' current wolf populations.

6.    Now Wyoming is set to join the northern Rockies states seeking wolf population reductions.  On September 10, 2012, FWS published a final rule eliminating ESA protections for the Wyoming portion of the northern Rockies gray wolf DPS.  77 Fed. Reg. 55,530.  As of October 1, 2012, the estimated 328 wolves in Wyoming were under state management.  The Wyoming wolf hunting season began on that date, and all protections were removed for wolves in approximately 85% of the state.  Wyoming has committed to maintain only 100 wolves and 10 breeding pairs outside of Yellowstone National Park and the Wind River Reservation.

7.    Given hostile state wolf management measures, the entire northern Rockies DPS will never reach a sustainable long-term population level and is instead threatened with a long-term decline.  In addition, Wyoming's plans for post-delisting wolf management throughout

most of that state represent a return to the devastating policies that resulted in wolves'

eradication from Wyoming and the entire western landscape in the early-20th century.

8.      Plaintiffs in this case challenge FWS's decision to designate and delist the

Wyoming portion of the northern Rocky Mountains gray wolf DPS.  FWS's decision to delist

Wyoming's wolves despite the best available scientific evidence indicating that the NRM DPS is

not biologically recovered and cannot withstand the excessive human-caused mortality promoted

under state management contradicts the purposes and mandates of the ESA and its implementing

regulations and ignores fundamental principles of conservation biology.  Thus, the Delisting

Rule is arbitrary, capricious, an abuse of discretion and contrary to the law, and must be set

aside.

## JURISDICTION, VENUE AND ADMINISTRATIVE REMEDIES

9.      Plaintiffs bring this action pursuant to the ESA citizen suit provision, 16 U.S.C. §

1540(g), which waives defendants' sovereign immunity.  In the alternative, this Court has

jurisdiction over plaintiffs' claims under the Administrative Procedure Act ("APA"), 5 U.S.C. §

551 et seq.  This Court has jurisdiction over plaintiffs' claims pursuant to 28 U.S.C. § 1331

(federal question) and may issue a declaratory judgment and further relief pursuant to 28 U.S.C.

§§ 2201-02.

10.     Venue is proper in this District under 28 U.S.C. § 1391 because one or more

plaintiffs reside in the District of Columbia and a substantial part of the events or omissions

giving rise to plaintiffs' claims occurred in this District.

11.     Plaintiffs have attempted to resolve their claims administratively by twice

commenting on the proposed delisting rule that appeared in the Federal Register and by

providing defendants with notice of plaintiffs' intent to sue on September 10, 2012, as required by 16 U.S.C. § 1540(g)(2).

## PARTIES

12.     Plaintiff Defenders of Wildlife ("Defenders") is a national non-profit conservation organization headquartered in Washington, D.C., with offices throughout the country, including a Rocky Mountain office in Bozeman, Montana.  Defenders has 385,173 members, including 4,312 in the northern Rockies states of Idaho, Montana, and Wyoming.  Defenders is a science-based advocacy organization focused on conserving and restoring native species and the habitat upon which they depend, and has been involved in such efforts since the organization's establishment in 1947.  Over the last three decades, Defenders has played a leading role in the recovery of wolves in the northern Rockies.

13.     Plaintiff Natural Resources Defense Council ("NRDC") is a non-profit conservation organization that uses law, science, and the support of its 363,778 members, including 776 members in Wyoming, 1,770 members in Idaho, and 1,745 members in Montana, to protect the planet's wildlife and wild places, and to ensure a safe and healthy environment. NRDC and its members have a longstanding interest in conserving threatened and endangered species, including wolves.  NRDC is headquartered in New York City, with additional domestic offices in Montana, Washington, D.C., Illinois and California.

14.     Plaintiff Sierra Club is a nationwide conservation organization with more than 595,288 members, 891 of whom belong to the Wyoming Chapter, 2,214 of whom belong to the Idaho Chapter and 2,061 of whom belong to the Montana Chapter.  The Sierra Club is America's oldest, largest, and most influential grassroots environmental organization.  The mission of the Sierra Club is: "To explore, enjoy and protect the wild places of the earth; to practice and

4

promote the responsible use of the earth's ecosystems and resources; and to educate and enlist humanity to protect and restore the quality of the natural and human environments." The Sierra Club national headquarters are in California, its legislative office is based in Washington, D.C., and it has local chapters in every state.

15.     Plaintiff Center for Biological Diversity (the "Center") is a nonprofit organization dedicated to the preservation, protection and restoration of biodiversity, native species and ecosystems. The Center was founded in 1989 and is based in Tucson, Arizona, with offices throughout the country, including an office in Washington, D.C. The Center has more than 39,000 members, including many who reside in, explore and enjoy the northern Rockies.

16.     All plaintiffs have long-standing interests in the preservation and recovery of gray wolves in Wyoming, Idaho and Montana, both because they and their members place a high value on wolves as a species and because the presence of gray wolves is essential to the healthy functioning of the ecosystems in which they evolved. Plaintiffs actively seek to protect and recover the gray wolf through a wide array of actions including public education, scientific analysis and advocacy intended to promote achievement of healthy ecosystem functioning in the region.

17.     Members of each of the plaintiff conservation groups use public land in the northern Rocky Mountains for recreational pursuits, including hiking, camping, backpacking, hunting, horseback riding, cross-country skiing, wildlife viewing and aesthetic enjoyment. Members of the plaintiff groups work in industries, such as tourism, that depend on the opportunity to view wolves. Members of the plaintiff groups seek to view wolves and signs of wolf presence in the wild throughout the northern Rockies, including in Wyoming, and defendants' challenged action will reduce their opportunity to do so. The decision to eliminate

ESA protections for gray wolves in Wyoming will cause irreparable ecological harm to the ecosystems throughout the northern Rockies where wolves are now found. The legal violations alleged in this complaint cause direct injury to the aesthetic, conservation, economic, recreational, scientific, educational and wildlife preservation interests of the plaintiff organizations and their members.

18.     Plaintiffs' aesthetic, conservation, economic, recreational, scientific, educational and wildlife preservation interests have been, are being and, unless their requested relief is granted, will continue to be adversely and irreparably injured by defendants' failure to comply with federal law. These are actual, concrete injuries, traceable to defendants' conduct that would be redressed by the requested relief. Plaintiffs have no adequate remedy at law.

19.     Defendant Ken Salazar is the United States Secretary of the Interior. In that capacity, Secretary Salazar has supervisory responsibility over the United States Fish and Wildlife Service. Defendant Salazar is sued in his official capacity.

20.     Defendant United States Fish and Wildlife Service ("FWS") is a federal agency within the Department of the Interior. FWS is responsible for administering the ESA with respect to terrestrial wildlife such as gray wolves. Defendant Dan Ashe is the Director of the United States Fish and Wildlife Service. Defendant Ashe is sued in his official capacity.

## THE ENDANGERED SPECIES ACT

21.     The ESA was enacted to "provide a program for the conservation of . . . endangered species and threatened species" and to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved." 16 U.S.C. § 1531(b). To receive full protections of the Act, a species must first be listed by the Secretary of the Interior as "endangered" or "threatened" pursuant to ESA section 4. Id. § 1533.

22.    The ESA defines "endangered species" as "any species which is in danger of extinction throughout all or a significant portion of its range."  Id. § 1532(6).  A "threatened species" is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range."  Id. § 1532(20).  The term "species" is defined to include "any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature."  Id. § 1532(16).  Under these definitions, the FWS can list or delist a distinct population segment of a vertebrate species, even when the species as a whole would not warrant such a listing or delisting action.

23.    In making decisions to list or delist a species, including a DPS, as "endangered" or "threatened," the ESA requires the Secretary to "determine whether [the species is an endangered species or a threatened species because of any of the following factors:

(A) the present or threatened destruction, modification, or curtailment of its habitat or range;

(B) overutilization for commercial, recreational, scientific, or educational purposes;

(C) disease or predation;

(D) the inadequacy of existing regulatory mechanisms; or

(E) other natural or manmade factors affecting its continued existence."

16 U.S.C. § 1533(a)(1).  The Secretary must make these determinations "solely on the basis of the best scientific and commercial data available to him after conducting a review of the status of the species."  Id. § 1533(b)(1)(A).

24.    Once a species is listed as "endangered" or "threatened" under the ESA, "all Federal departments and agencies shall seek to conserve endangered species and threatened

species and shall utilize their authorities in furtherance of the purposes of [the ESA]." Id. §
1531(c).

