# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| DEFENDERS OF WILDLIFE; NATURAL RESOURCES DEFENSE COUNCIL; SIERRA CLUB; and CENTER FOR BIOLOGICAL DIVERSITY | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Case No. 1:12-cv-01833-ABJ |
| KEN SALAZAR, Secretary of the Interior; DAN ASHE, U.S. Fish and Wildlife Service Director; and UNITED STATES FISH AND WILDLIFE SERVICE, | ) ) ) ) ) | |
| Defendants. | ) | |

**[PROPOSED]** *AMICUS CURIAE* **BRIEF OF THE HUMANE SOCIETY OF THE UNITED STATES AND THE FUND FOR ANIMALS IN OPPOSITION TO FEDERAL DEFENDANTS' MOTION TO TRANSFER VENUE TO THE DISTRICT OF WYOMING**

**INTRODUCTION**

Although gray wolves were once abundant across North America, habitat destruction and government bounties that encouraged widespread poisoning, trapping, and hunting of gray wolves nearly extirpated the species from the lower-48 states.  Due to its significant imperilment, the gray wolf was one of the first species listed as endangered when Congress enacted the Endangered Species Act ("ESA") in 1973.  With the protections of the ESA, the gray wolf was shielded from the unrestrained killing that drove it to the brink of extinction and the species began a slow progression towards recovery.  With the protections of the ESA, the gray wolf also became one of the nation's most iconic imperiled species, and its recovery a national concern.

Plaintiffs in this action – Defenders of Wildlife, Natural Resources Defense Council, the Sierra Club, and the Center for Biological Diversity – filed a lawsuit in the District of Columbia on November 13, 2012, challenging the decision of the U.S. Fish and Wildlife Service ("FWS") to delist the Wyoming portion of the Northern Rocky Mountain gray wolf population under the ESA and Administrative Procedure Act ("APA").  Plfs. Comp. ¶ 1, Dkt 1; 77 Fed. Reg. 55,530 (Sept. 10, 2012) (delisting rule).  *Amici* – The Humane Society of the United States ("the HSUS") and the Fund for Animals ("the Fund") – have also filed a lawsuit in the District of Columbia alleging violations of federal law stemming from the same decision, which is also before this Court.  *See The Humane Society of the United States, et al v. U.S. Fish and Wildlife Serv., et al.*, No. 1:12-cv-01965-ABJ (D.D.C filed Dec. 7, 2012).

Federal Defendants have now moved to transfer the present case to the District of Wyoming.  Fed. Def. Transfer Mot., Dkt 3.  Although Federal Defendants have not filed a similar motion in *Amici's* case, a decision to transfer this case to the District of Wyoming would

prejudice the interests of the HSUS and the Fund in litigating their case in their chosen forum, as it would make the filing of a similar transfer motion in *Amici's* case all the more inevitable and make opposition to that motion that much more difficult.   *Amici* therefore oppose Defendants' Motion to Transfer Venue to the District of Wyoming ("Transfer Motion").

In their Transfer Motion, Federal Defendants spend a lot of time attempting to characterize this case as a "local controversy."  Fed. Def. Transfer Br. at 2, 13, Dkt 3.  However, a review of the history and facts leading up to and surrounding the FWS's decision, rather than counsel's briefing, paints a far different picture.  The recovery of the gray wolf – one of the nation's most iconic native predators – clearly implicates national interest.  Indeed, Congress has specifically declared that the nation's imperiled "fish, wildlife, and plants are of esthetic, ecological, educational, historical, recreational and scientific *value to the Nation*."  16 U.S.C. § 1531(a)(3) (emphasis added).  In addition, the FWS's proposed rule to delist the gray wolf in Wyoming garnered significant national media attention and generated nearly *a quarter of a million* public comments, 77 Fed. Reg. at 55,543, indicating the strong national interest in this specific issue.