## GRAY WOLVES IN THE NORTHERN ROCKIES

25.     The gray wolf (*Canis lupus*) is the largest wild member of the dog family
(Canidae).  Wolves' fur ranges from white to shades of gray to coal black.  Wolves primarily
prey on medium and large mammals.  In the northern Rockies, wolves' most common prey are
ungulate species including elk, white-tailed deer, mule deer, moose, pronghorn antelope and
bison.  Although wolves prefer their native prey of wild ungulates, wolves in the northern
Rockies occasionally prey on domestic livestock, including sheep and cattle.  Wolf predation on
livestock represents a relatively minor source of total livestock mortality in Wyoming, Idaho and
Montana.  Many livestock owners have successfully avoided or reduced conflicts with wolves
through non-lethal methods, including the use of fladry (strips of fabric tied to fences), range
riders, guard dogs, and changed calving practices.

26.     Wolves are social animals that normally live in packs of 2 to 12 animals and have
strong social bonds with each other.  Wolf packs are usually family groups consisting of a
breeding pair (the "alpha male" and "alpha female"), their offspring from previous years, and an
occasional unrelated wolf.  In general, only the alpha male and alpha female of a wolf pack
breed, which, along with territorial instincts that limit the number of packs in any given region,
serves to naturally limit wolf numbers.  Litters are generally born in April and range from 1 to 11
pups.  All pack members help feed, protect, and play with the pups as they grow.  Wolf pups are
weaned at 5 to 6 weeks of age, and are mature enough to begin traveling with the pack by around
October, a critical period for wolf survival.

27.     Research demonstrates that when one alpha wolf is removed from a pack, the probability that the pack will successfully breed the following years is approximately halved. When both alpha wolves are killed, the short-term reproductive potential of the pack is generally destroyed.  This impact is exaggerated for smaller or less concentrated wolf populations, as an alpha wolf that is eliminated from a pack generally must be replaced by a mature wolf from an adjacent pack to allow the pack to persist and produce pups the following year.  The chances of reproduction and pup survival after the loss of one or both alpha wolves are greatly influenced by pack size and distribution.

28.     Wolves were once abundant throughout all of North America except in extreme desert regions.  With European settlement of North America, "superstition and fears . . . led to widespread persecution of wolves."  68 Fed. Reg. 15,804, 15,805 (Apr. 1, 2003).  According to FWS, "wolves were hunted and killed with more passion and zeal than any other animal in U.S. history." U.S. Fish and Wildlife Service, Gray Wolf, March 2003, http://digitalmedia.fws.gov/cdm/ref/collection/document/id/111.  This hunting, together with an active eradication program sponsored and carried out by FWS and its predecessor agency, resulted in the extirpation of wolves from more than 95 percent of their range in the lower-48 states. 68 Fed. Reg. at 15,805.  In Montana, Idaho, Wyoming, and adjacent southwestern Canada, wolves were exterminated by the 1930s.  77 Fed. Reg. 55,530, 55,535.

29.     Following enactment of the ESA and protection of the wolf under its provisions, FWS in 1987 developed a wolf recovery plan that established a northern Rockies wolf recovery goal of at least 10 breeding pairs and 100 wolves for three consecutive years in each of three recovery areas: northwestern Montana, central Idaho and the Greater Yellowstone area.  FWS's 1994 environmental impact statement for the wolf reintroduction restated these criteria, requiring

a minimum of "thirty or more breeding pairs . . . comprising some 300+ wolves in a metapopulation … with genetic exchange between subpopulations."  77 Fed. Reg. at 55,536.  A metapopulation is a group of spatially separated populations of the same species that interact with each other.  FWS has stated repeatedly that gray wolves will not be recovered in the northern Rockies until wolves in the Greater Yellowstone, central Idaho, and northwestern Montana sub-populations are genetically linked.  See, e.g., id. at 55,537; FWS, Final Environmental Impact Statement studying the reintroduction to Yellowstone National Park and central Idaho (1994), App. 9 at 42 ("It is fairly clear that ten breeding pairs in isolation will not comprise a 'viable' population"), id. ("The importance of movement of individuals between sub-populations cannot be overemphasized."), id.; Glossary, at 4 (defining metapopulation as essential component of recovery).  FWS also has recognized that "the numerical recovery goal … should be considered minimal," 77 Fed. Reg. at 55,537, and that "[m]anaging to minimal recovery levels also increases the chances of genetic problems developing in the GYA population and would reduce the opportunities for demographic and genetic exchange in the WY portion to the GYA," 74 Fed. Reg. 15,123, 15,172 (Apr. 2, 2009).

30.     In 1995, FWS embarked on an ambitious plan to restore wolves in the northern Rockies by relocating and releasing 66 gray wolves from Canada into Yellowstone National Park and central Idaho.  See 72 Fed. Reg. 36,942, 36,943 (July 6, 2007).  In the years following reintroduction, wolves reproduced and established packs. Since returning to their native landscape, wolves have restored a more natural balance to northern Rockies ecosystems.  Wolves benefit the health of elk and deer populations by virtue of their selection of prey animals, as they primarily take the old, the very young, the injured and the diseased, leaving the healthiest animals to produce the next generation.  In Yellowstone National Park, the renewed presence of

wolves has altered the behavior of elk, which now tend to avoid browsing in areas where they are most vulnerable to predation, and this in turn has reduced destruction of young aspen and willow shoots.  The restoration of shrubs and trees in riparian areas controls stream erosion and supports native bird communities, beavers and other wildlife. Wolves aggressively prey on coyotes within wolves' home territories.  By reducing the number of coyotes in the area, the presence of wolves has also benefited populations of small rodents, birds of prey (who feed on the rodents), and pronghorn antelope (who are often preyed upon by coyotes).

31.     According to a 2006 study, roughly 151,000 people visit Yellowstone National Park each year to see and hear wolves in the wild, and bring in $35 million in direct spending annually to Wyoming, Idaho and Montana.

32.     The most recent official population estimate for the northern Rockies wolf population (at the end of 2011) was approximately 1,774.  Numerous scientists have informed FWS that a connected population of 2,000-5,000 wolves is necessary to ensure a genetically viable northern Rockies wolf population over the long term.  Further, the current wolf population must expand geographically to achieve necessary connectivity and genetic exchange between the three core wolf recovery areas in the northern Rockies.  To date, sufficient connectivity has not been achieved.  In particular, the Greater Yellowstone area remains the most genetically isolated recovery segment in the NRM DPS.  The Delisting Rule will decrease the wolf population, decrease connectivity, and contract the wolves' geographic range.

## HISTORY OF THE DELISTING DECISION

33.     In 2000, the northern Rockies wolf population met FWS's minimal numeric recovery goal of 300 wolves in 30 breeding pairs for the first time, though the population had not achieved connectivity that FWS has deemed essential for recovery.

11

34.     Nevertheless, in 2008, FWS designated the NRM DPS for gray wolves and eliminated ESA protections for wolves throughout the DPS, turning management over to the states.  73 Fed. Reg. 10,514 (Feb. 27, 2008).  The DPS encompassed all of Montana, Idaho, and Wyoming; and parts of Washington, Oregon and Utah.  See id. at 10,516.  This 2008 delisting rule would have permitted the states of Montana, Idaho and Wyoming to eliminate all but 100-150 wolves each.  The management that the state of Wyoming proposed was the most aggressive.  The Wyoming plan on which FWS based its 2008 delisting rule (the 2007 Wyoming Plan) classified wolves as "predators" in 90% of the state—meaning such wolves could be killed by any means, in any numbers, at any season—and required Wyoming to manage for only 7 breeding pairs outside of Yellowstone park.  Wyoming law also contained an extreme "defense of property" exception allowing unlimited wolf killing, and explicitly called for aggressive management of wolves.

35.     Plaintiffs, and other groups, challenged the 2008 delisting in federal court. Plaintiffs' complaint included claims that gray wolves remain threatened in the northern Rockies by virtue of their small population size, lack of genetic exchange, and inadequate regulatory mechanisms.  Plaintiffs also alleged that FWS failed to assess threats to gray wolves over a significant portion of their range (including unoccupied historic range), that FWS established arbitrary DPS boundaries, and that the 2008 Delisting Rule arbitrarily departed from FWS's 1978 determination that wolves are endangered throughout the lower-48 states, except Minnesota, where wolves were listed as threatened.  In addition, plaintiffs challenged FWS's determination that Wyoming's aggressive wolf control laws constituted a sufficient legal safety net for wolves to justify delisting, noting that FWS itself had previously deemed Wyoming's approach to be inadequate.