Moreover, many of the wolves in the Northern Rocky Mountains – the relevant population for purposes of this delisting decision under the ESA – live in or travel through Yellowstone National Park and other federal lands that experience significant public use.  As an apex predator, wolves have a significant impact on the ecosystems in which they live, including that of Yellowstone National Park.  Congress has specifically declared that Yellowstone National Park is part of our "expressions of a single national heritage. . .  [that is to be] preserved and managed for the benefit and inspiration of all the people of the United States. . . ."  16 U.S.C. § 1a-1.  Indeed, in denying the federal government's prior attempt to transfer a case to Wyoming in

which the challenged action also affected the ecosystem of Yellowstone National Park, this court rejected the government's attempt to characterize the controversy as local in nature, noting that "Yellowstone National Park is truly a national icon" and that "conserving the scenery, natural objects and wildlife of that park is a matter of great national importance." *Greater Yellowstone Coalition v. Kempthorne*, No. 07-2111 (EGS), 2008 WL 1862298, at * 6 (D.D.C. Apr. 24, 2008).

In addition to fundamentally mischaracterizing the nature of this controversy, Federal Defendants also implore this court to ignore well-established law commanding that a plaintiff's choice of forum is entitled to substantial deference. This deference is especially relevant here, as *Amici* have independently filed a separate lawsuit to exercise their own rights for judicial review of the decision to delist the last remaining ESA-listed portion of the Northern Rocky Mountain population of gray wolves. The venue choice *of two separate sets of litigants* on an issue that is clearly national in scope should counsel *heavily* in favor of denying Federal Defendants' Motion to Transfer Venue to Wyoming.

## ARGUMENT

Federal Defendants' Motion to transfer this case to the District of Wyoming should be denied. As the Supreme Court has explained, "there is ordinarily a *strong presumption* in favor of the plaintiff's choice of forum, which may be overcome only when the private and public interest factors *clearly* point toward trial in the alternative forum," *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255-56 (1981) (emphasis added), and district courts must "accord[] [plaintiff's] forum choice *substantial weight*" in evaluating a transfer motion. *In re Scott*, 709 F.2d 717, 720 (D.C. Cir. 1983) (emphasis added). Because the plaintiff's choice of forum is typically afforded substantial weight, the moving party has the "*heavy burden*" of demonstrating transfer is appropriate and "a court will not order transfer unless the balance *is strongly in favor of the*

4

*defendant*."  *Boland v. Fortis Const. Co., LLC,* 796 F.Supp.2d 80, 91 (D.D.C. 2011) (internal citation and quotation omitted, emphasis added).

In balancing the plaintiff's choice of forum against the inconvenience to the parties and others, the Court is required to consider various private and public interest factors affecting the convenience of the forum.  *Demery v. Montgomery County, MD,* 602 F.Supp.2d 206, 210 (D.D.C. 2009).   The public interest factors include: "1) the local interest in making local decisions about local controversies, 2) the potential transferee court's familiarity with the applicable law, and 3) the congestion of the transferee court compared to that of the transferor court."  *Id.*  The private interests include: "1) the plaintiff's choice of forum, 2) the defendant's choice of forum, 3) where the claim arose, 4) the convenience of the parties, 5) the convenience of the witnesses, particularly if important witnesses may actually be unavailable to give live trial testimony in one of the districts, and 6) the ease of access to sources of proof."  *Id.*

Again, not all of these factors are weighed equally and there is great deference given to a plaintiff's choice of forum.  *See e.g.*, *Piper Aircraft Co*., 454 U.S. at 255; *Air Line Pilots Ass'n v. Eastern Air Lines*, 672 F. Supp. 525, 526 (D.D.C. 1987).  It is settled law that "a court may not transfer a case from a plaintiff's chosen forum simply because another forum, in the court's view, may be superior to that chosen by the plaintiff."  *Sierra Club v. Van Antwerp,* 523 F.Supp.2d 5, 11 (D.D.C. 2007) (internal citations omitted).  Accordingly, transfer under 28 U.S.C. § 1404(a) "must not be lightly granted."  *Miller v. Insulation Contractors, Inc.* 608 F.Supp.2d 97, 101 (D.D.C. 2009).