36.     Plaintiffs sought a preliminary injunction of the 2008 delisting based on a subset of these claims.  In response, the U.S. District Court for the District of Montana reinstated the ESA protections for northern Rocky Mountain wolves, concluding that FWS's attempt to delist the population was arbitrary, capricious, and "disingenuous."  Defenders of Wildlife v. Hall, 565 F. Supp. 2d 1160, 1169, 1173, 1178 (D. Mont. 2008).  The court documented a series of substantial deficiencies afflicting FWS's effort to delist the region's wolves—among them, a lack of the "genetic exchange" FWS deemed essential to the population's recovery, and state regulatory mechanisms that left wolves in "serious jeopardy."  Id. at 1175.   The court also agreed that FWS should not have delisted wolves in light of Wyoming's deficient wolf management laws.  Id.  In particular, the court found that FWS's "unexplained surrender of the agency's rational rejection of the 2003 Wyoming management plan" was likely arbitrary and capricious.  Id. at 1174.

37.     Rather than defend the 2008 delisting rule on the merits, FWS moved for a voluntary remand and vacatur of the rule.  On October 14, 2008, the Montana court granted FWS's motion and remanded and vacated the 2008 delisting rule for northern Rockies gray wolves.

38.     Two weeks after the Court vacated FWS's 2008 northern Rockies delisting regulation, FWS announced the reopening of the comment period on the February 2007 proposed rule to delist the northern Rocky Mountains DPS – the same proposal that launched the illegal February 2008 delisting.  See 73 Fed. Reg. 63,926, 63,928-29 (Oct. 28, 2008); see also 72 Fed. Reg. 6,106 (Feb. 8, 2007).  While announcing this reopening, FWS offered no new information indicating that the region's wolf population was suitable for delisting.  Instead, FWS provided a draft, unsigned memorandum of understanding which made vague representations about post-

13

delisting state management to address the wolf population's lack of genetic connectivity.  See 73

Fed. Reg. at 63,930.  In response to the Court's determination that FWS arbitrarily deemed

Wyoming regulatory mechanisms adequate to maintain a recovered wolf population, FWS

proposed to retain ESA protections for wolves in Wyoming, while delisting the remainder of the

newly designated NRM DPS.  See id. at 63,927-29; 72 Fed. Reg. at 6,131.

39.     FWS's second attempt to delist the northern Rockies wolves culminated in a final

rule published in the Federal Register on April 2, 2009, that took effect on May 4, 2009.  74 Fed.

Reg. 15,123 (April 2, 2009).  With respect to Idaho and Montana, the 2009 delisting rule relied

on the same flawed biological conclusions, and repeated nearly all of the same legal errors, as the

2008 rule.  The 2009 rule also contained several new violations, including delisting only a

portion of the NRM DPS, which violated the plain language of the ESA prohibiting such

piecemeal listing actions.

40.     In the 2009 delisting, FWS retained Wyoming's wolves under federal ESA

protections, as FWS determined that the Wyoming portion of the range "represents a significant

portion of range where the species remains in danger of extinction because of inadequate

regulatory mechanisms."  74 Fed. Reg. at 15,147.  Specifically, FWS determined that

Wyoming's extensive "predator" management area posed an obstacle to delisting, stating that

"the State's regulatory framework should minimize take of non-problem wolves in all suitable

habitat and across all of Wyoming's potential migration routes among NRM subpopulations."  Id.

at 15,142.  It further stated that "[s]tatewide trophy game status will assist in this regard as

migrating wolves use the current predator area."  Id.  FWS found that, for Wyoming delisting to

become appropriate, Wyoming would have to commit to managing for at least 15 breeding pairs

and at least 150 wolves in mid-winter, and at least 7 breeding pairs and at least 70 wolves in

14

Wyoming outside Yellowstone and Grand Teton National Parks.  Id.  FWS stated that "[s]uch requirements are necessary to provide adequate buffers to prevent the population from falling below recovery levels."  Id.  FWS also raised significant concerns about the lack of genetic connectivity caused by the predator status of wolves in 88% of Wyoming, finding that "the extent of the predatory animal area certainly limits most opportunity for genetic and demographic connectivity, a condition that will assist in sustaining wolf recovery in the GYA."  Id. at 15,149 (emphasis added).  FWS further found that Wyoming's wolf management statutes did not, in fact, support some of the claims of the state's administrative wolf management plan, and found that "[t]he very specific and deliberate intent, tone, and wording of Wyoming law clearly continues to be the major impediment to Wyoming developing and implementing a wolf management plan the Service can approve.  In the past Wyoming has … almost without exception encouraged wolf take to drive the wolf population down to minimum recovery levels."  Id.

41.     Plaintiffs and other groups challenged the Montana and Idaho partial delisting.  In August 2010, the U.S. District Court for the District of Montana issued a final judgment in favor of the plaintiffs and vacated the 2009 delisting rule.  Defenders of Wildlife v. Salazar, 729 F. Supp. 2d 1207 (D. Mont. 2010).  The court's decision was driven by its rejection of FWS's decision to delist only part of the NRM DPS.  The Court wrote that "even if the Service's solution is pragmatic, or even practical, it is at its heart a political solution that does not comply with the ESA.  The northern Rocky Mountain DPS must be listed, or delisted, as a distinct population and protected accordingly."  Id. at 1228.  The court did not address the other challenges raised by the plaintiffs, including the adequacy of the regulatory mechanisms of Montana and Idaho, population size, connectivity and genetic exchange.  Id.

42.     Following the Montana court's ruling, FWS in October 2010 published a final rule reinstating federal protections for the entire NRM DPS.  However, following the relisting, Congress passed, and President Obama signed, legislation directing FWS to reissue the 2009 delisting rule, and FWS complied with this in May 2011.  In the wake of that statutory enactment, Wyoming remained the only state in the NRM DPS in which wolves had protection under the ESA.

**THE 2012 DELISTING RULE**

43.     On October 5, 2011, FWS issued a proposed rule to remove ESA protections for the gray wolf in Wyoming.  76 Fed. Reg. 61,782 (Oct. 5, 2011).  The proposed rule stated that changes to Wyoming law and regulations would be required.  Id. at 61,788.  Before delisting, FWS requested that the state of Wyoming prepare a wolf management plan specifying how the state would manage wolves once the animals were no longer listed under the ESA.  See 77 Fed. Reg. at 55,533.  Both the decision to delist Wyoming's wolves and the substance of the management plan itself were the result of discussions between Wyoming Governor Mead and Interior Secretary Salazar.  See Trevor Brown, Feds, Governor Agree Wyoming Wolves Should be Delisted, Wyoming Tribune Eagle, Aug. 4, 2011, www.wyomingnews.com/articles /2011/08/04/news/01top_08-04-11.txt.

44.     Under the Delisting Rule, Wyoming is permitted to eliminate all but 100 wolves outside Yellowstone National Park and the Wind River Indian Reservation.  Wyoming's legal framework for wolf management, consisting of state statutes and an administrative management plan, does not differ substantially from either the Wyoming framework that was rejected by the Montana district court in 2008, or the framework that FWS itself rejected in 2009.  In other words, Wyoming law has remained, in substance, consistent.  FWS, meanwhile, has reversed its

position each time it has considered a new iteration of Wyoming's wolf management laws, from

rejecting Wyoming's 2003 plan, to supporting it in 2008, to again rejecting it forcefully in 2009,

before once again embracing the plan in the current Delisting Rule.

45.     Rather than requiring Wyoming to manage for 15 breeding pairs and 150 wolves,

as it required of Montana, Idaho, and previously required for Wyoming, FWS has allowed

Wyoming to manage for 10 breeding pairs and 100 wolves while relying on the Yellowstone

wolves as a buffer.  Wyoming is not required, as FWS had previously deemed necessary, to

increase its population minimum if the Yellowstone Park population drops below a threshold of,

for example, 50 wolves.  Wyoming is also not required to provide a mortality buffer around

Yellowstone to ensure that state management does not diminish the Yellowstone population.

Many of the Yellowstone packs routinely leave the park and park wolves could be taken under

Wyoming laws that allow, and indeed promote, wolf killing.  In addition, genetic connectivity

between Yellowstone Park, the Greater Yellowstone Area and the rest of the NRM DPS will be

diminished under Wyoming management.