Here, Federal Defendants spend most of their time complaining about Plaintiffs' choice of forum – as if it was somehow nefarious for Plaintiffs to have filed this case in this Court rather than in Wyoming.  However, Federal Defendants have not asserted that Plaintiffs' choice of

venue was improper, nor could they made such an assertion in light of the fact that the specific agency decision at issue was signed at FWS headquarters in the District of Columbia, and Plaintiffs were permitted to file this action in any judicial district in which a substantial part of the events giving rise to the claim occurred.  28 U.S.C. § 1391(b)(2).  Further, because this case was brought against the federal government, Plaintiffs were permitted to file it in the judicial district where any of the plaintiffs "reside."  *Id.* § 1391(e)(1).  In other words, the applicable venue statute clearly allows Plaintiffs to choose the District of Columbia as their forum.  It is those wishing to change that venue who bear the "heavy burden" of proving that a proper venue – the one chosen by Plaintiffs – is inconvenient.  Federal Defendants' have clearly failed to meet their burden.

**I.**     **The Public Interest Factors Weigh in Favor of Denying the Transfer Motion**

**A.  This Case Implicates National, Rather than Purely Local, Interests**

As indicated in Plaintiffs' Opposition to Defendants' Motion to Transfer Venue to the District of Wyoming ("Plaintiffs' Opposition"), Plaintiffs' choice of forum here is entirely appropriate as the case is one of national significance.  Federal Defendants' attempt to characterize this controversy as purely local in nature falls far short given the nature of the case and the resources at issue.  The present case deals with whether a federal agency has complied with a federal law that is national in scope, and involves the conservation of two national icons – the gray wolf and our nation's public lands, including Yellowstone National Park, Grand Teton National Park, the National Elk Refuge, and U.S. Forest Service-designated Wilderness Areas. *See* 77 Fed. Reg. at 55,533 (noting the public lands implicated in the delisting rule).

The gray wolf is one of the nation's most iconic native predator species.  Since the listing of the gray wolf under the ESA, the public has been heavily involved in wolf conservation and

recovery efforts, including the formulation of recovery plans and the reintroduction of wolves to Yellowstone National Park.  *See e.g.*, 59 Fed. Reg. 60,266, 60,268 (Nov. 22, 1994) (noting that the FWS received over 160,200 public comments on the draft environmental impact statement ("EIS") analyzing the effects of reintroduction of wolves to Yellowstone).  Indeed, the FWS itself mailed an EIS planning update report to "interested individuals residing in all 50 states and over 40 foreign countries."  *Id.*  The agency also noted that the "magnitude of the response" to the draft EIS on the reintroduction of wolves to Yellowstone "shows the strong interest people have in wolf management."  *Id.*  On the 2009 proposed rule delisting wolves everywhere in the Northern Rocky Mountains except for Wyoming – which a federal court later vacated as violative of the ESA for taking *too narrow* a view of the wolf population at issue and the overall scope of the action – the FWS received *over half a million* public comments.  74 Fed. Reg. 15,123, 15,138 (Apr. 2, 2009).  On the proposed delisting rule that is the subject of this litigation – the rule delisting wolves in Wyoming – the FWS received approximately 250,000 public comments from individuals and organizations across the country representing a broad array of interests, including the general public, environmental organizations, outdoor recreational and agricultural groups, as well as local, state, and federal government agencies.  *See* 77 Fed. Reg. at 55,543.  Such widespread public involvement clearly indicates the national interest and scope of this case.  *See Greater Yellowstone*, 2008 WL 1862298, at * 6 (noting that comments on the proposed rule and draft EIS "came from every state in the United States and 14 foreign countries").