46.     Wyoming law treats wolves as "predatory animals" that can be shot on sight, year

round and with no bag limit, in approximately 85% of the state.  In the remaining 15% of the

state, consisting of Yellowstone and Grand Teton National Parks, and land surrounding the parks

in the northwest corner of Wyoming, wolves will be managed as "trophy game" animals that are

subject to regulated hunting.  This trophy game area is expanded slightly from October 15 to

March 1 each year in an area extending southward from the "trophy game" boundary which

encompasses 1.3% of the state (the "flex zone").  This approach is not meaningfully different

from earlier Wyoming wolf management statutes, which treated wolves as predators in a slightly

larger area.  FWS approved this plan despite previously stating that it would require the entire

state's wolf population to be managed as trophy game.

47.    Prior to promulgating the Delisting Rule, FWS conducted a peer review of the

Wyoming wolf management framework, soliciting comments from a panel of five scientists.

After the initial round of peer reviewers' comments raised significant questions about both the

sufficiency of the Wyoming plan and whether Wyoming law adequately ensured that the plan

could be implemented, Wyoming released an Addendum to its Gray Wolf Management Plan.

Wyoming made no additional changes to its wolf management laws.  FWS then solicited a

second round of comments from the panel.  Members of the panel continued to be unconvinced

by Wyoming's plan, including the Addendum.  For example, Dr. John Vucetich of Michigan

Technological University stated that, while the Addendum contained some further description of

the Wyoming approach, these changes were cosmetic and failed to address the scientific

substance of his criticisms, including the inadequacy of Wyoming's regulatory mechanisms.

48.    The Service proceeded with its Delisting Rule despite the significant concerns

with the Wyoming plan and Wyoming law raised by some peer reviewers.  The Service did not

require Wyoming to cure the many weaknesses of Wyoming law that these peer reviewers

identified.

49.    On September 10, 2012, FWS issued its final rule removing the Wyoming portion

of the northern Rocky Mountains DPS from the list of threatened and endangered species.  77

Fed. Reg. 55,530.  FWS announced that it was satisfied with Wyoming's wolf management

statutes and plan, stating that they appeared to provide adequate regulatory mechanisms to justify

delisting under the ESA.  Id.

50.     As a result, wolf management in Wyoming is now in the hands of state officials. Since the delisting took effect on October 1, 2012, at least 35 wolves have been killed in the trophy area and 15 wolves have been killed without a permit in the predator area, as of November 12, 2012.

51.     Contrary to FWS's conclusion, Wyoming law fails in several important ways to provide adequate regulatory mechanisms for wolf management.  The state's wolf management provisions do not require Wyoming to manage for a buffer above the minimum population threshold, thereby failing to ensure that the threshold is met; they provide for the killing of wolves under a defense of property provision, even if wolves are baited into attacking livestock or pets; they provide for aggressive state management; and they do not require management to minimize damage to members of the Yellowstone population that range outside of the park. Wyoming law provides little detail as to how management will be accomplished and the Wyoming plan merely states that it will use "adaptive management" without adequately explaining or describing specific future steps to be taken if wolf populations fail to meet objectives.

52.     Wyoming law and regulations also do not contain management goals based on the best available science.  The state's wolf management decisions are based on a sustainable human-caused mortality level up to 48% of total wolf population.  Wyoming has no firm target for human-caused wolf mortality, beyond expressing, in the plan, its intent to stay between 22% and 48%.  The lack of a sustainable human-caused mortality level, in conjunction with lack of a management buffer, means that Wyoming lacks the management tools to ensure it meets the minimum population threshold.  Furthermore, one of the goals under Wyoming law is to minimize conflict between wolves and the populations of ungulates such as elk, wolves' native

prey, without considering that such "conflict" can in fact be desirable.  That is, the plan does not

address substantial research that establishes the positive impact that wolf predation has on

ungulate populations.

53.     In sum, Wyoming's wolf-management scheme contains numerous deficiencies

and each on its own would be sufficient grounds to establish the illegality of the Delisting Rule.

Even more troubling is the manner in which these weaknesses build upon each other to make the

whole plan even more damaging to the entire northern Rockies wolf population than each

deficiency would on its own.  For example, the many forms of unregulated take allowed under

Wyoming law are an even greater threat to the wolf population because Wyoming law allows for

the wolf population to be managed without a buffer at the very minimum population, such that

unregulated take of wolves presents a heightened threat of driving the population below the

required minimum.  The Delisting Rule, despite being more than seventy pages long, required

Wyoming to do only one thing: maintain a minimum population of 100 wolves (and 10 breeding

pairs).  Beyond this, Wyoming has no obligation to contribute to the long-term success of a

recovered wolf population.

## FIRST CAUSE OF ACTION

(Violation of Endangered Species Act, §4(a); Lack of Biological Recovery – Insufficient
Population Size)

54.     Plaintiffs hereby reallege and incorporate Paragraphs 1 through 53.

55.     FWS may "delist" a species only if it determines, based on "the best scientific and

commercial data available" that the species is no longer threatened or endangered.  See 16

U.S.C. § 1533(a)(1) (listing factors); id. at § 1533(b) (listing determinations shall be made

"solely on the basis of the best scientific and commercial data available"); see also 50 C.F.R. §

424.11(d) (providing grounds for delisting).  In order to delist the Wyoming portion of the

northern Rocky Mountain wolf DPS, FWS must find that the entire DPS is not threatened or

endangered by "natural or manmade factors affecting its continued existence." 16 U.S.C. §

1533(a)(1)(E).  FWS arbitrarily concluded that northern Rockies gray wolves are not threatened

by a current or foreseeable lack of genetic diversity, small population size, or lack of population

connectivity.

56.     FWS based its arbitrary conclusion on an unfounded assumption about the

number of wolves that would be sustained under state management.  Outside of Wyoming, the

states managing the NRM DPS are increasing the number of wolves that can be killed under state

management, and are employing more aggressive measures with a stated intention to reduce the

wolf population.  The Final Rule asserts that "[m]easurable declines across the region are

expected to begin to occur in 2012."  77 Fed. Reg. at 55,553.  However, FWS stated that,

"[a]lthough population decreases are expected in Idaho, Montana, and Wyoming, we expect that

these reductions will be carefully managed so that populations are maintained well above

recovery levels (perhaps around 1,000 wolves will be maintained across the NRM DPS long

term)."  Id. at 55,552-53.  No rationale was given for FWS's optimistic expectation that 1,000

wolves will be maintained, and no state management measures ensure this population level.

57.     There is no factual or legal basis for FWS's belief that the states of Montana,

Idaho and Wyoming will maintain a wolf population above the minimum population level in the

long term.  The states have not committed to maintaining anywhere near 1,000 wolves.  Idaho's

2002 wolf management plan establishes a population objective of 15 "packs," which is below

even FWS's minimum standard that Idaho is required to maintain 15 breeding pairs.  "Breeding

pair" is a term of art, which FWS has defined to mean an adult male and an adult female wolf

that have produced, during the previous breeding season, at least two pups that survived until

December 31 of the year of their birth.  77 Fed. Reg. at 55,538.  The "breeding pair" criterion is useful because it ensures that the wolf population continues to reproduce.  Not every "pack" contains a breeding pair, and therefore Idaho's law does not ensure that the population standard FWS has set for it will be met.  Montana's plan commits state wolf managers to maintain only 15 breeding pairs.  And Wyoming law commits to maintaining only 10 breeding pairs and 100 wolves.  Further, despite the fact that wolves residing in Yellowstone National Park often range into surrounding lands, no state has an obligation to ensure a minimum population of wolves in Yellowstone, where the population as reported in the Yellowstone Wolf Project's 2011 Annual Report was 98 wolves and 8 breeding pairs.  Nat'l Park Serv., Yellowstone Wolf Project, Annual Report 2011 (2012).  FWS expects a decline in the Yellowstone wolf population, and stated in the Delisting Rule that the Yellowstone population is "predicted to settle between 50 to100 wolves and 5 to 10 packs with 4 to 6 of these packs meeting the breeding pair definition annually."  77 Fed. Reg. at 55,552.