Federal Defendants try to make much of the fact that the animals at issue in the delisting rule lie in the District of Wyoming.  Fed. Def. Transfer Br. at 16-17, Dkt 3.  However, the wolf population in the United States can only be sustained if the natural dispersal of individual

animals from existing packs to form new packs is allowed to occur. *See e.g.*, 77 Fed. Reg. at 55,537; 74 Fed. Reg. at 15,131 (noting the import of dispersal to recovery). In fact, another federal district court – also not in Wyoming – rejected a prior effort to delist in the Northern Rocky Mountains largely because state management plans, and Wyoming's in particular, did not provide for the necessary genetic connectivity of the whole population, and did not ensure that wolves could disperse as necessary to maintain natural pack dynamics. *Defenders of Wildlife v. Hall*, 565 F.Supp.2d 1160, 1169-70 (D.Mont. 2008). Moreover, the movement of wolves from Wyoming to other states has been well-documented. For example, radio-collared Yellowstone wolves have traveled to Colorado, Michelle Nijhuis, *Prodigal Dogs: Have Gray Wolves Found a Home in Colorado*, HIGH COUNTRY NEWS, Feb. 20, 2010, and the most famous Yellowstone wolf ever – "rock star," who the National Park Service has estimated to have been seen by over a million park visitors – was very recently killed after leaving the state of Wyoming. Nate Schweber, *"Famous" Wolf is Killed Outside Yellowstone*, N.Y. TIMES, Dec. 8, 2012, at A34. Indeed, the FWS itself based its delisting decision, in part, on its contested finding that wolves in Wyoming disperse into other areas within the Northern Rocky Mountains, and that such dispersal will continue following delisting. *See* 77 Fed. Reg. at 55,543, 55,550. The notion that this decision only affects wolves in Wyoming is preposterous.

Further, according to this Court, the geographic location of the particular land at issue in a case – and by extension the particular species of wildlife – does not necessarily mean that the effects of the litigation are limited to where that land – or wildlife – is found. *Sierra Club*, 523 F.Supp.2d at 13. As was the case in *Sierra Club*, that proposition is particularly true where, as here, the issue is "whether federal agencies complied with federal law" and that law is the ESA, which contains an express declaration from Congress "of the national character of the statute[]."

*Id.* (citing 16 U.S.C. § 1531(a) as "declaring the *national value* of endangered species") (emphasis in original).  Indeed, this court has repeatedly denied motions to transfer in instances where the underlying statute – and thus the interests it sought to protect – were national in scope. *See e.g.*, *Otay Mesa v. Dep't of Interior*, 584 F.Supp.2d 122, 126 (D.D.C. 2008) (denying a motion to transfer a challenge to California regarding a critical habitat designation of land located in San Diego County because the protection of endangered species is "a national concern," not just a local one); *Wilderness Soc'y v. Babbitt,* 104 F.Supp.2d 10, 13-14 (D.D.C. 2000) (denying government's motion to transfer to Alaska, finding that the impact of development of the National Petroleum Reserve planning area in Alaska was not local to Alaska but rather the product of "a national policy decision determining the use of scarce national resources").  In other words, because this case deals with whether the FWS complied with the ESA – a federal law, the violation of which is national in scope – this case is one that inherently implicates national interests and there will be far more than localized impacts.  The national character of this particular case is further evidenced by the fact that gray wolves once roamed across the lower-48 states.  *See* 77 Fed. Reg. at 55,535.

In addition to involving the conservation of an iconic species in which the public has repeatedly expressed a strong interest, the case also involves the national treasure that is Yellowstone National Park.  As the FWS itself has noted, as a keystone predator the gray wolf "is an integral component of the ecosystems to which it typically belongs."  FWS, *Species Profile: Gray Wolf (Canis lupus)*, http://ecos.fws.gov/speciesProfile/profile/speciesProfile.action ?spcode=A00D (last updated Dec. 18, 2012).  Indeed, the Delisting Rule details the importance of the Yellowstone wolves to the FWS's decision to delist the Wyoming portion of the Northern Rocky Mountain gray wolf population.  *See* 77 Fed. Reg. at 55,535 (describing reliance directly

on the Yellowstone wolf population to provide a buffer against aggressive Wyoming management).  The environmental impacts to Yellowstone from hunting wolves in the Northern Rocky Mountains have already been felt -- at least eleven Yellowstone National Park wolves have been killed by hunters in Wyoming, Idaho, and Montana when they left the park boundaries and traveled into the surrounding states, including eight radio-collared wolves on whom biologists relied to conduct scientific research.  Nate Schweber, *"Famous" Wolf is Killed Outside Yellowstone*, N.Y. TIMES, Dec. 8, 2012, at A34.