58.     State management policies are becoming more aggressive throughout the DPS. For example, Montana began to allow trapping of wolves in the 2012 season for the express purpose of reducing the wolf population.  Wyoming law represents the most aggressive management strategy of any of the three states.  In 85% of Wyoming, wolves are expected to be eradicated under state "predator" management.  In addition, the plain language of the state wolf management statute requires allowance of wolf killing by private landowners or livestock owners at any time that Wyoming's wolf population exceeds the minimum.  Specifically, the statute states that lethal take permits <u>shall</u> be issued to landowners or livestock owners "as long as the removals authorized by such permits could not reduce the numbers of gray wolves below ten (10) breeding pairs or a total of one hundred (100) individual gray wolves within the state and

outside of Yellowstone National Park."  Wyo. Stat. § 23-1-304(n).  Finally, there was no basis

for FWS to conclude that the wolf population in Yellowstone National Park will provide a buffer

to state management, when (i) states are not required to consider protections for Yellowstone's

wolves in management activities along the Park's boundaries and (ii) states are not required to

maintain adequate connectivity between Park wolves and wolves under state management.  The

Yellowstone National Park wolf population declined by approximately 43 percent from 2007 to

2011 without any of the additive human-caused mortality that will occur under Wyoming

management.  Nat'l Park Serv., Yellowstone Wolf Project, Annual Report 2011 at 1 (2012).

59.    The final Delisting Rule is rife with references to FWS's optimistic determination

that the states will manage wolf populations well above the required minimum, though FWS

bases this determination on non-regulatory and non-scientific factors such as its beliefs as to

changing public opinion and unsupported assurances by state managers.  See, e.g., 77 Fed. Reg.

at 55,545 (stating that FWS has few concerns about increasingly aggressive state management

because of the states' "commitment" to manage the population above minimum levels); 55,553

(stating that because state management has thus far resulted in gradual reductions, state

management provides sufficient protections); 55,554 (stating that the Yellowstone wolf

population will always provide a sufficient buffer against population reduction below minimum

levels); 55,556 (asserting that, though state management may reduce populations, the populations

will stabilize well above minimum recovery goals); 55,567 (FWS was confident that states will

not manage at minimum levels because "[s]tate wildlife managers have consistently reiterated to

us their desire not to come close to their floor levels"; and "harvest rates will moderate as the

population stabilizes and the public's current angst and intense interest wanes … . The NRM

gray wolf population will then likely settle into a reasonable, long term equilibrium, well above

minimum recovery levels."); 55,568 (stating that "a NRM gray wolf population more than double the minimum management targets is likely" based on FWS's determinations that (i) increasingly aggressive state management such as longer hunting seasons and larger quotas are "temporary", (ii) wolves are difficult to hunt because they prefer rugged, remote, and difficult-to-access landscapes; (iii) wolves will become more difficult to find and kill as their numbers are reduced; and (iv) it is likely that hunter and trapper interest and dedication will diminish as the wolf population is reduced, as success rates for hunters and trappers decrease); 55,569 (public pressure to aggressively manage wolves will decrease as the wolf population decreases, such that states will not manage at minimum levels). None of these determinations provides a rational basis for FWS's continuing assertions that the NRM DPS population will remain "perhaps around 1,000 wolves," but FWS's continued reliance on population numbers well above the recovery minimums demonstrates an apparent lack of confidence that the agency's recovery criteria of 300 wolves/30 breeding pairs are truly sufficient.

60.     As a matter of the best available scientific information, FWS's recovery criteria are not sufficient. Under the internationally accepted International Union for Conservation of Nature's "Red List Criteria" (previously relied upon by the Service as persuasive authority when rendering ESA listing decisions, but inexplicably disregarded by the agency here), a species must be listed as "vulnerable" when its population falls below 1,000 "mature" individuals. With respect to wolves in particular, scientists have calculated that a minimum population of 2,000 to 5,000 (including both mature and immature animals) is required to ensure long-term viability. Indeed, FWS itself requires 1,251–1,400 wolves for a recovered population in Minnesota and FWS's Post-Delisting Monitoring Plan for western Great Lakes wolves identifies a trigger for consideration of relisting if the Minnesota winter wolf population reaches "1500 or fewer

wolves." FWS, Post-Delisting Monitoring Plan for Western Great Lakes Distinct Population Segment of the Gray Wolf (Feb. 2008). The differential standards for gray wolves in the northern Rockies and the western Great Lakes cannot be justified under scientific principles of conservation biology.

61.     FWS has acknowledged that small, isolated populations of only 100-150 wolves, as contemplated by the Delisting Rule, are not sustainable. See 74 Fed. Reg. at 15,172 (minimal recovery levels will reduce genetic exchange and are inadequate). The Delisting Rule fails to address any concerns regarding the "small, isolated population." 77 Fed. Reg. at 55,565. Instead, FWS continually predicted that a larger wolf population will be maintained, despite the fact that no legal mechanisms actually exist to prevent states from managing for minimum population levels.

62.     Because FWS arbitrarily determined that wolves in the NRM DPS are not threatened by a small population size, the Delisting Rule is arbitrary, capricious, an abuse of discretion, and otherwise contrary to the ESA, 16 U.S.C. § 1533(a), (b), in violation of the APA, 5 U.S.C. §706(2), and must be set aside.

## SECOND CAUSE OF ACTION

(Violation of Endangered Species Act, §4(a); Lack of Biological Recovery - Lack of Genetic Connectivity and Diversity)

63.     Plaintiffs hereby reallege and incorporate Paragraphs 1 through 62.

64.     The Delisting Rule is arbitrary and contrary to the best available science because it failed to demonstrate that the NRM wolf population is not threatened by ongoing genetic isolation that is certain to worsen under Wyoming management. The health of the population is determined not only by population size, as discussed above, but also by metapopulation

connectivity, meaning exchange of individual wolves and their genetic material among

population centers.  Metapopulation connectivity is a function of both population size and

distribution; connectivity is enhanced in metapopulations with shorter distances between

subpopulations.  Without rationally determining that wolves throughout the DPS are not

imperiled by future inadequate genetic exchange, FWS could not determine that the recovery

criteria in the ESA are met.

65.     Even with the current wolf population at roughly 1,700-1,800 wolves, the current

wolf population in the northern Rockies has not yet established the connectivity between core

recovery areas that FWS itself has deemed essential.  FWS has repeatedly stated that the

establishment of a metapopulation dynamic among the three recovery areas and Canada is

essential to the long-term viability of the NRM DPS.  See 77 Fed. Reg. at 55,537 ("[t]he

importance of movement of individuals between subpopulations cannot be overemphasized."

(the Delisting Rule, quoting the 1994 Environmental Impact Statement)). While limited genetic

connectivity has been demonstrated between the three subpopulations, (B.M. VonHoldt et al., A

Novel Assessment of Population Structure and Gene Flow in Grey Wolf Populations of the

Northern Rocky Mountains of the United States, 19 Molecular Ecology 4412 (2010)), the GYA

subpopulation continues to be the most isolated of the three NRM DPS subpopulations, (J.K.

Oakleaf et al., Habitat Selection by Recolonizing Wolves in the Northwestern United States, 70

J. Wildlife Management 554 (2006) ("Oakleaf et al. (2006)")); 77 Fed. Reg. at 55,593.

66.     Connectivity will continue to decrease under state management.  As FWS stated

in the Delisting Rule, "after delisting the population will no longer be growing, the population

will likely go through a period [of] reduction before leveling off, and management will likely

result in higher mortality rates for both dispersers and resident wolves."  Id. at 55,953-54.

26

67.     Furthermore, both the home range of, and dispersal opportunities for, wolves in the NRM DPS will be decreased under Wyoming management.  FWS previously rejected Wyoming's attempts to adopt a dual-classification status for wolves (i.e., regulated trophy game management in some areas and unregulated predator management in others), and called for wolves to be managed as trophy game animals throughout the state.  FWS cited several reasons cited for this decision, including concerns that treating wolves as predators in most of the state would limit opportunities for genetic and demographic connectivity.  Now FWS has apparently reversed its position, and stated that its prior concerns have been addressed.  In lieu of trophy game status throughout the state, FWS stated in the final rule that it accepted the following Wyoming measures as adequate: (i) regulations committing to manage wolves so that genetic diversity and connectivity issues do not threaten the population, (ii) incorporating a "management goal" of one migrant per generation, (iii) committing to an adaptive management approach that adjusts management if the management goal is not met, (iv) planning to use human translocation of wolves if necessary to increase genetic interchange, and (v) the seasonal expansion, or "flex zone," for trophy game management during four and a half months per year. These measures are not sufficient to remedy the concerns FWS previously raised, and are no substitute for the previous FWS requirement that Wyoming manage wolves as trophy game throughout the state.