The Delisting Rule's impact on Yellowstone-area resources alone makes this forum appropriate.  As highlighted in Plaintiffs' Opposition, this court has specifically held that cases involving impacts to Yellowstone National Park "stem[] from the formulation of national policy on an issue of national significance."  *Greater Yellowstone*, 2008 WL 1862298, at *5; *see also Greater Yellowstone Coalition v. Bosworth*, 180 F.Supp.2d 124, 129 (D.D.C. 2001) (denying the government's motion to transfer the case to Montana, noting that the litigation, which involved a challenge to grazing permits and the effects of the permits on bison in Yellowstone, had "national significance").  Litigation affecting the Park and its wildlife are inherently of interest to the nation as a whole because "Yellowstone National Park is truly a national icon" and "[m]ore than 70% of visitors to Yellowstone and Grand Teton National Parks are from states other than Wyoming, Montana and Idaho, the States in which those Parks are located in whole or in part."  *Greater Yellowstone*, 2008 WL 1862298, at *6.  As noted by this court, "[t]he first case challenging the winter use plan for the parks was litigated in this District *precisely because conserving the scenery, natural objects and wildlife of that park is a matter of great national importance*."  *Id.* (emphasis added) (referencing *Fund for Animals v. Norton*, 294 F.Supp.2d 92, 102-103 (D.D.C 2003)).

Moreover, Federal Defendant's myopic focus on the local effects in Wyoming ignores the much broader geographic scope of the rule.  Wyoming wolves are part of what the FWS has designated the Northern Rocky Mountain distinct population segment ("DPS") – an area that encompasses all or part of six states.  *See* 74 Fed. Reg. at 15,125 (describing the DPS boundaries).  In delisting wolves in Wyoming, the ESA requires the FWS to consider the impacts of delisting on the entire Northern Rocky Mountain DPS, including wolves in Wyoming, as well as wolves in Montana, Idaho, Washington, Oregon, and Utah.  *See Defenders of Wildlife v. Salazar*, 729 F. Supp. 2d 1207, 1217 (D.Mont. 2010) ("Congress defined 'species' to be nothing smaller than a [distinct population segment]").  Federal Defendants' attempt to emphasize the local nature of this case not only underscores the legal error in their delisting analysis, but ignores significant precedent in this circuit holding that cases that involve Yellowstone National Park or deal with whether the federal government has violated the ESA have effects that are nationally important in scope and significance.

## B.  The Remaining Public Interest Factors Do Not Favor Transfer

As explained in Plaintiffs' Opposition, the remaining public interest factors do not favor transfer.  Although the District of Wyoming previously heard one case involving the delisting of wolves in the region, the present case is not a "continuation" of the prior Wyoming decision as Federal Defendants contend in their Transfer Motion.  *See* Fed. Def. Transfer Br. at 14.  Rather, this is a new case based on new delisting decision with new claims that were not at issue in the previous Wyoming case.  Indeed, the Wyoming decision focused solely on one issue – the requirement for a statewide "trophy game" area.  *See Wyoming v. U.S. Dep't of Interior*, No. 09-CV-118J, 2010 WL 4814950, at *45 (D. Wyo. Nov. 18, 2010) – a claim that Plaintiffs have not brought in this case, nor one that *Amici* have brought in their case.  In other words, the District of

Wyoming has not examined the claims at issue in this case, nor many of the facts pertinent to such claims.  Its ruling on a single issue in no way demonstrates that transferring the case to Wyoming would serve judicial economy.

Moreover, any suggestion on the part of Federal Defendants in their Transfer Motion that Wyoming has some special knowledge of issues involving wolf delisting is refuted by the fact that the prior case was just one among many in the long-running controversy involving the FWS's attempts to delist wolves in the Northern Rocky Mountains – numerous courts across the country have heard such cases.  *Defenders of Wildlife v. Sec'y, U.S. Dep't of Interior*, 354 F. Supp. 2d 1156 (D. Or. 2005); *Nat'l Wildlife Fed. v. Norton*, 386 F. Supp. 2d 553 (D. Vt. 2005); *Defenders of Wildlife v. Hall*, 565 F. Supp. 2d 1160 (D.Mont. 2008).