68.     The Wyoming regulations state that Wyoming's commitment to manage wolves so that genetic diversity and connectivity issues do not threaten the population will be accomplished by "encouraging effective migrants into the population."  Wyo. Admin. Code GAME HUNT Ch. 21 § 5.  The Wyoming wolf management regulations do not provide a mechanism by which this encouragement will be accomplished.  Neither Wyoming's wolf

management statute nor its regulations affirm the "management goal" of one migrant per generation, and do not specifically commit to using an adaptive management approach. Furthermore, stating that Wyoming will use "adaptive management" does not actually establish any regulatory mechanisms to ensure that state management will be adequate to meet Wyoming's obligation to ensure the recovery criteria are met.

69.     State management will diminish connectivity by diminishing the wolf's range within Wyoming, which will have the effect of diminishing its range throughout the NRM DPS. The predator area designation, even with the flex zone's seasonal expansion, decreases the wolf's range in Wyoming and limits opportunities for dispersers to cross into wolf populations in the rest of the NRM DPS.

70.     Mortality of future dispersing wolves is certain to increase under state management.  Wolves attempting to enter Wyoming from Idaho will have to run the gauntlet of the predator management area, including the flex zone which will be managed as a predator zone for roughly two thirds of the year (between March 1 and October 14).  While the flex zone imposes a regulated-hunting approach to wolf management in the affected area for a period of four and a half months each year, nearly half of all known past wolf dispersal events occurred outside of that period and wolves on average have taken more than five months to disperse from home territory to their new range.  The wolf hunting regulations in Montana and Idaho will also affect the number of successful dispersals to and from Wyoming.  In particular, Idaho's wolf hunting regulations for areas adjacent to Wyoming's flex zone, in combination with the management of the flex zone itself, fail to ensure that there will be a single day of the year when a wolf can disperse across the Idaho-Wyoming border without being subject to human-caused mortality.

71.     The Delisting Rule also allowed for "human-assisted" genetic exchange as a backstop mechanism should the Wyoming plan result in inadequate genetic connectivity.  This is inappropriate in the delisting context.  One of the primary purposes of the ESA is to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be <u>conserved</u>." 16 U.S.C. § 1531(b) (emphasis added).  The term "conserve" means "to use … all methods and procedures which are necessary to bring any endangered species or threatened species <u>to the point at which the measures provided [by the ESA] are no longer necessary</u>.  Such methods include … transplantation … ."  16 U.S.C. § 1532(3) (emphasis added).  While translocation, genetic manipulation, and maintenance of captive populations are appropriate tools for promoting recovery of an endangered population, they are not appropriate bases upon which to determine that a species has recovered and no longer requires protections of the ESA.  Other ESA authorities confirm that the statute aims to sustain species through restoration of natural processes rather than through perpetual human manipulation.  <u>See</u> <u>id.</u> § 1539(a)(2)(B)(iv) (before issuing incidental take permit, FWS must find "the taking will not appreciably reduce the likelihood of the survival and <u>recovery of the species in the wild</u>") (emphasis added); Interagency Cooperative Policy for the Ecosystem Approach to the ESA, 59 Fed. Reg. 34,273, 34,274 (July 1, 1994) (agency policy is to "[d]evelop and implement recovery plans … in a manner that restores, reconstructs, or rehabilitates the structure, distribution, connectivity and function upon which … listed species depend").

72.     In the Delisting Rule, FWS pointed to past examples of dispersal to indicate that genetic exchange in the future will be sufficient.  At the same time, FWS also acknowledged that because the wolf population will be diminished, "past dispersal data is unlikely to be an exact predictor of future effective migration rates."  77 Fed. Reg. at 55,954.  However, FWS failed to

consider two other important factors: that the referenced past dispersal events took place at a time when (i) the wolf population was increasing, not declining and (ii) wolves were under federal protection throughout their range.  Neither of these factors will be present in the future.

73.     In addition to relying on Wyoming's inadequate measures, FWS also based its conclusion that essential genetic exchange will be sufficient after delisting on its determination that "the overall NRM population is likely to be maintained well above recovery levels (perhaps around 1,000 wolves across the NRM DPS)."  As discussed above, this claim is unfounded and represents an arbitrary basis for conclusions regarding genetic connectivity and exchange. Therefore, FWS's determination that genetic exchange will be fostered under state management relies on inflated population estimates, and is arbitrary and unfounded.

74.     The Delisting Rule is thus arbitrary, capricious, an abuse of discretion, and otherwise contrary to the ESA, 16 U.S.C. § 1533(a), (b), in violation of the APA, 5 U.S.C. §706(2), and must be set aside.

### THIRD CAUSE OF ACTION

(Violation of Endangered Species Act, §4(a); Inadequate Regulatory Mechanisms)

75.     Plaintiffs hereby reallege and incorporate Paragraphs 1 through 74.

76.     FWS arbitrarily concluded that the Wyoming portion of the northern Rockies DPS is not threatened by "the inadequacy of existing regulatory mechanisms."  16 U.S.C. § 1533(a)(1)(D); 77 Fed. Reg. at 55,591.

77.     Wyoming's wolf management statute requires the Wyoming Game and Fish Department to manage for wolves based on a minimum population of 100 wolves and 10 breeding pairs outside of Yellowstone National Park and the Wind River Reservation, and does

not require Wyoming management to take into account, or compensate for, reductions in the

population within Yellowstone.

78.     Wyoming law fails to ensure the wolf population does not drop below 100 wolves

or 10 breeding pairs.  For example, Wyoming law does not include a population buffer above

this minimum, and as such cannot ensure even that this low minimum is maintained.  This was a

key issue raised in the peer review panel's initial report, and more than one panelist believed

there was a need for explicit buffering.  In response to the repeated calls for an explicit buffer,

among other issues, Wyoming produced an "Addendum" to its wolf management plan.  The

Addendum contains assertions that Wyoming's approach will "maintain an adequate population

buffer above minimum recovery levels," but fails to amend state law to actually require a buffer.

Wyoming Game and Fish Department, Addendum: Wyoming Gray Wolf Management Plan at 4

(March 22, 2012).  Nevertheless, in the Delisting Rule, FWS affirmed that "[w]e decided against

requiring Wyoming to provide a specific numeric buffer above these minimum management

targets."  77 Fed. Reg. at 55,556.

79.     This population buffer question is critical to FWS's determination that adequate

regulatory mechanisms exist to protect the NRM gray wolf population after delisting, given

Wyoming's stated intent to reduce the population, starting in the 2012-13 hunting season.  See

77 Fed. Reg. at 55,553; see also Wyoming Plan Addendum at 6; Wyo. Stat. § 23-1-304(g), (h),

(j), (m), (n).  This anticipated wolf killing would play out against the backdrop of a wolf

population history that saw the Yellowstone National Park wolf population decline by

approximately 43 percent from 2007 to 2011 without any of the additive, human-caused

mortality that Wyoming now contemplates.  Nat'l Park Serv., Yellowstone Wolf Project, Annual

Report 2011 at 1 (2012).  A similar decline for the portion of the population outside of

Yellowstone National Park and the Wind River Reservation could quickly leave the state below

agreed-upon minimums.  Without any safeguards in place to guarantee an adequate buffer,

FWS's determination that the NRM DPS is not endangered or threatened by inadequate state

regulatory mechanisms is arbitrary, capricious, contrary to the ESA and not based on the best

available science.  16 U.S.C. § 1533(a), (b).

80.     Compounding the problem caused by lack of a management buffer, Wyoming law

contains no firm target for or limitation on human-caused mortality.  Wyoming plans in the first

year to aim for a human-caused mortality rate between 22% and 35%.  Wyoming Game and Fish

Department, Addendum: Wyoming Gray Wolf Management Plan at 8 (March 22, 2012).

Wyoming management officials have stated that they intend to be "conservative" in their

approach during the 2012 season.  See, e.g., Wyoming Game and Fish Department, Wolves in

Wyoming: Wolves in Wyoming Information, http://gf.state.wy.us/web2011/wildlife-

1000380.aspx (last visited November 12, 2012).  Wyoming has made no assurance regarding

target mortality rates in future years.  The state's management documents express an intention to

achieve an allegedly "sustainable" rate between 22% and 48%.  This range is based on several

studies evaluating the level of human-caused mortality that is sustainable for a wolf population.