In addition, as also explained in Plaintiffs' Opposition, this case does not require any significant interpretation of state law or management plan for which the District of Wyoming is specially qualified.  The laws governing this case are federal laws, specifically Section 4 of the ESA, 16 U.S.C. § 1533, and the Administrative Procedure Act, 5 U.S.C. § 706(2), not any state law.  While the Court's analysis of one of Plaintiffs' claims – whether the FWS's determination that existing regulatory mechanisms are adequate to protect the gray wolf under the ESA[1] – will require some examination of Wyoming law, it will also require an examination of the laws of Montana and Idaho.  Additionally, that analysis will require only an examination of the relevant laws on their face.  The question will be whether those laws are sufficient to support the FWS's determination that the requirements for delisting under the ESA have been met – no complex interpretation will be required.  *See Schmid Labs., Inc. v. Hartford Acc. and Indem. Co*., 654 F.

---

[1] The HSUS and the Fund have raised a similar claim in their lawsuit.  *See* Plfs. Complaint ¶ ¶ 85-92, Dkt. 1, *The Humane Society of the United States, et al v. U.S. Fish and Wildlife Serv., et al.*, No. 1:12-cv-01965-ABJ (D.D.C filed Dec. 7, 2012).

Supp. 734, 737 n.11 (D.D.C. 1986) (the potential transferee court's familiarity with governing law "is properly given greater weight when the applicable state law is unclear"). But, more importantly, in conducting this review, this Court will examine the administrative record to determine whether the FWS made a rational decision and whether that decision complied with the mandates of the ESA and the APA. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983). These are federal laws with which all federal courts are presumed equally familiar, *Al-Ahmed v. Chertoff*, 564 F. Supp. 2d 16, 20 (D.D.C. 2008), and certainly laws that this Court has been frequently called on to interpret. Accordingly, the District of Wyoming is not more familiar with the law governing this case.

Finally, the national scope of this litigation and the fact that Plaintiffs have filed the case in their home forum, weigh heavily in favor of denying the transfer motion. Accordingly, while the District of Wyoming may have less of a caseload than that of the District of Columbia, "congestion alone is not sufficient reason for transfer." *Starnes v. McGuire*, 512 F.2d 918, 932 (D. C. Cir. 1974). Moreover, this Court has repeatedly declined to transfer cases to the District of Wyoming. *See e.g.*, *Greater Yellowstone*, 2008 WL 1862298, at *8; *Fund for Animals v. Norton*, 352 F.Supp.2d 1, 2 (D.D.C 2005). Accordingly, the public interest factors weigh in favor of denying the Transfer Motion.

II.     **The Private Interests Weigh in Favor of Denying the Transfer Motion**

A. **Plaintiffs' Choice of Forum is Entitled to Substantial Deference**

The first private interest factor – Plaintiffs' choice of forum – clearly supports maintaining the case in the District of Columbia. Again, as the Supreme Court itself explained in *Piper Aircraft Co.*, "there is ordinarily a *strong presumption* in favor of the plaintiff's choice of forum, which may be overcome only when the private and public interest factors *clearly point*

13

toward trial in the alternative forum." 454 U.S. at 255-56 (emphasis added); *see also Gemological Institute of America, Inc. v. Thi-Dai Phan*, 145 F.Supp.2d 68, 71 (D.D.C. 2001) ("[d]eference to a plaintiff's choice of forum is particularly strong where plaintiff has chosen his home forum"); *Air Line Pilots Ass'n*, 672 F. Supp. at 526 ("Plaintiff's choice of forum is given paramount consideration and the burden of demonstrating that an action should be transferred is on the movant").   Nonetheless, Federal Defendants seek to dismiss the deference owed to Plaintiffs' choice of forum because, according to Federal Defendants, the case lacks connection to the District and because only one Plaintiff resides in the District.  Fed. Def. Transfer Br. at 18-19.