Several other studies placed the sustainable range between 17% and 29%.  One outlying study

found that wolves could sustain an anthropogenic mortality rate of up to 48%; Wyoming relies

on this outlier study to establish the upper human-caused mortality limit for the state's wolves.

Wolf management decisions, including hunting quotas, will largely be based on achieving a

particular rate of anthropogenic mortality.  Because Wyoming is relying on a rate that is derived

from an outlier study, the plan does not adequately ensure that the rate of human-caused

mortality will be sustainable.  This is especially problematic because (i) Wyoming has not

established a management buffer or a specific adaptive management framework, so there is no assurance that the mortality rate will be decreased even if the number of wolves approaches the minimum threshold, and (ii) Wyoming intends to pursue an aggressive reduction of its wolf population.

81.     The final Delisting Rule discussed Wyoming's planned high rate of human-caused mortality, and stated that this rate is not a concern because Wyoming intends to consider all sources of mortality when making management decisions.  77 Fed. Reg. at 55,600.  The rule acknowledged that there will be "[s]ources of mortality that will be difficult to limit, or may be uncontrollable, occur regardless of population levels and include things like defense of property mortality, illegal take, accidental mortality (such as vehicle collisions), and mortality in the predator area of Wyoming."  Id.  FWS stated that it is not concerned about either aggressive state management or the impact of the significant uncontrollable sources of mortality, because Wyoming "intends to maintain an adequate buffer above minimum population objectives to accommodate management needs and ensure uncontrollable sources of mortality do not drop the population below this minimum population level."  Id.  However, as stated above, this commitment appears nowhere in Wyoming statutes or regulations.  Furthermore, while FWS took comfort in the fact that "Wyoming removed statutory mandates for aggressive management of wolves (WGFC 2011, pp. 24, 52)," and considers this a "substantial improvement," this was only a cosmetic change in Wyoming law.  77 Fed. Reg. at 55,535.  Wyoming struck the word "aggressive" from the statutory provision listing management techniques, but did not alter, clarify, or remove any of the techniques to be used.  Wyoming law still states that permits shall be issued to landowners or livestock owners for removing wolves which are "harassing, injuring, maiming or killing livestock or other domesticated animals (or where chronic wolf predation

occurs)," so long as the wolf population remains above the minimum threshold. Wyo. Stat. § 23-1-304(n).  The statute may no longer contain the word "aggressive," but FWS has nonetheless failed to require meaningful assurance from Wyoming, in the form of regulatory measures, that Wyoming wolf management could not accurately be described as such.

82.     The Delisting Rule is therefore arbitrary, capricious, an abuse of discretion, and otherwise contrary to the ESA, 16 U.S.C. § 1533(a), (b), in violation of the APA, 5 U.S.C. §706(2), and must be set aside.

## FOURTH CAUSE OF ACTION

(Violation of Endangered Species Act, §4(a); Inadequate Regulatory Mechanisms –
Human-Caused Mortality)

83.     Plaintiffs hereby reallege and incorporate Paragraphs 1 through 82.

84.     FWS wrongly concluded that the Wyoming portion of the northern Rockies DPS is not threatened by "the inadequacy of existing regulatory mechanisms."  16 U.S.C. § 1533(a)(1)(D); 77 Fed. Reg. at 55,588-91.  In fact, existing regulatory mechanisms provide for an unreasonably high level of human-caused mortality, including unregulated killing of wolves in the vast majority of the state, where they are classified as "predators," unlimited mortality under defense-of-property laws, and aggressive state management techniques intended to reduce the population of wolves that prey on elk and livestock at any time the minimum wolf population of 100 wolves and 10 breeding pairs is present.

85.     Wyoming law classifies wolves as predators in all but the northwest corner of the state.  This designation subjects wolves to unlimited killing by a full array of aggressive techniques.  For example, traps and snares may be used.  Wyo. Stat. § 23-2-303 (d), (e).  Other methods that may be used on wolves in the predator area include harassing, pursuing, hunting, shooting, or killing wolves "with, from, or by use of any aircraft, automotive vehicle, trailer,

motor-propelled wheeled vehicle, or vehicle designed for travel over snow." Wyo. Stat. § 23-3-306(a).

86.     Management of wolves as trophy game in the northwest corner of Wyoming also offers numerous opportunities for human-caused mortality.  In the trophy game area, Wyoming law allows the Wyoming Game and Fish Department to use, or issue permits for private landowners to use, aerial hunting and hazing, among other techniques, in order to protect private property "including, but not limited to, livestock and other domesticated animals from wolf depredation."  Wyo. Stat. § 23-1-304 (g).Wyoming law further authorizes Wyoming Game and Fish Department to "take any action necessary to reduce the effects of gray wolf predation on wild ungulate herds in areas of the state experiencing unacceptable impacts from gray wolf predation."  Wyo. Stat. § 23-1-304 (g)-(n).  "Unacceptable impact on a wild ungulate population or herd" is broadly defined in the Wyoming regulations to mean "any decline in a wild ungulate population or herd that results in the population or herd not meeting the Commission population management goals, objectives or recruitment levels established for the population or herd." Wyo. Admin. Code GAME HUNT Ch. 21 § 3.  The Wyoming Game and Fish Department is granted the authority to "determine whether a decline in a wild ungulate population or herd constitutes an 'unacceptable impact' and whether wolf predation is a significant factor causing the 'unacceptable impact' based upon the best scientific data and information available."  Id. The subjective nature of the determinations both of whether an impact is "unacceptable" and whether wolf predation is a "significant factor" allows the Wyoming Game and Fish Department broad authority to manipulate these objectives to authorize wolf killing.  Permits allowing landowners or livestock owners to kill wolves shall be issued as long as "the removals authorized by such permits could not reduce the numbers of gray wolves below ten (10) breeding pairs or a

total of one hundred (100) individual gray wolves within the state and outside of Yellowstone

National Park and the Wind River Indian Reservation." Id.

87.     In addition, throughout the state, Wyoming law allows for unpermitted and

unregulated take of wolves that are "doing damage to private property."  Wyo. Stat. § 23-3-

115(c).  Under the statute, this means attacking or threatening livestock or dogs.  Id.  This

provision is incompatible with a recovered wolf population suitable for delisting under the ESA

because it lacks any exception for wolves that are "intentionally baited" into conflicts with

livestock or dogs, and as such does not merely authorize but actually promotes wolf killing.  By

way of comparison, prior to delisting, FWS's wolf-management rule pursuant to ESA section

10(j) also authorized taking of wolves attacking livestock or dogs, but included a safeguard to

prohibit such taking where there is "evidence of intentional baiting, feeding, or deliberate

attractants of wolves."  50 C.F.R. § 17.84(n)(4)(xiii) (2008).  Similarly, Montana's wolf

management regulations provide that "a person may kill a wolf that is attacking, killing, or

threatening to kill a person or livestock, or that is in the act of attacking or killing a domestic

dog"; however, "[a] person may not intentionally bait a wolf with domestic dogs or livestock for

the purposes of killing the wolf."  Mont. Admin. R. 12.9.1305 (11) (2012).  Not only does the

Wyoming statute fail to provide any such intentional baiting exception from the defense of

property law, but Wyoming Game and Fish Department officials have stated at public meetings

in Wyoming that baiting techniques such as staking out a dog or leaving sheep carcasses in an

area of known wolf presence would be lawful for the express purpose of drawing in wolves for

killing.

88.     With respect to the concerns regarding the lack of a baiting exception, the final

rule states that while it is unclear to FWS whether baiting would be allowed under Wyoming

law, FWS was unconcerned that this will become a widespread practice.  This determination is

based on two assumptions: first that baiting is a time-consuming practice that is difficult to carry

out, and second, that landowners would instead prefer to obtain a lethal take permit.  77 Fed.

Reg. at 55,561.  These assumptions in no way provide an adequate substitute for a baiting

exception to the doing damage to private property law.  In particular, these assurances become

meaningless at exactly the point where the defense-of-property law becomes most troubling:

when the wolf population falls below minimum levels.  At that point, despite perhaps the

perceived inconvenience of baiting wolves, killing wolves "doing damage" to property,

including wolves baited into such a conflict, would become the only avenue by which

landowners could continue to kill wolves as state law would prevent the issuance of further lethal

take permits.

89.     Compounding the threat to a recovered wolf population, the defense-of-property

law is not suspended or qualified even if the state's minimum wolf population objectives are

approached or actually breached.  Based on this, as well as the foregoing sources of human-

caused wolf mortality, many of which cannot be halted, FWS's determination that the NRM DPS

is not endangered or threatened by inadequate state regulatory mechanisms is arbitrary,

capricious, contrary to the ESA and not based on the best available science.  16 U.S.C. §

1533(a), (b).