First, contrary to Federal Defendants' suggestion, courts give great deference to a plaintiff's choice of forum when it is the plaintiffs' home forum *or* when the forum has strong connections to the claims asserted.  *See e.g., Akiachak Native Community v. Dep't of Interior*, 502 F.Supp.2d 64, 67 (D.D.C. 2007) ("[a] plaintiff's choice of forum is usually accorded great deference, unless the plaintiff chooses a forum that is not his home and that has no substantial connection to the subject matter of the action.").   Courts have therefore emphasized that "'[d]eference to the plaintiff's choice of forum is particularly strong where the plaintiff has chosen his home forum.'"   *Great Socialist People's Libyan Arab Jamahiriya v. Miski*, 496 F.Supp.2d 137, 144 (D.D.C. 2007) (quoting *Reiffin v. Microsoft Corp*., 104 F.Supp.2d 48, 52 (D.D.C. 2000)); *c.f. Harris v. Republic Airlines, Inc.*, 699 F.Supp 961, 963-64 (D.D.C. 1988) (plaintiffs were "foreigners in the District of Columbia" and "presumption in favor of plaintiff's choice of forum is a much less significant factor when the plaintiff is a foreigner in the chosen forum."); *National Ass'n of Home Builders v. E.P.A.,* 675 F.Supp.2d 173, 179-80 (D.D.C. 2009) (deference to plaintiff's choice of forum is diminished when there is "only an 'attenuated'

14

connection between the controversy and the plaintiff's chosen forum *and* the that [sic] forum is not the plaintiff's home forum. . .") (emphasis added).

In this case, not only does Plaintiff Defenders of Wildlife reside in the District of Columbia – indeed, it has its national headquarters in the District of Columbia – but the very claims it seeks to advance here in its home forum complements the work it does in this forum. Similarly, the HSUS – the lead plaintiff in *Amici's* case – also resides in, and has its national headquarters in this District and its claims complement the work it does in this forum. None of the Plaintiffs in this action, or the plaintiffs in the lawsuit filed by *Amici*, reside in the District of Wyoming. Notably, the cases Federal Defendants rely on in an attempt to minimize the deference to Plaintiffs' choice of forum are cases in which the plaintiffs had not filed suit in their home forum, and in several cases, the requested transfer was to the forum where the plaintiffs resided – facts which weighed heavily in the courts' decisions. *See Trout Unlimited v. U.S. Dep't of Agric.*, 944 F.Supp. 13 (D.D.C. 1996) (neither plaintiff was a resident of District of Columbia); *Shawnee Tribe v. U.S.*, 298 F.Supp.2d 21 (D.D.C. 2002) (tribal Plaintiffs did not reside in District of Columbia); *Hawksbill Sea Turtle v. F.E.M.A.*, 939 F.Supp. 1 (D.D.C 1996) (every one of the plaintiffs resided in the district to which the government sought to transfer the case).

Moreover, as discussed in detail in Plaintiffs' Opposition and above, this case does have connections to the District of Columbia because it raises issues of substantial national significance and interest and the impact from the outcome of this case will be felt here in the District of Columbia. More specifically, Plaintiff Defenders of Wildlife is headquartered here, each of the other Plaintiffs has offices here, and all three Federal Defendants – the FWS, Secretary Salazar, and Director Ashe – are located in the District of Columbia. Indeed, Director

15

Ashe signed the final delisting rule on August 22, 2012.  77 Fed. Reg. at 55,604.  Moreover, the impact of a ruling in this case against Federal Defendants will most certainly have an effect on the Federal Defendants at their headquarters here in the District in future actions in which Federal Defendants interact with various field offices.