90.     The Delisting Rule is therefore arbitrary, capricious, an abuse of discretion, and

otherwise contrary to the ESA, 16 U.S.C. § 1533(a), (b), in violation of the APA, 5 U.S.C.

§706(2), and must be set aside.

### FIFTH CAUSE OF ACTION

(Violation of Endangered Species Act, §4(a); Significant Portion of the Range)

91.     Plaintiffs hereby reallege and incorporate Paragraphs 1 through 90.

92.     ESA section 4(a) sets forth a five factor test for determining whether a species is threatened or endangered.  16 U.S.C. § 1533(a).  These factors must be analyzed "throughout all or a significant portion of [the species'] range."  Id. § 1532(6), (20).  A species' range includes "major geographical areas in which [a species] is no longer viable but once was."  Defenders of Wildlife v. Norton, 258 F.3d 1136, 1145 (9th Cir. 2001).  The Delisting Rule failed to analyze threats to the gray wolf throughout significant portions of its range within the NRM DPS, instead assuming that the entire range of gray wolves is the DPS area currently occupied by a significant number of gray wolves. 77 Fed. Reg. at 55,576.

93.     In the Delisting Rule, FWS also arbitrarily and capriciously determined that areas of the DPS outside the occupied portions of Wyoming's core recovery area are not significant portions of the gray wolf's range because they do not contain suitable wolf habitat.  Id. at 55,576-77.  This finding is based in part on current and future threats due to development and in part on the lack of resident wolves due to human-caused mortality or agency removal of wolves that have dispersed to these areas.  To disqualify a major portion of wolves' historic range within the DPS due to preventable factors relating to human activities turns the ESA on its head.  The Act's protections are meant to protect species from such threats.

94.     The Delisting Rule is thus arbitrary, capricious, an abuse of discretion, and otherwise contrary to the ESA, 16 U.S.C. § 1533(a), (b), in violation of the APA, 5 U.S.C. §706(2), and must be set aside.

## SIXTH CAUSE OF ACTION

(Violation of Endangered Species Act, §4; failed to consider threats throughout entire DPS)

95.     Plaintiffs hereby reallege and incorporate Paragraphs 1 through 94.

96.     In the Delisting action, FWS failed to consider both the impact the Wyoming

delisting would have on the entire NRM DPS, and the threats posed to the DPS due to inadequate

regulatory mechanisms in Idaho and Montana.  FWS delisted wolves in Idaho and Montana in

2009 on the basis of its "belief" that the states would manage wolves for numbers far above the

Service's inadequate recovery standards, notwithstanding the lack of any such commitments in

state laws or regulations.  The state game commissions have since demonstrated the ease with

which hunting seasons and quotas may be changed.  For example, in 2009, Idaho's statewide

wolf population target was 520 wolves.  See 74 Fed. Reg. at 15,169.  In 2010, Idaho dispensed

with any minimum total wolf population number, committing instead to maintain only 15

"packs" (as opposed to breeding pairs).  Idaho Wolf Conservation and Management Plan (2002)

at 18.  Although FWS previously stated that significant changes in wolf management would

trigger a status review for the species, see 74 Fed. Reg. at 15,133, FWS has not initiated a status

review, nor has the Service even acknowledged the change in Idaho's population commitment.

Instead, FWS continued to rely on an unrealistically high prediction of future wolf numbers in

Idaho and other states.  77 Fed. Reg. at 55,568, 55,569, 55,594.

97.     FWS also referenced unenforceable state intentions with respect to genetic

exchange in its 2009 rule, including alleged state commitments to promote wolf dispersal and a

memorandum of understanding ("MOU") among the Service, Montana, and Idaho that provides

for wolf translocation in the event that genetic problems ever surface.  Id. at 55,568. ("While we

did not rely on the genetics MOU in reaching the above conclusion on population viability, the

MOU is indicative of an intention of the States to maintain the NRM population's

metapopulation structure by encouraging natural dispersal and effective migrants and

implementing management practices that should foster both").  However, because the genetics

MOU does not alter the statutory or regulatory responsibilities of state wildlife managers and fails to establish concrete management actions or thresholds, it too is subject to political caprice or inertia.

98.     Finally, both Montana and Idaho have established 2012-13 regulations that promote far more aggressive wolf killing than FWS previously evaluated, including hunting and trapping within the December through April period FWS previously identified as critical for wolf dispersal.  See 74 Red. Reg. at 15,176.  In Montana, wildlife commissioners extended the general wolf-hunting season closing date from December 31 to February 28 and for the first time added a trapping season, in which each trapper can take three wolves.  See Montana Department of Fish, Wildlife and Parks, 2012-2013 Wolf Season, Quotas and HD Boundaries—Final, available at http://fwp.mt.gov/doingBusiness/insideFwp/commission/meetings/agenda.html?si&coversheet&itemId=27071101 (last visited November 12, 2012).  In Idaho, hunting and trapping of wolves is allowed through March 31 in many parts of the state, and each tag holder may take up to 10 wolves—5 trapped and 5 hunted.  See 2012 Gray Wolf Hunting and Trapping Seasons and General Rules, available at http://fishandgame.idaho.gov/public/docs/rules/bgWolf.pdf (last visited November 12, 2012).

99.     FWS failed to confront the decrease in wolf dispersal that is likely to result from such increasingly aggressive and hostile state wolf management measures.  FWS's failure to reevaluate Montana and Idaho's regulatory changes, which further diminish protections for Northern Rocky Mountain gray wolves and threaten their viability, is arbitrary and contrary to the ESA.  16 U.S.C. § 1533(a)(1)(D).

100.    The Delisting Rule is thus arbitrary, capricious, an abuse of discretion, and otherwise contrary to the ESA, 16 U.S.C. § 1533(a), (b), in violation of the APA, 5 U.S.C. §706(2), and must be set aside.

## SEVENTH CAUSE OF ACTION

(Violation of Endangered Species Act, §4(a); Arbitrary Reliance on Non-Regulatory State Representations in Assessment of Regulatory Mechanisms)

101.    Plaintiffs hereby reallege and incorporate Paragraphs 1 through 100.

102.    FWS arbitrarily relied on non-regulatory state representations, including statements contained in state wolf management guidance documents and other non-binding state representations such as oral representations from Wyoming Game and Fish personnel, in assessing the adequacy of state regulatory mechanisms.  This reliance evinces a failure to distinguish between regulatory and non-regulatory mechanisms.

103.    For example, while FWS relied "primarily" on its review of the Wyoming laws and regulations, it also relied on the Wyoming wolf management plan to "further clarif[y] that the WGFD and WGFC intends to satisfy these statutory and regulatory mandates by maintaining a buffer above minimum population targets." 77 Fed. Reg. at 55,567.  The Delisting Rule states that although "it would have been desirable for Wyoming to have included a reference to a buffer above minimum population targets in State statute and regulations, inclusion of such a concept or a specific numeric buffer is not required for us to consider the buffer described in Wyoming's wolf management plan." Id.  Despite its centrality to the rationale offered in FWS's Delisting Rule, the concept of a population buffer above minimum wolf recovery levels does not appear in Wyoming's regulatory mechanisms.

104.    Accordingly, FWS's assessment of regulatory mechanisms was arbitrary, capricious and not based upon the best available scientific information in violation of the ESA, 16 U.S.C. § 1533(a), (b), and the APA, 5 U.S.C. §706(2), and must be set aside.

## PRAYER FOR RELIEF

THEREFORE, plaintiffs respectfully request that the Court:

1.    Declare that FWS has violated the ESA and its implementing regulations in delisting the Wyoming portion of the NRM DPS;

2.    Set aside FWS's Delisting Rule, and reinstate FWS's prior rule affording ESA protections for gray wolves in the state of Wyoming;

3.    Award plaintiffs their reasonable fees, costs, and expenses, including attorneys fees, associated with this litigation; and

4.    Grant plaintiffs such further and additional relief as the Court may deem just and proper.

Respectfully submitted this 13th day of November, 2012.

_____/s/ Timothy J. Preso_____

Timothy J. Preso
Earthjustice
313 East Main Street
Bozeman, MT 59715
(406) 586-9699
Fax: (406) 586-9695
tpreso@earthjustice.org

*Attorney for Plaintiffs*