In addition, while Federal Defendants emphasize that only one of the Plaintiffs resides in the District of Columbia, Fed. Def. Transfer Br. at 19,[2] this in no way diminishes the substantial deference afforded a plaintiff when choosing to bring a case in their home forum.  Indeed, this Court has already specifically rejected such a notion.  *See Sierra Club*, 523 F.Supp.2d at 11 ("[o]f the five plaintiffs that filed suit in this Court, at least one-Clean Water Action- has its headquarters in the District of Columbia, and is thus clearly a resident of this District.  Consequently, this plaintiff is entitled to a strong presumption in favor of the chosen forum. . ."); *see also Otay Mesa*, 584 F.Supp.2d at 125 (denying government's motion to transfer where "most of the Plaintiffs reside within the [proposed venue]").  Thus, "[r]egardless of whether the remaining plaintiffs are entitled to a presumption in favor of the chosen forum, . . .[one Plaintiff's] District of Columbia residency is sufficient to tip the balance in favor of this Court's strong presumption in favor of venue in this District."  *Sierra Club*, 523 F.Supp.2d at 11-12.

**B.  The Remaining Public Interest Factors Do Not Favor Transfer**

The remaining public interest factors either weigh against transfer or are neutral, and should not disrupt Plaintiffs' choice of forum, or the choice of forum of the HSUS and the Fund as Plaintiffs in the related litigation.  Plaintiffs chose to file in this Court because it was more convenient for them – all have offices here, yet only one of the Plaintiffs even has an office in Wyoming.  Similarly, the HSUS and the Fund both have offices in the District of Columbia and

---

[2] As noted above, the HSUS also resides in the District of Columbia.

are represented by counsel in the District of Columbia.  Moreover, all three Defendants are based in the District of Columbia.  All three Defendants regularly defend their regulatory actions, including their ESA listing decisions, in this forum.  *See e.g.*, *Colorado River Cutthroat Trout v. Salazar*, No. 09-2233-PLF, ---F.Supp.2d ---, 2012 WL 4890100 (D.D.C. Oct 16, 2012); *Illinois Commercial Fishing Ass'n v. Salazar*, 867 F.Supp.2d 108 (D.D.C. 2012).

Moreover, because this case will be determined on the basis of the administrative record, and without trial, *see, e.g.*, 5 U.S.C. § 706 (in reviewing an agency regulation "the court shall review the whole record"); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420 (1971) ("review is to be based on the full administrative record that was before the [agency] at the time [it] made [its] decision"), convenience with respect to evidentiary matters (*e.g.*, discovery and location of fact witnesses) is not an issue.  *See e.g.*, *Otay Mesa,* 584 F.Supp.2d at 125 (the "private interest factors are of limited value in this case. . . [because] there is unlikely to be any discovery or trial since this case involves judicial review of agency action that is preserved in the administrative record, and the case likely will be resolved on summary judgment on the basis of that administrative record."); *Cloud Found. v. Salazar*, 738 F. Supp. 2d 42, 45 (D.D.C. 2010) ("the Court defers to the Plaintiffs' choice of forum, particularly where the case may not involve many, if any, witnesses and will likely rest heavily on an administrative record already available to both parties"); *Sheraton Operating Corp. v. Just Corporate Travel*, 984 F.Supp. 22, 26 (D.D.C. 1997) ("[e]ven if a transfer would significantly benefit [the][defendant[ ], the Court will not grant the motion if the result merely would shift the inconvenience from [d]efendant [ ] to [plaintiff]; the net convenience must increase." ) (internal quotations omitted).  Accordingly, the private interest factors weigh in favor of denying the motion to transfer.

**CONCLUSION**

In sum, Federal Defendants have failed to overcome their heavy burden of proving why transfer is appropriate.  The venue choice of *two separate sets of litigants* – the Plaintiffs in this case and *Amici* in their related case – on an issue that implicates one of the nation's most iconic species of wildlife and some of the nation's most treasured public lands, is entitled to substantial deference and should not be disturbed.  Accordingly, Federal Defendants' Motion to Transfer Venue to the District of Wyoming should be denied.

Respectfully Submitted,

Ralph Henry
D.C. Bar No. 982586
The Humane Society of the United States
2100 L Street, N.W.
Washington, DC 20037
(202) 676-2324
rhenry@humanesociety.org
*Attorney for Amicus Curie*