UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| DEFENDERS OF WILDLIFE, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No.  1:12-CV-01833-ABJ |
| vs. | ) | |
| | ) | |
| SALLY JEWELL, et al., | ) | |
| | ) | |
| Defendants, and | ) | |
| | ) | |
| SAFARI CLUB INT'L, et al., | ) | |
| | ) | |
| Defendant-Intervenors. | ) | |
| | ) | |
| THE HUMANE SOCIETY OF THE UNITED STATES, et al., | ) ) | |
| | ) | |
| Plaintiffs, | ) | Case No.  1:12-CV-01965-ABJ |
| | ) | |
| vs. | ) | |
| | ) | |
| U.S. FISH AND WILDLIFE SERVICE, et al., | ) | |
| | ) | |
| Defendants, and | ) | |
| | ) | |
| SAFARI CLUB INT'L, et al., | ) | |
| | ) | |
| Defendant-Intervenors. | ) | |
| | ) | |

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

BACKGROUND .....................................................................................................2

    I.      Gray Wolves In The Northern Rocky Mountains.................................2

    II.     The Endangered Species Act ...............................................................3

    III.    Gray Wolf Reintroduction To The Northern Rocky Mountains............4

    IV.    FWS's Prior Delisting Efforts..............................................................5

    V.      The Challenged Wyoming Delisting Rule ............................................8

ARGUMENT .........................................................................................................11

    I.      STANDARD OF REVIEW ................................................................11

    II.     FWS ARBITRARILY DETERMINED THAT WOLVES ARE NOT ENDANGERED BY THE INADEQUACY OF EXISTING REGULATORY MECHANISMS ........................................................12

          A.     FWS Wrongly Accepted Wyoming's Refusal To Legally Commit To An Essential Buffer Over Bare-Minimum Wolf Population Levels ............................................................................................13

          B.     FWS Disregarded Wyoming's Failure To Impose Necessary Controls On Issuance Of Lethal Take Permits ...........................17

          C.     FWS Irrationally Discounted Wyoming's Authorization For Unregulated Taking Of Wolves "Doing Damage To Private Property"......................................................................................22

          D.     FWS's Failures Corrupted The Agency's Analysis Of Other Wyoming Regulatory Mechanisms............................................25

    III.    FWS UNLAWFULLY DISCOUNTED THE ONGOING THREAT OF INADEQUATE GENETIC CONNECTIVITY....................................28

          A.     Current Wolf Dispersal Into the GYA Does Not Meet FWS's "One-Effective-Migrant-Per-Generation" Standard ..................29

          B.     Wolf Dispersals Into The GYA Will Diminish Under State Management................................................................................32

1. State Management Will Inhibit Genetic Connectivity By Reducing The Size Of The Northern Rockies Wolf Population ........................................................................................33

2. State Management Will Inhibit Genetic Connectivity By Increasing The Likelihood That Dispersing Wolves Will Be Killed..............................................................................................36

3. FWS's Reliance On Human-Assisted Genetic Exchange Was Unlawful ...............................................................................38

C. FWS's Attempt To Dismiss The Importance Of Genetic Connectivity Is Contrary To Science And FWS's Own Recovery Standard .........................................................................................39

IV. FWS WRONGLY DETERMINED THAT WOLVES ARE NOT IMPERILED THROUGHOUT A "SIGNIFICANT PORTION" OF THEIR RANGE ...................................................................................40

CONCLUSION...........................................................................................45

# TABLE OF AUTHORITIES

## FEDERAL CASES

Am. Wildlands v. Kempthorne,
    530 F.3d 991 (D.C. Cir. 2008).................................................................................11

*Biodiversity Legal Found. v. Babbitt,
    943 F. Supp. 23 (D.D.C. 1996)..........................................................................12, 19

*Carlton v. Babbitt,
    26 F. Supp. 2d 102 (D.D.C. 1998)..........................................................................31

Citizens to Preserve Overton Park, Inc. v. Volpe,
    401 U.S. 402 (1971).................................................................................................11

*Colo. River Cutthroat Trout v. Salazar,
    898 F. Supp. 2d 191 (D.D.C. 2012)........................................................................41

*Ctr. for Biological Diversity v. Morgenweck,
    351 F. Supp. 2d 1137 (D. Colo. 2004)...................................................................12

Defenders of Wildlife v. Babbitt,
    958 F. Supp. 670 (D.D.C. 1997).............................................................................31

*Defenders of Wildlife v. Hall,
    565 F. Supp. 2d 1160 (D. Mont. 2008)................................................6, 28, 32, 40

*Defenders of Wildlife v. Norton,
    258 F.3d 1136 (9th Cir. 2001) ................................................................................41

Defenders of Wildlife v. Salazar,
    729 F. Supp. 2d 1207 (D. Mont. 2010)....................................................................7

Georgetown Univ. Hosp. v. Bowen,
    821 F.2d 750 (D.C. Cir. 1987)................................................................................45

*Humane Soc'y of U.S. v. Kempthorne,
    579 F. Supp. 2d 7 (D.D.C. 2008)............................................................................45

Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.,
    463 U.S. 29 (1983)............................................................................................11, 22

Natural Res. Def. Council v. Daley,
    209 F.3d 747 (D.C. Cir. 2000)................................................................................12

New England Coal. on Nuclear Pollution v. Nuclear Regulatory Comm'n,
    727 F.2d 1127 (D.C. Cir. 1984)..............................................................................35

\*<u>Or. Natural Res. Council v. Daley</u>,
    6 F. Supp. 2d 1139 (D. Or. 1998) ............................................................12, 14, 17

<u>Purepac Pharm. Co. v. Thompson</u>,
    354 F.3d 877 (D.C. Cir. 2004) .................................................................42

\*<u>S.W. Ctr. for Biological Diversity v. Norton</u>,
    2002 WL 1733618 (D.D.C. 2002) ..........................................................14, 20

<u>Tenn. Valley Auth. v. Hill</u>,
    437 U.S. 153 (1978)...................................................................................3, 18

<u>Trout Unlimited v. Lohn</u>,
    559 F.3d 946 (9th Cir. 2009) ...................................................................39

<u>United States v. Monzel</u>,
    641 F.3d 528 (D.C. Cir. 2011) .................................................................18

\*<u>WildEarth Guardians v. Salazar</u>,
    741 F. Supp. 2d 89 (D.D.C. 2010) ..........................................................41

<u>Wyoming v. U.S. Dep't of Interior</u>,
    2010 WL 4814950 (D. Wyo. Nov. 18, 2010) ...................................8, 45

### STATUTES AND LEGISLATIVE MATERIALS

5 U.S.C. § 706(2)(A)......................................................................................11

16 U.S.C. § 1531 <u>et seq.</u> ................................................................................1
    § 1531(b) ...............................................................................................38
    § 1532(3) ...............................................................................................38
    § 1532(6) ...............................................................................................40
    § 1532(16) .............................................................................................6
    § 1532(20) .............................................................................................40
    § 1533(a)(1) ..........................................................................................3
    § 1533(a)(1)(D) ............................................................................. *passim*
    § 1533(b)(1)(A) .............................................................................3, 29, 39, 40
    § 1536(a)(2)...........................................................................................4
    § 1538(a)(1)(B)......................................................................................4
    § 1539(a)(2)(B)(iv)...............................................................................39
    § 1539(j) ................................................................................................5

**STATE STATUTES AND LEGISLATIVE MATERIALS**

Wyo. Stat. Ann. § 23-1-304(a)................................................................................10, 14, 33

§ 23-1-304(n)................................................................................................17, 19

§ 23-2-303(d)........................................................................................................25

§ 23-2-303(e)........................................................................................................25

§ 23-3-115(a)..................................................................................................22, 23

§ 23-3-115(c)....................................................................................20, 22, 23, 25

§ 23-3-306(a) .......................................................................................................26

**REGULATIONS AND ADMINISTRATIVE MATERIALS**

50 C.F.R. § 17.84(n)(4)(xiii)....................................................................................23

§ 424.11(d) ........................................................................................................3

59 Fed. Reg. 34,273 (July 1, 1994).........................................................................39

68 Fed. Reg. 15,804 (Apr. 1, 2003) ..........................................................................2

71 Fed. Reg. 43,410 (Aug. 1, 2006).........................................................................25

73 Fed. Reg. 10,514 (Feb. 27, 2008) ............................................................ 6, 28, 39-40

74 Fed. Reg. 15,123 (Apr. 2, 2009) ................................................................ *passim*

76 Fed. Reg. 61,782 (Proposed Oct. 5, 2011) .................................................... 8-9, 34

77 Fed. Reg. 55,530 (Sep. 10, 2012) ............................................................... *passim*

**STATE REGULATIONS AND ADMINISTRATIVE MATERIALS**

Mont. Admin. R. 12.9.1301(1) ................................................................................33

Wyo. Admin. Code GAME HUNT Ch. 21 § 3(b)........................................................19

§ 4(a)(i) ........................................................................ *passim*

§ 4(a)(ii) ........................................................................21

§ 6(a)......................................................................22, 23

§ 6(b)(i) ..................................................................17, 19

§ 6(d)..............................................................................24

§ 7(a)......................................................................17, 21

§ 7(b)(iii)........................................................................21

**OTHER AUTHORITIES**

Oxford English Dictionary (2d ed. 1989) ...........................................................12, 18

**INTRODUCTION**

This case concerns the U.S. Fish and Wildlife Service's ("FWS") decision to remove the gray wolf in Wyoming from the list of endangered and threatened species under the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 et seq.  See 77 Fed. Reg. 55,530 (Sep. 10, 2012) ("Wyoming Delisting Rule").[1]  In the Wyoming Delisting Rule, FWS prematurely declared victory in the wolf-recovery process and unlawfully lifted the key ESA protections that have allowed wolves across the northern Rocky Mountains to rebound from a historic slaughter.

The agency's decision exposed gray wolves in Wyoming to a host of new threats, including the state's post-delisting regulatory scheme, which opens a free-fire zone on wolves across 83.5% of Wyoming and leaves wolves inadequately protected in the remainder.  FWS's decision also increased the danger to gray wolves in Wyoming from ongoing threats, including a persistent lack of adequate genetic exchange with other wolf populations that is essential to prevent eventual inbreeding problems, but is certain to worsen under state management.

In an effort to justify this outcome, FWS engaged in an elaborate exercise of wishful thinking.  The agency forgave numerous critical gaps in Wyoming's post-delisting regulatory structure for wolf management, repeatedly assuming that Wyoming would voluntarily undertake essential conservation actions not promised in state law or sometimes even in the state's informal pronouncements.  FWS also assumed away the wolf population's genetic-exchange problems, speculating without basis as to likely post-delisting wolf population levels and resulting genetic interchange among northern Rocky Mountains wolves despite widespread wolf killing.

However, the ESA requires more than hope and faith to preserve imperiled wildlife; it requires enforceable regulatory mechanisms to address the key threats to wolf survival.  It also

---

[1] Citations to items in the Federal Register are to the official citation; these documents are also available in the Administrative Record.  Citations to the Administrative Record begin with AR.

demands that FWS rest its delisting conclusions on the best available scientific information rather than unsupported assumptions and speculation.  Because FWS failed to follow law and science in delisting wolves in Wyoming, plaintiffs respectfully ask this Court to grant their summary judgment motion, vacate the Wyoming Delisting Rule, and reinstate the prior rule protecting wolves in Wyoming under the ESA.

## BACKGROUND

### I.      Gray Wolves In The Northern Rocky Mountains

The recovery of the gray wolf in the northern Rocky Mountains represents one of our nation's greatest conservation success stories—but it is not yet completed.  The gray wolf is the largest wild member of the dog family.  77 Fed. Reg. at 55,535.  Wolves' fur is frequently a grizzled gray, but ranges from pure white to coal black.  Id.  In the northern Rockies, wolves' most common prey are elk, white-tailed and mule deer, moose, bighorn sheep, mountain goats, pronghorn antelope and bison.  Id.

Wolves are social animals normally living in packs of 2 to 12 animals.  Id.  Wolf packs usually consist of a breeding pair (the "alpha male and female"), their offspring, and an occasional unrelated wolf.  68 Fed. Reg. 15,804, 15,805 (Apr. 1, 2003).  In general, only the alpha male and female of a wolf pack breed and produce pups.  77 Fed. Reg. at 55,535.

Gray wolves once were abundant throughout all of North America except in extreme desert regions, with a historic population estimated at 350,000 to 400,000 wolves.  AR 1128.  However, as European-American settlers moved west, they targeted wolves for eradication.  77 Fed. Reg. 55,535; AR 637.  As a result, wolves were quickly eliminated from most of their historic range through a combination of government-sponsored bounties and pest eradication campaigns; settlers' almost pathological hatred of wolves and retaliation against them for real

and perceived threats to property, safety, or game species; and wolves' natural vulnerability due to their large home ranges, low density, and susceptibility to poison.  AR 637; AR 1130; AR 3391.  Cultural factors also drove these eradication efforts; as one researcher put it, "[m]ore than any other animal in North America, wolves have a long mythological history.  Rumors and myths about wolves attacking people, decimating ungulate populations and frequently attacking livestock are still widely believed."  AR 1115.  By 1930, this campaign of killing exterminated the wolf population in the northern Rockies, including Yellowstone National Park, and the wolf disappeared from almost all the lower forty-eight states.  AR 1452; AR 1130.

## II.    The Endangered Species Act

Because of this history of wanton slaughter, gray wolves were among the first species to be listed by the Secretary of the Interior as endangered when changing American attitudes about wildlife led Congress 1973 to pass the Endangered Species Act—"the most comprehensive legislation for the preservation of endangered species ever enacted by any nation."  Tenn. Valley Auth. v. Hill, 437 U.S. 153, 180 (1978); see AR 112.  The ESA provides for species to be listed or delisted by FWS as endangered or threatened "because of any of the following five factors:" habitat destruction; "overutilization for commercial, recreational," or other purposes; "disease or predation"; "the inadequacy of existing regulatory mechanisms"; or other "natural or manmade factors."  16 U.S.C. § 1533(a)(1); see 50 C.F.R. § 424.11(d) (addressing delisting).  The ESA requires FWS to make such determinations "solely on the basis of the best scientific and commercial data available."  16 U.S.C. § 1533(b)(1)(A); 50 C.F.R. §424.11(d).

While listed under the ESA, endangered wildlife species are shielded from a variety of harms, including any federal action that would likely jeopardize the continued existence of the

species, 16 U.S.C. § 1536(a)(2), and any "taking"—i.e., killing, harming, or harassing—of individual members of the species by any person, see id. § 1538(a)(1)(B).

### III.    Gray Wolf Reintroduction To The Northern Rocky Mountains

At the time of listing, naturally dispersing gray wolves from Canada were beginning to colonize northwestern Montana.  AR 23798.  In 1980, FWS developed a recovery plan to reestablish and maintain viable wolf populations in their former northern Rockies range "where feasible."  77 Fed. Reg. at 55,536.  As revised in 1987, this plan specified recovery criteria requiring at least 10 breeding pairs of wolves for a minimum of three successive years in three distinct recovery areas:  northwestern Montana, central Idaho, and the Yellowstone National Park area; the plan also encouraged connectivity between these areas.  Id.

To facilitate this recovery plan, FWS in the 1990s began planning to reintroduce wolves to their former northern Rockies range.  See id. at 55,531.  As part of that process, FWS reviewed and updated its wolf-recovery goals in a 1994 Environmental Impact Statement ("1994 EIS").   The 1994 EIS concluded that "[t]hirty or more breeding pairs comprising some 300+ wolves in a metapopulation (a population that exists as partially isolated sets of subpopulations) with genetic exchange between subpopulations" would be viable for the long term because it would "contain enough individuals in successfully reproducing packs that were distributed over distinct but somewhat connected large areas."  Id. at 55,536.  FWS measures the number of breeding pairs to assess wolf recovery because wolf populations are maintained by packs that successfully raise pups; each successfully reproducing pack contains one breeding pair.  Id. at 55,537.  As to the genetic-exchange criterion for recovery, scientific research demonstrates that loss of genetic variation may cause increased juvenile mortality, AR 11350, and diminished fitness and physical deformities, AR 5429.  FWS's 1994 EIS cautioned that "[t]he importance of movement of individuals between sub-populations cannot be overemphasized."  AR 7834.

4

Following completion of the 1994 EIS, FWS moved forward with the northern Rockies wolf reintroduction pursuant to ESA section 10(j), 16 U.S.C. § 1539(j), which authorizes release of "experimental, non-essential" populations of listed species and allows flexible tailoring of the ESA's management requirements to facilitate such releases.  77 Fed. Reg. at 55,531.   In 1995-96, FWS reintroduced 66 gray wolves into Yellowstone National Park and central Idaho.  AR 1038; 77 Fed. Reg. at 55,531.  Since then, the northern Rockies wolf population has prospered, with 1,774 wolves estimated in the region at the end of 2011, of which 328 were in Wyoming. 77 Fed. Reg. at 55,535, 55,539.  In Wyoming, wolf packs have formed primarily in mountainous, forested habitat in and around the Greater Yellowstone Area ("GYA").  Id. at 55,574-75.  The GYA is one of the largest contiguous blocks of suitable wolf habitat within the northern Rocky Mountains region, including Yellowstone and Grand Teton National Parks; the John D. Rockefeller, Jr. Memorial Parkway; several National-Forest wilderness areas (the Absaroka Beartooth, North Absaroka, Washakie, and Teton Wilderness Areas); and other public-land roadless areas.  Id. at 55,577.

## IV.    FWS's Prior Delisting Efforts

While wolf numbers in the northern Rockies have surpassed FWS's numeric recovery objectives, it became apparent over the course of the agency's wolf-recovery program that the genetic-exchange requirement of its recovery criteria could not be so easily attained.  Despite limited wolf dispersal between the three subpopulations of northern Rockies wolves, the GYA subpopulation continues to be the most isolated, receiving insufficient natural gene flow from either northwestern Montana or central Idaho to satisfy FWS's recovery standard.   AR 11355-370 (vonHoldt et al. 2010); 77 Fed. Reg. at 55,593 (citing Oakleaf et al. 2006; vonHoldt et al. 2007).

Nevertheless, FWS in 2008 initiated efforts to remove the northern Rockies wolf population from the list of species protected under the ESA.  In February 2008, FWS designated a northern Rocky Mountains wolf "distinct population segment" ("DPS")[2] under the ESA, found state wolf management laws and plans sufficient to safeguard that population after delisting, and removed the DPS from the list of ESA-protected species.  See 73 Fed. Reg. 10,514, 10,517, 10,549 (Feb. 27, 2008); see also Defenders of Wildlife v. Hall, 565 F. Supp. 2d 1160, 1172-75 (D. Mont. 2008).

In response, a group of conservation organizations—including most plaintiffs here— challenged FWS's February 2008 delisting rule in the federal district court for Montana.  See Defenders of Wildlife, 565 F. Supp. 2d at 1162-64.  On July 18, 2008, that court granted plaintiffs' preliminary-injunction motion and reinstated ESA protections for the northern Rockies wolves.  Id. at 1178.  The court found that plaintiffs were likely to succeed on the merits of their claim that FWS had arbitrarily departed from its own recovery standard requiring genetic exchange among the wolves in northwestern Montana, central Idaho, and the GYA.  Id. at 1171-72.  The court also ruled that plaintiffs were likely to succeed on their claim that FWS acted arbitrarily in declaring Wyoming's regulatory mechanisms adequate to maintain a recovered wolf population.  See id. at 1175-76.  Rather than attempt to defend its 2008 delisting rule on the merits, FWS moved for a voluntary remand and vacatur, which the Montana court granted in October 2008.  77 Fed. Reg. at 55,532.

FWS concluded that remand by emerging with a new northern Rockies wolf delisting proposal in April 2009.  In its 2009 decision, FWS delisted wolves throughout the northern Rocky Mountains DPS except Wyoming.  Id.  FWS retained Wyoming's wolves under ESA

---

[2] The definition of "species" under the ESA includes "any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature."  16 U.S.C. § 1532(16).

protections, determining that Wyoming's legal framework did not provide adequate regulatory mechanisms to maintain Wyoming's share of a recovered wolf population if ESA protections were removed.  Id.  FWS was particularly concerned that "[a] central component of Wyoming's regulatory framework is its plan to designate wolves as predatory animals across at least 88 percent of the State" where unlimited wolf killing would be permitted by any means at any time, observing that "[i]n the past Wyoming has ... almost without exception encouraged wolf take to drive the wolf population down to minimum recovery levels."  74 Fed. Reg. 15,123, 15,149, 15,170 (Apr. 2, 2009).  Only in the remaining 12% of the state would wolves be managed as a "trophy game" species whose killing would be limited by hunting seasons, bag limits, and authorized hunting methods.  Id.  FWS recommended that Wyoming "develop a statewide trophy game management designation," and stated that until Wyoming revised its statutes, regulations and management plan, and obtained FWS approval, wolves in Wyoming would remain protected under the ESA.  Id. at 15,149; 77 Fed. Reg. at 55,532.  FWS also raised the concern that the "predator" status of wolves in 88% of Wyoming would impede essential genetic exchange, finding that "the extent of the predatory animal area certainly limits most opportunity for genetic and demographic connectivity, a condition that will assist in sustaining wolf recovery in the GYA."  74 Fed. Reg. at 15,149.

Conservation plaintiffs—again including most plaintiffs here—challenged the 2009 partial delisting in the Montana federal district court.  In response, that court in August 2010 vacated the 2009 rule, concluding that the ESA required that the northern Rocky Mountains wolf DPS must be listed or delisted in its entirety.  See Defenders of Wildlife v. Salazar, 729 F. Supp. 2d 1207, 1228 (D. Mont. 2010).  In addition to the Montana case, the State of Wyoming and others challenged the 2009 partial delisting in federal district court in Wyoming.  77 Fed. Reg. at

55,532.  In a ruling issued in November 2010, that court found FWS's recommendation that the entire State of Wyoming be designated a "Trophy Area" to be arbitrary and capricious.  <u>See</u> <u>Wyoming v. U.S. Dep't of Interior</u>, 2010 WL 4814950 (D. Wyo. Nov. 18, 2010).   However, the Wyoming court "did not order [FWS] to accept [Wyoming's] plan," 77 Fed. Reg. at 55,551, instead leaving to FWS on remand the determination of an adequate size and location for Wyoming's "Trophy Area."  <u>See</u> <u>Wyoming</u>, 2010 WL 4814950, at *45.

In response to the Montana court's ruling, FWS in October 2010 published a final rule reinstating federal protections for the entire northern Rocky Mountains wolf DPS.  77 Fed. Reg. at 55,532.  However, following relisting, Congress passed, and President Obama signed, appropriations legislation that included a rider directing FWS to reissue the 2009 delisting rule. <u>Id.</u> at 55,532-33. This rider specified that it "shall not abrogate or otherwise have any effect on the order and judgment" issued by the Wyoming district court concerning the 2009 partial delisting.  AR 502.  FWS complied with the rider in May 2011, leaving Wyoming as the only state in the northern Rocky Mountains in which wolves remained protected by the ESA. 77 Fed. Reg. at 55,533.

**V.    The Challenged Wyoming Delisting Rule**

In early 2011, FWS began discussions with Wyoming regarding the substance of a state management plan to justify delisting Wyoming's wolves. 77 Fed. Reg. at 55,533; <u>see also</u> AR 13716; AR 13794.  FWS and Wyoming eventually negotiated an agreement in principle and Wyoming revised its wolf-management plan to reflect that agreement.  <u>See</u> AR 14970; AR 15015; 76 Fed. Reg. 61,782, 61,788 (Proposed Oct. 5, 2011).  Accordingly, on October 5, 2011, FWS issued a proposed rule to remove ESA protections from the gray wolf in Wyoming.  76

Fed. Reg. at 61,782.  In the proposed rule, FWS stated that changes to Wyoming laws and regulations would be required before delisting could be finalized.  See id. at 61,788.

After FWS promulgated the proposed delisting rule, the Wyoming legislature and Game and Fish Department acted to amend the state's wolf management laws.  AR 23540; AR 3866; AR 25246.  FWS then conducted a peer review of the Wyoming wolf-management framework, soliciting comments from five scientists.  AR 718.  The peer reviewers' comments raised significant questions about both the sufficiency of the Wyoming plan and its capability of implementation under Wyoming law, prompting Wyoming to issue an Addendum to its wolf-management plan.  AR 936-39; AR 12345.  FWS then solicited a second round of peer-review comments.  AR 858.  Members of the peer-review panel remained unconvinced by Wyoming's Addendum.  For example, Dr. John Vucetich of Michigan Technological University stated that, while the Addendum further described the Wyoming approach, it failed to address the scientific substance of his criticisms, including the inadequacy of Wyoming's regulatory mechanisms.  AR 859-62.  Nevertheless, FWS required no further changes to Wyoming's regulatory regime for wolf management.  See AR 11479 (Wyoming Regulations signed April 25, 2012); AR 12212 (Wyoming 2012 wolf legislation document dated March 1, 2012).

That regulatory regime continues to authorize widespread wolf killing.  Despite Wyoming's augmented wolf-management plan and amended statutes and regulations, Wyoming law still treats wolves as "predatory animals" that can be shot on sight, with no bag limit, year-round in approximately 83.5% of the state.  77 Fed. Reg. at 55,538.  As FWS repeatedly determined, "no wolf packs or breeding pairs will persist in the predator area of Wyoming."  77 Fed. Reg. at 55,587; accord id. at 55,558, 55,559.  In another approximately 15.2% of the state, consisting of Yellowstone and Grand Teton National Parks and surrounding lands in northwest

Wyoming, wolves will be managed as "trophy game" animals that are subject to regulated

hunting outside of the parks. AR 28976. An area adjoining the southwest border of this "Trophy

Area" and encompassing about 1.3% of Wyoming (the "flex zone") will vary seasonally between

"trophy" and "predator" management of wolves, with "predator" management controlling at all

times except from October 15 to March 1 each year. 77 Fed. Reg. at 55,534. Accordingly, the

portion of Wyoming managed for eradication of wolves as "predators" during all or most of the

year encompasses about 84.8% of the state—only 3.2% less than under Wyoming's prior

"predator-zone" regime. Further, even in the regulated "Trophy Area" and seasonally "trophy"-

managed "flex zone," Wyoming law contains numerous provisions for wolf killing, including

requiring issuance of lethal take permits to property owners and allowing property owners to kill

any wolf doing damage to private property. 77 Fed. Reg. at 55,585-86 (canvassing Wyoming

wolf-killing authorizations).

        In addition, even in the "Trophy Area," Wyoming law guarantees only that the state will

maintain at least 10 breeding wolf pairs and 100 individual wolves outside of Yellowstone

National Park and the Wind River Indian Reservation at each year's end. See Wyo. Stat. § 23-1-

304(a); Wyo. Admin. Code GAME HUNT Ch. 21 § 4(a)(i). This is the minimum that FWS

deemed necessary to "satisfy Wyoming's contribution to [northern Rocky Mountains] gray wolf

recovery." 77 Fed. Reg. at 55,538. While FWS required Montana and Idaho to maintain at least

15 breeding pairs and 150 wolves to ensure a margin of safety over minimum recovery levels,

the agency accepted a lesser requirement for Wyoming with the expectation that Yellowstone

National Park wolves would ensure an equivalent statewide wolf population.[3] See id. Still, FWS

stated that, even outside of Yellowstone Park, Wyoming "must … maintain a buffer" over its

_____

[3] The Wind River Reservation "typically contains a small number of wolves," none of which has
ever satisfied the definition of a breeding pair. 77 Fed. Reg. at 55,600.

minimum requirements of 10 breeding pairs and 100 wolves to ensure that those minimum

requirements are satisfied.  Id. at 55,556.

Despite the state's extensive legal mechanisms for wolf killing, FWS proceeded to delist

wolves in Wyoming.  FWS deemed the population recovered and announced that Wyoming had

adopted adequate regulatory mechanisms to justify delisting under the ESA.  77 Fed. Reg. at

55,591, 55,601.  Accordingly, on September 10, 2012, FWS issued its final Wyoming Delisting

Rule removing the Wyoming portion of the northern Rocky Mountains wolf DPS from the ESA

list of threatened and endangered species.  Id. at 55,604.

## ARGUMENT

FWS's decision to delist wolves in Wyoming was plagued by numerous irrational

judgments and disregarded essential requirements of the Endangered Species Act.

## I.     STANDARD OF REVIEW

FWS's ESA listing determinations are subject to review under the Administrative

Procedure Act, providing for invalidation of agency action that is "arbitrary, capricious, an abuse

of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); see Am.

Wildlands v. Kempthorne, 530 F.3d 991, 997 (D.C. Cir. 2008).  While this standard does "not

empower[] [courts] to substitute [their] judgment for that of the agency," it requires "a thorough,

probing, in-depth review" of challenged decisions.  Citizens to Preserve Overton Park, Inc. v.

Volpe, 401 U.S. 402, 415-16 (1971).  Administrative action must be vacated where the agency:

> relied on factors which Congress has not intended it to consider, entirely failed to
> consider an important aspect of the problem, offered an explanation for its
> decision that runs counter to the evidence before the agency, or is so implausible
> that it could not be ascribed to a difference in view or the product of agency
> expertise.

Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 43 (1983).  Even

where issues involve scientific judgments within the scope of agency expertise, the agency still

must rationally explain its findings to warrant judicial deference.  Natural Res. Def. Council v. Daley, 209 F.3d 747, 755 (D.C. Cir. 2000) (holding that agency "cannot rely on reminders that its scientific determinations are entitled to deference in the absence of reasoned analysis to cogently explain why" its actions satisfy statutory mandates) (quotations omitted).

## II.    FWS ARBITRARILY DETERMINED THAT WOLVES ARE NOT ENDANGERED BY THE INADEQUACY OF EXISTING REGULATORY MECHANISMS

FWS violated the ESA in determining that Wyoming wolves, and therefore the northern Rocky Mountains wolf population, are not endangered or threatened due to "the inadequacy of existing regulatory mechanisms."  16 U.S.C. § 1533(a)(1)(D); see 77 Fed. Reg. at 55,591.  The ESA does not leave the fate of imperiled wildlife to the vagaries of informal governmental policies, non-binding assurances, voluntary undertakings, or promises of future action.  Rather, consistent with the statutory word "regulatory"—the adjective form of "regulate," meaning "to control, govern, or direct by rule," 13 Oxford English Dictionary 524 (2d ed. 1989)—the ESA demands that conservation measures essential to species viability be embodied in specific legal mandates with "some method of enforcing compliance," Or. Natural Res. Council v. Daley, 6 F. Supp. 2d 1139, 1155 (D. Or. 1998); see also Ctr. for Biological Diversity v. Morgenweck, 351 F. Supp. 2d 1137, 1141 (D. Colo. 2004) (FWS improperly relied on conservation agreement with states to reject ESA listing of fish species where the agreement "does not legally bind the states to implement such actions"); Biodiversity Legal Found. v. Babbitt, 943 F. Supp. 23, 26 (D.D.C. 1996) (rejecting FWS reliance on "possible future actions" to deny ESA listing of wolf species).

Here, FWS disregarded this requirement.  FWS recognized that "human-caused mortality is the most significant issue influencing" wolf-population levels, and that it must be "adequately regulated"; further, population targets must be sufficient "to allow for other potential unforeseen

12

or uncontrollable sources of mortality." 77 Fed. Reg. at 55,588. Nevertheless, when faced with Wyoming's repeated refusals to adopt needed regulatory measures to ensure wolf survival, FWS time and again overlooked these regulatory shortcomings and relied on non-regulatory, voluntary undertakings by the state to supply critically important limitations on widespread wolf killing under Wyoming law. Moreover, FWS disregarded the fact that even Wyoming's non-regulatory assurances failed to promise the explicit measures that FWS itself identified as essential to ensure the viability of wolves. FWS's analysis of Wyoming's "regulatory mechanisms" therefore violated the ESA.

> **A.**     **FWS Wrongly Accepted Wyoming's Refusal To Legally Commit To An Essential Buffer Over Bare-Minimum Wolf Population Levels**

FWS failed to require an adequate regulatory commitment to ensure that Wyoming maintains specified wolf-population minimums of at least 10 breeding pairs and at least 100 wolves in Wyoming outside of Yellowstone National Park and the Wind River Indian Reservation at the end of the calendar year. FWS stated that Wyoming "must … maintain a buffer to consistently meet its minimum management targets." 77 Fed. Reg. at 55,556 (emphasis added). As FWS has explained:

> Attempts to maintain any wildlife population at bare minimum levels are unlikely to be successful. As with all wildlife species, periodic disturbance or random events will occur. … Managing at minimal levels increases the likelihood that periodic disturbance or random events will leave the population below management objectives. … Managing to minimal recovery levels also increases the chances of genetic problems developing in the GYA population and would reduce the opportunities for demographic and genetic exchange in the WY portion [of] the GYA.

74 Fed. Reg. at 15,172. Thus, "an adequate buffer above minimum population objectives" is necessary to "ensure uncontrollable sources of mortality do not drop the population below this minimum population level." 77 Fed. Reg. at 55,535.

Nevertheless, despite recognizing that, among the northern Rockies states harboring wolves, "Wyoming will likely be the closest to its minimum management targets," 77 Fed. Reg. at 55,567, and "social carrying capacity among hunters and WY for wolves appears low," AR 13696, FWS accepted Wyoming's refusal to adopt any regulatory measure requiring an adequate buffer to ensure achievement of minimum wolf population levels.  77 Fed. Reg. at 55,556 ("We decided against requiring Wyoming to provide a specific numeric buffer above … minimum management targets.").  Wyoming law specifies that the state shall set wolf hunting seasons and bag limits annually only "as necessary to reasonably ensure <u>at least ten (10) breeding pairs of gray wolves and a total of at least one hundred (100) individual gray wolves</u> are located in this state outside of Yellowstone National Park and the Wind River Indian Reservation at the end of the current calendar year."  Wyo. Stat. § 23-1-304(a) (emphasis added); <u>accord</u> Wyo. Admin. Code GAME HUNT Ch. 21 § 4(a)(i).  Wyoming's regulatory mechanisms for wolf management therefore promise the bare-minimum 10 breeding wolf pairs and 100 individual wolves—but no more.

Attempting to patch over this gap, FWS asserted in its regulatory-mechanisms analysis that "Wyoming <u>intends</u> to maintain an adequate buffer above minimum population targets," citing Wyoming's 2012 Addendum to its Gray Wolf Management Plan.  77 Fed. Reg. at 55,590 (emphasis added); <u>see also</u> AR 12347-49 (Addendum discussion of buffer).  However, Wyoming's mere statement of <u>intent</u>, embodied in an unenforceable Addendum to an unenforceable plan, does not constitute a "regulatory mechanism[]" to ensure implementation of this essential conservation measure.  16 U.S.C. § 1533(a)(1)(D); <u>see</u> <u>Or. Natural Res. Council</u>, 6 F. Supp. 2d at 1155 ("Voluntary actions … are necessarily speculative."); <u>see also</u> <u>S.W. Ctr. for Biological Diversity v. Norton</u>, 2002 WL 1733618, at *9 (D.D.C. 2002) ("The operative question

14

[in addressing adequacy of regulatory mechanisms under the ESA] is whether a set of regulations is concrete and specific enough to ensure that it will in fact be implemented.").[4]

Even putting aside its unenforceable, non-regulatory character, the Wyoming Addendum cited by FWS fails even to provide adequate conservation assurances.  The Addendum principally outlines a bullet-point list of reasons why Wyoming believes it would have an incentive to maintain a population buffer.  See AR 12348.  However, even FWS recognized the impropriety of relying only on perceived state incentives to supply adequate wolf-protection mechanisms, stating that "we did not rely on this in making our decision."  77 Fed. Reg. at 55,590.  Moreover, the Addendum fails to state any explicit buffer level or range or to offer any other indication of what an "adequate buffer" might be.  AR 12348.  Under the plain terms of the Addendum relied upon by FWS, there is nothing to foreclose the possibility that the state's idea of an "adequate buffer" might turn out to be 10 wolves, 5 wolves, or even a lone wolf.

FWS's own peer-review process for the Wyoming Delisting Rule emphasized this shortcoming.  One reviewer, Dr. Vucetich, stated that "Wyoming's apparent resistance to specifying the size of the buffer raises concern that the buffer will be inadequate."  AR 930. Another reviewer, Dr. L. Scott Mills of the University of Montana, echoed Dr. Vucetich's concern, stating that the Addendum "do[es] not provide a scientifically based response that articulates a commitment to a meaningful population buffer."  AR 921.  In synthesizing the peer review, FWS's third-party peer-review coordinator stated that Dr. Vucetich's points "have force"

---

[4] FWS's experience in the wolf-delisting context only underscores how ephemeral such unenforceable state promises may be.  In its 2009 delisting of wolves in Idaho and Montana, FWS relied on an Idaho wolf-management plan that "call[ed] for maintaining the population near or above the 2005 levels (approximately 520 wolves)," 74 Fed. Reg. at 15,169, but, after Congress delisted wolves in Idaho, Idaho suspended the cited plan, see 77 Fed. Reg. at 55,566.

and are "well made."  AR at 856.  Nevertheless, FWS failed to require any specific buffer, much

less any regulatory commitment to a buffer, before delisting wolves in Wyoming.

FWS's efforts to justify its unlawful treatment of this critical issue are meritless.  FWS

asserted that "the buffer necessary to achieve" Wyoming's minimum wolf-population

requirement "will change over time" with the development of new scientific information, such

that "an arbitrary, mandatory buffer based on current data … is unlikely to be an accurate

predictor of long term population response after delisting."  77 Fed. Reg. at 55,556.  Regardless

whether an adequate buffer should be stated numerically or otherwise, the key point is that

Wyoming made no regulatory commitment to any buffer of any type.  FWS also claimed that

"the minimum recovery criteria for Wyoming will always be greatly exceeded" because the

population of wolves outside Yellowstone National Park and the Wind River Reservation will be

buffered by the park wolf population.  Id. at 55,571.  However, FWS repeatedly predicted that

future Yellowstone National Park wolf-population levels will stabilize around four to six

breeding pairs and 50 to 100 wolves.  Id. at 55,552, 55,554, 55,571.  Given that the predicted

future range of the park's wolf population drops as low as four breeding pairs and 50 wolves,

Wyoming cannot ensure compliance with FWS's wolf-recovery requirement of "at least 15

breeding pairs and at least 150 wolves statewide" without at least meeting its own minimum

requirements of 10 breeding pairs and 100 wolves on lands outside the park.  Id. at 55,538.

Meeting those requirements, in turn, means that Wyoming "must" manage for a buffer over

minimum wolf-population levels to ensure that uncontrollable mortality sources do not drive the

population below minimum levels, id. at 55,556, but Wyoming's regulatory mechanisms offer no

assurance that any buffer—much less a sufficient buffer—will be maintained.  FWS violated the

16

ESA by accepting Wyoming's mere statement of intent as a regulatory commitment to this key

conservation measure.  See Or. Natural Res. Council, 6 F. Supp. 2d at 1155.

> **B.      FWS Disregarded Wyoming's Failure To Impose Necessary Controls On Issuance Of Lethal Take Permits**

Further demonstrating FWS's irrational assessment of adequate "regulatory mechanisms"

to protect wolves in Wyoming after delisting, 16 U.S.C. § 1533(a)(1)(D), FWS arbitrarily

disregarded Wyoming's failure to impose necessary regulatory limits on wolf mortality from the

issuance of lethal take permits under state law.  A Wyoming statute and regulation provide for

"issuance of permits to landowners or livestock owners for removing wolves which are

harassing, injuring, maiming or killing livestock or other domesticated animals and for wolves

occupying geographic areas where chronic wolf predation occurs."  Wyo. Stat. Ann. § 23-1-

304(n); accord Wyo. Admin. Code GAME HUNT Ch. 21 § 6(b)(i).  FWS failed in three respects

to assure that critical limitations were placed on issuance of these kill permits.

First, compounding its unlawful acceptance of Wyoming's failure to enact regulatory

guarantees for an adequate population buffer, FWS failed to ensure that lethal take permits will

not be allowed to annihilate any population buffer that might naturally exist.  Wyoming's statute

and regulation provide that lethal take permits for wolves "shall be issued as long as the

removals authorized by such permits could not reduce the numbers of gray wolves below ten

(10) breeding pairs or a total of one hundred (100) individual gray wolves within the state and

outside of Yellowstone National Park and the Wind River Indian Reservation."  Wyo. Stat. Ann.

§ 23-1-304(n) (emphasis added); accord Wyo. Admin. Code GAME HUNT Ch. 21 §§ 4(a)(i),

7(a).  This use of the mandatory term "shall" appears to require Wyoming to issue lethal take

permits even if doing so would eliminate any population buffer and reduce the wolf population

under Wyoming's jurisdiction to bare-minimum levels that FWS itself deemed inadequate to

ensure compliance with recovery standards.  See AR 23133-34 (FWS official raising concern that Wyoming lethal-take-permit statute will "mandate lethal take permits to drive the wolf population down to minimum recovery levels"); see also United States v. Monzel, 641 F.3d 528, 531 (D.C. Cir. 2011) ("'shall' is a term of legal significance, in that it is mandatory or imperative, not merely precatory") (quotations omitted).

Nevertheless, FWS dismissed this concern, claiming that the word "could" in Wyoming's lethal-take-permit statute "(as opposed to would or will) provides authority for the [Wyoming Game and Fish Department ("WGFD")] to manage for a buffer above the minimum target and limit control from lethal take permits, if necessary, to maintain an adequate minimum buffer." 77 Fed. Reg. at 55,557.  FWS placed more weight on "could" than that single word can bear. "Could" in the context of Wyoming's statute reflects a conditional form of "can," meaning "to be able."  2 Oxford English Dictionary 817-18.  As a matter of plain language, the Wyoming statute mandates issuance of lethal take permits as long as they are not "able" to reduce the wolf population below 10 breeding pairs and 100 wolves—a condition that would be satisfied even if there remained only 11 breeding pairs and 101 wolves under state jurisdiction.  While FWS concocted a less straight-forward interpretation, its choice to gamble the fate of wolves on such a tenuous statutory reading defies the ESA's policy of "'institutionalized caution.'"  Tenn. Valley Auth., 437 U.S. at 194.

However, even accepting FWS's strained interpretation, the cited statutory language does not provide an adequate conservation assurance.  At best this statutory language leaves Wyoming with some uncertain quantum of discretion—but not a clear commitment, much less an enforceable one—to manage for an undefined buffer above minimum wolf population levels in the face of landowner demands for lethal take permits.  This amounts to no more than an

opportunity for Wyoming in the future to voluntarily exercise whatever discretion it may retain under the statute.  However, the ESA does not permit FWS to rely on Wyoming's mere "possible future actions" as a "regulatory mechanism[]" to ensure adequate implementation of this aspect of Wyoming's lethal-take-permit program that FWS itself deemed "important[]."  Biodiversity Legal Found., 943 F. Supp. at 26; 16 U.S.C. § 1533(a)(1)(D); 77 Fed. Reg. at 55,557.

Second, FWS failed to ensure that Wyoming's provision for mandatory issuance of lethal take permits based on the nebulous "harassing" of livestock or pets by wolves would not create a loophole allowing excessive wolf killing in response to trivial conflicts.  See Wyo. Stat. Ann. § 23-1-304(n); accord Wyo. Admin. Code GAME HUNT Ch. 21 § 6(b)(i).  During the rulemaking process, FWS's regional ESA recovery coordinator stated that issuance of lethal take permits in response to wolves "harassing" livestock "has the potential to be a significant source of mortality that is not currently authorized by the existing [FWS wolf "take" rule under ESA section 10(j)] and is not allowed in either Montana or Idaho."  AR 24663.  The FWS official continued:

> Harass differs from the other justifications for declaring an area a chronic depredation area in that no injury is required and evidence to support or refute claims of harassment would be difficult to generate.  Thus, if landowners can claim wolf harassment without proof the entire trophy game area could be designated as a chronic depredation [area] and every landowner in the trophy game area would then be entitled to a lethal take permit until or unless minimum population objectives are threatened.  This could drive the population down toward minimums.

AR 24663.[5]

Despite this concern, FWS ultimately signed off on the "harassment" language in Wyoming's lethal-take-permit statute.  See 77 Fed. Reg. at 55,585-86.  In so doing, FWS relied

---

[5] Wyoming regulations define a "chronic wolf depredation area" as an area within the Trophy Area where state game officials have "verified that wolves have repeatedly (twice or more within a two (2) month period immediately preceding the date on which the owner applies for a lethal take permit) harassed, injured, maimed or killed livestock or domestic animals."  Wyo. Admin. Code GAME HUNT Ch. 21 § 3(b) (emphasis added).

on an assurance that "Wyoming will require that WGFD staff verify that wolves were present
and involved in activities that would directly indicate an actual attack was likely; such activity
must be an immediate precursor to actual biting, wounding, grasping, or killing, such as chasing
or molesting." Id.  However, the cited assurance came not through any change in Wyoming law,
but rather through a May 15, 2012 letter to FWS from Wyoming Gov. Matt Mead, who said
"[t]here is a broad range of actions by wolves that could be loosely defined as 'harassment'" but
"the Department intends to use the meaning of 'harassment' as implied in Wyoming statutes."
AR 3867 (emphasis added).  As the governor explained, the statute from which such meaning
would be "implied" was not even the lethal take statute itself, but rather a separate statute, Wyo.
Stat. Ann. § 23-3-115(c), that provides for taking of wolves "doing damage to private property"
and is not referenced in the state's lethal-take-permit laws.  AR 3867.

This approach again fails to comply with the ESA.  Governor Mead's unenforceable
letter assurance is obviously not a regulatory mechanism, and the statutory language from which
the governor "implied" his assurance to FWS does not even apply in the issuance of lethal take
permits for "harassment" of livestock or pets by wolves.  This is not a "concrete," "specific"
conservation measure that is secure enough "to ensure that it will in fact be implemented." S.W.
Ctr. for Biological Diversity, 2002 WL 1733618, at *9.  Once again, when confronted with an
important gap in Wyoming's regulatory regime for wolf management, FWS did not insist upon
regulatory changes but instead unlawfully relied on an informal assurance that is as transitory as
the political term of the state officer who provided it.  Once again, FWS violated the ESA.

Third, FWS failed to secure an important regulatory commitment from Wyoming that
issuance of lethal take permits would not be permitted to obstruct essential genetic connectivity
between wolves in the Greater Yellowstone Area and other subpopulations elsewhere in the

20

northern Rockies.  Because genetic exchange between the largely isolated GYA-area wolves and other wolf subpopulations is an essential component of FWS's northern Rockies wolf-recovery standard, see 77 Fed. Reg. at 55,538, FWS identified potential lethal-take-permit interference with genetic exchange as a "Major Issue" when reviewing Wyoming's draft wolf-management regulations.  AR 24877.  For this reason, FWS "strongly recommend[ed]" that Wyoming's draft regulatory provision for suspending and canceling lethal take permits "also include reference to Wyoming's stated goal of maintaining genetic connectivity" because otherwise "Wyoming does not have the authority to limit sources of mortality (as recently and explicitly committed to in the State wolf plan addendum) if necessary to achieve and maintain connectivity." Id.

Wyoming never responded to this concern.  While Wyoming's final regulations added a new section 4(a)(ii) to its wolf-management regulations asserting the state's commitment "to managing gray wolves in Wyoming to ensure genetic diversity and connectivity issues do not threaten the population," Wyo. Admin. Code GAME HUNT Ch. 21 § 4(a)(ii), Wyoming failed to make this provision a basis for suspending or canceling lethal take permits.  Instead, Wyoming's regulations for issuing, suspending, and canceling lethal take permits are crafted to ensure compliance only with Wyoming's asserted commitment, in the separate regulatory section 4(a)(i), to manage for at least 10 breeding pairs and 100 wolves outside Yellowstone National Park and the Wind River Reservation.  Id. Ch. 21 § 4(a)(i); see id. Ch. 21 § 7(a) (requiring issuance of lethal take permits unless doing so will "prevent the Department from achieving the management objective described in Section 4(a)(i)" but not 4(a)(ii)), § (7)(b)(iii) (requiring suspension and cancellation of lethal take permits if authorized wolf killing "may prevent the Department from achieving the management objectives described in Section 4(a)(i)" but not 4(a)(ii)).  As a result, Wyoming's wolf-management regulations continue to mandate issuance of

lethal take permits even where authorized wolf-killing would impede essential genetic connectivity between GYA wolves and other wolf subpopulations.  For example, Wyoming's regulations preclude the state from withholding requested lethal take permits for the purpose of promoting genetic connectivity within the state's "flex zone," which FWS identified as important for "[m]aintenance of genetic exchange." 77 Fed. Reg. at 55,595.

Despite identifying this point as a "Major Issue" during the rulemaking process, FWS's final Wyoming Delisting Rule glossed over this problem, merely asserting that Wyoming would respond to inadequate genetic exchange by "reducing mortality quotas in dispersal corridors or reducing total mortality quotas over a series of years to increase the probability that migrants into the population survive and reproduce."  77 Fed. Reg. at 55,596.  This rationale ignores the fact—identified by FWS itself—that Wyoming lacks statutory authority to reduce mortality by terminating the issuance or implementation of lethal kill permits "if necessary to achieve and maintain connectivity."  AR 24877.  FWS's failure to respond to this admittedly "Major Issue" further demonstrates the arbitrary and unlawful nature of its conclusion regarding the adequacy of Wyoming's regulatory mechanisms under the ESA.  See Motor Vehicles Mfrs. Ass'n, 463 U.S. at 43.

### C.    FWS Irrationally Discounted Wyoming's Authorization For Unregulated Taking Of Wolves "Doing Damage To Private Property"

FWS also unlawfully dismissed the impacts of unregulated wolf mortality under Wyoming's law allowing killing of wolves "doing damage to private property."  Under a Wyoming statute, a property owner or employee or lessee of the property owner may "immediately" take and kill any gray wolf "doing damage to private property."  Wyo. Stat. Ann. § 23-3-115(a), (c); accord Wyo. Admin. Code GAME HUNT Ch. 21 § 6(a).  "'[D]oing damage to private property' means actual biting, wounding, grasping or killing of livestock or a dog, or

chasing, molesting or harassing of livestock or a dog by a wolf that would indicate to a reasonable person that actual biting, wounding, grasping or killing of the livestock or dog is likely to occur at any moment."  Wyo. Stat. Ann. § 23-3-115(c).

Importantly, unlike even the inadequate lethal-take-permit provisions discussed supra, this wolf-killing authorization contains no safeguard constraining wolf killing when the state's wolf population approaches or even drops below the minimum population level of 10 breeding pairs and 100 wolves, let alone any population buffer above those minimums.  See id.; Wyo. Admin. Code GAME HUNT Ch. 21 § 6(a).  Given that FWS relied on Wyoming's ability to limit human-caused mortality "[s]hould Wyoming's wolf population approach minimum management objectives," 77 Fed. Reg. at 55,555, this provision for unregulated wolf mortality at any population level represents a gaping hole in Wyoming's regulatory wolf-management structure that FWS arbitrarily disregarded.

This provision is even more problematic because Wyoming's "doing-damage-to-private-property" statute contains no exception to disallow killing of wolves when they have been intentionally baited into situations where livestock or dogs are threatened—e.g., when a rancher places livestock carcasses for the purpose of attracting wolves into a pasture where they can be shot.  See Wyo. Stat. Ann. § 23-3-115(a), (c).  The absence of such an intentional-baiting exception marks a departure from the federal regulatory scheme that governed taking of gray wolves in Wyoming under FWS's pre-delisting rule pursuant to ESA section 10(j).  That 10(j) rule also authorized taking of wolves attacking livestock or dogs, but included a safeguard to prohibit such taking where there is "evidence of intentional baiting, feeding, or deliberate attractants of wolves."  50 C.F.R. § 17.84(n)(4)(xiii).  By contrast, the Wyoming provision permits private individuals to kill wolves threatening livestock or dogs even if wolves were

intentionally baited into such conflicts.  Put starkly, there is nothing in Wyoming law to prevent a landowner from baiting a wolf into conflict with livestock or a dog and then killing that wolf even if that wolf's death drops the population below minimum recovery levels.

FWS offered no rational response to this concern.  FWS asserted that wolf-killing under this provision would be "minimal" because it is "similar" to FWS's 10(j) rule, which was "sufficiently protective to allow continued population expansion."  77 Fed. Reg. at 55,585. However, this assertion ignores the key distinction that the FWS 10(j) rule prohibited intentional baiting that is allowed under Wyoming's "doing-damage-to-private-property" statute.  Moreover, at other points in the Wyoming Delisting Rule, FWS itself acknowledged that wolf killing in Wyoming would "increase after delisting" because of, among other things, "more liberal defense of property allowances (than under previous experimental population rules)."  77 Fed. Reg. at 55,594; see also id. at 55,569 (recognizing "increased ability of members of the public to defend their property" from wolves after Wyoming delisting).

As to the potential for baiting of wolves, FWS called this an "improbable, theoretical issue" because baiting is too time-consuming and citizens desiring to "pursue wolf removal" would be more likely to "pursue either a hunting tag or a lethal take permit."  77 Fed. Reg. at 55,561.  However, this perceived disincentive for the public to bait wolves becomes meaningless at exactly the point when the "doing-damage" law becomes most troubling:  when the wolf population falls below minimum levels.  At that point, despite the assumed inconvenience of baiting wolves, killing wolves that are "doing damage to private property"—including baiting them into conflicts—would become the only legal method by which landowners could continue to kill wolves, as state law would prevent the issuance of further hunting tags and lethal take permits.  See Wyo. Admin. Code GAME HUNT Ch. 21, §§ 4(a)(i), 6(d).

FWS also sought to dispel this baiting concern by citing an email from a Wyoming state official stating that "[t]he exemptions provided in Wyoming Statute 23-3-115(c) <u>could</u> be interpreted by a prosecutor as not applying in the case of intentionally placing livestock in order to kill a wolf."  AR 4936 (emphasis added); <u>see</u> 77 Fed. Reg. at 55,561.  Not only does this email fail to cite any portion of section 23-3-115(c) to justify its conclusion (which finds no support in the statute's plain language), but its speculation about what a future state prosecutor "could" do falls far short of supplying an adequate regulatory mechanism to limit the killing of wolves intentionally baited into conflict with livestock or pets.  <u>Cf.</u> 71 Fed. Reg. 43,410, 43,429 (Aug. 1, 2006) (FWS rejecting adequacy of Wyoming wolf management regime in 2006 despite assurances from Wyoming attorney general; "Notwithstanding the Attorney General's opinion, we are concerned that WGFD would have no authority to act contrary to the categorical requirements of an operative provision of the state law.").

> **D.**     **FWS's Failures Corrupted The Agency's Analysis Of Other Wyoming Regulatory Mechanisms**

FWS's multiple failures to rationally assess Wyoming's regulatory regime for maintaining a buffer to ensure compliance with minimum wolf-population requirements and for limiting excessive wolf killing, as discussed <u>supra</u>, had cascading impacts through the remainder of FWS's regulatory-mechanisms analysis, corrupting the agency's conclusions on two additional, critical points.

<u>First</u>, FWS's acceptance of Wyoming's kill-on-sight "predator zone" for wolves depended on the agency's flawed evaluation of the state's regulatory mechanisms within the "Trophy Area."  Wyoming law subjects wolves over approximately 83.5% of that state to unlimited, year-round killing by almost any method.  Traps and snares may be used, Wyo. Stat. Ann. § 23-2-303(d), (e), as well as harassing, pursuing, hunting, shooting, or killing wolves

"with, from, or by use of any aircraft, automotive vehicle, trailer, motor-propelled wheeled

vehicle, or vehicle designed for travel over snow," id. § 23-3-306(a).  Baiting is not prohibited.

See id. § 23-33-306.  As a result, FWS concluded, "no wolf packs or breeding pairs will persist

in the predator area of Wyoming and … some wolves that primarily occupy the Trophy Area will

be killed when traveling into the predator area."  77 Fed. Reg. at 55,587.

FWS deemed such losses "a substantial concern when State law required WGFD to

aggressively manage the population down to minimal levels," but found that concern alleviated

by Wyoming's "inten[t] to maintain an adequate buffer above minimum population objectives to

accommodate management flexibility and to ensure that uncontrollable sources of mortality do

not drop the population below this minimum population level."  Id. (emphasis added).  However,

not only is Wyoming's mere unenforceable statement of intent to maintain some undefined

buffer an inadequate measure to compensate for the legally binding provisions for extermination

of wolves throughout the "predator zone," but Wyoming lacks sufficient regulatory mechanisms

to ensure that any voluntary effort by the state to maintain a buffer is not undermined by

Wyoming's statutory lethal-take-permit requirement and/or "doing-damage-to-private-property"

law.  Accordingly, the measures that FWS relied upon to offset the extermination of all wolves

from Wyoming's extensive "predator zone" are illusory.

Second, for the same reason, FWS irrationally discounted a significant concern raised by

one of the peer reviewers that Wyoming's approach to monitoring the wolf population appears

likely to mask declines, allowing the population to plummet toward—or even below—minimum

numbers without detection.  Wyoming's wolf-plan Addendum asserted that the state would take

a conservative approach to population monitoring, relying on "known minimums" and stating

that, "[a]s the gray wolf population approaches the minimum recovery level, monitoring intensity

will increase to ensure a more precise population estimate." AR 12347, 12348. As pointed out

by Dr. Mills, this approach threatens to mask population declines. <u>See</u> AR 922-23. This is

because more intensive monitoring is likely to detect a greater percentage of the population, even

as the total population declines:

> As a hypothetical example, suppose in 2016 the raw count reveals 105 wolves and
> in 2017 the raw count reveals 115 wolves. This would be widely perceived as a
> 10% increase in the wolf population. However, if the 2016 survey detected only
> 80% of the wolves (so the actual number of wolves was 131) while in 2017 a
> more intensive count detected 95% of the wolves (so [the] actual wolf number
> was 121), then the wolf population would actually have declined by 8% from
> 2016 to 2017 even though the uncorrected raw count index indicated a 10%
> increase!

AR 922.

FWS responded by discounting this concern on the basis that "estimates of abundance

and trends … are likely to always be sufficiently reliable <u>assuming maintenance of an adequate</u>

<u>buffer above minimum recovery levels</u>." 77 Fed. Reg. at 55,556 (emphasis added). FWS added,

however, that "the importance of this issue and any possible erroneous conclusions about

abundance and trends is dependent on <u>how close Wyoming manages to its minimum population</u>

<u>targets</u>." <u>Id.</u> (emphasis added). Once again, FWS stated its expectation that the wolf population

in Wyoming will "always [be] maintained with a sufficient buffer." <u>Id.</u>

Here too, FWS's assumptions about Wyoming's maintenance of a population buffer and

imposition of sufficient controls on wolf killing to sustain that buffer were central to its

conclusion on a key wolf-management issue. Absent an adequate regulatory commitment by

Wyoming to a sufficient buffer over minimum population requirements—which did not exist—

FWS had no rational basis to dismiss Dr. Mills' concern over Wyoming's monitoring methods.

The centrality of FWS's assumption about an adequate wolf-population buffer in Wyoming only

underscores the unlawful irrationality of the agency's ultimate decision to leave that critical

27

matter to nothing more than Wyoming's voluntary statement of intent, rather than a specific,
enforceable regulatory mechanism.  FWS's decision to delist wolves in Wyoming in the absence
of essential regulatory mechanisms violated the ESA.  <u>See</u> 16 U.S.C. § 1533(a)(1)(D).

## III.  FWS UNLAWFULLY DISCOUNTED THE ONGOING THREAT OF INADEQUATE GENETIC CONNECTIVITY

FWS's decision to delist wolves in Wyoming also is arbitrary and unlawful under the
ESA because the agency irrationally discounted the ongoing threat to the northern Rocky
Mountains wolf population posed by genetic isolation of GYA wolves—isolation that is certain
to worsen with inevitable population reductions under state management.

FWS has repeatedly reaffirmed that establishment of connectivity between wolf
subpopulations, including "genetic exchange" among the three northern Rocky Mountain
recovery areas and Canada, is essential to the long-term viability of the area's wolf population
and "<u>cannot be overemphasized</u>."  77 Fed. Reg. at 55,538; AR 7834 (emphasis added); <u>see</u> 73
Fed. Reg. at 10,521-22 .  Nevertheless, FWS's wolf delisting decisions for the northern Rockies
have repeatedly ignored or arbitrarily discounted evidence of inadequate connectivity and
genetic exchange between the relatively isolated GYA wolves and other wolf populations,
requiring judicial intervention to ensure that the agency did not simply disregard this critical
component of its own scientifically based recovery criteria.  <u>See</u> <u>Defenders of Wildlife</u>, 565 F.
Supp. 2d at 1168-72 (enjoining 2008 delisting rule because FWS unlawfully "continues to stand
behind one component of the recovery criteria—30 breeding pairs and 300 wolves—but rejects
another component—genetic exchange—as unnecessary").  The challenged Wyoming Delisting
Rule continues this pattern of unlawful agency action.

Once again, FWS confronted a lack of adequate genetic exchange between the GYA
wolves and other populations.  FWS concluded that "a <u>minimum</u> of one effective migrant [i.e., a

breeding migrant that passes on its genes] per generation is a reasonable and acceptable goal to avoid any degradation in the [northern Rocky Mountains] DPS's current levels of genetic diversity."  77 Fed. Reg. at 55,593 (emphasis added; citing inter alia Mills (2007)); see also id. at 55,564 (emphasizing that the standard requires "at least" one migrant).  A wolf generation is approximately four years.  77 Fed. Reg. at 55,593; AR 11365.[6]

The documented level of genetic exchange into the GYA since wolves were reintroduced in 1995-96 does not meet FWS's own "one-effective-migrant-per-generation" standard.  Further, FWS acknowledged that wolf dispersal into the GYA from the central Idaho and northwest Montana subpopulations is likely to decline in future years because wolf killing in Montana, Idaho and Wyoming is no longer restricted by the ESA.  FWS's conclusion that wolves in the GYA and Northern Rockies nonetheless are not threatened by insufficient genetic exchange was not supported by the record or the best available science and therefore violated the ESA.  See 16 U.S.C. § 1533(b)(1)(A) (requiring FWS to use "best scientific … data available").

### A.    Current Wolf Dispersal Into The GYA Does Not Meet FWS's "One-Effective-Migrant-Per-Generation" Standard

Even before the Wyoming Delisting Rule erected new obstacles to wolf migration, wolf dispersal into the GYA did not satisfy FWS's recovery standard.  The Wyoming Delisting Rule analyzed two types of information to assess the historic level of connectivity between the GYA and other subpopulations:  (1) known effective migrants based on wolf-tracking data; and (2) analysis of actual genetic material gathered from individual wolves.  See 77 Fed. Reg. at 55,593.  Both analyses documented insufficient effective migration into the GYA to meet FWS's minimal

---

[6] Dr. Mills, upon whose research FWS relied, said geneticists actually employ a guideline calling for "one to ten migrants per generation."  AR 22298; see also AR 4141 (Mills and Allendorf (1996)) ("one migrant per generation is a desirable minimum, but it may be inadequate for many natural populations"); 77 Fed. Reg. at 55,593 (FWS citing Mills and Allendorf (1996)).  Accordingly, the best available science—as identified by FWS itself—establishes that the "one-effective-migrant-per-generation" standard is, at best, a bare minimum.

"one-effective-migrant-per-generation" standard even when wolves in the region were shielded by the ESA.  Id.  FWS nonetheless touted these findings as evidence that "acceptable levels of effective migration occurred when the population was between 101 and 846 wolves and have likely been exceeded at higher population levels."  Id.

FWS failed to articulate a rational basis for this conclusion, which runs counter to the agency's own cited evidence.  FWS's painstaking efforts to document successful wolf dispersals into the GYA based upon wolf-tracking information identified only two wolves that dispersed into the GYA and successfully bred between 1995 (the year wolves were first reintroduced into Yellowstone) and 2008.  See id. at 55,593 (documenting 2002 dispersal from central Idaho into Greybull pack near Meeteetse, Wyoming, and 2007 dispersal from central Idaho into a pack near Sunlight Basin, Wyoming).  Thus, tracking data confirmed only two effective migrants over a 13-year period, or approximately 0.62 effective migrants per generation.  See id.  Even so, FWS attempted to convert this evidence of inadequate genetic connectivity between the GYA and central Idaho into a success story by noting that only 20% to 30% of northern Rockies wolves have radio collars.  Id.  FWS said "it is reasonable to assume several times the documented number of radio-collared wolves likely entered the GYA.  …  Specifically, these data indicate we may have averaged around one-and-a-half effective migrants into the GYA per generation since reintroduction, with a large portion of this dispersal occurring in recent years."  Id.  However, FWS cited no scientific authority to support its speculation that recorded observations underestimated actual effective migration into the GYA by two-thirds.

To the contrary, analysis of actual wolf genetic material only confirmed tracking observations of limited dispersal, demonstrating "a minimum of 0.42 natural effective migrants entering the GYA per generation from 1995 to 2004."  Id. (emphasis added) (citing Stahler

2011).  Although citing this genetics study as the best available science, FWS once again claimed that the study significantly underestimated actual effective migration.  Id.  To support this claim, FWS cited another publication, Hebblewhite et al. (2010), which extrapolated that because genetic samples were available for only 30% of the northern Rockies wolf population, "this estimate is 'almost certainly low by at least half.'"  Id.  However, FWS ignored the fact that Hebblewhite's extrapolation was rejected by the very geneticist upon whose scientific analysis the agency relied.  Dr. Daniel Stahler, a Yellowstone National Park wolf biologist who co-authored the genetics study documenting 0.42 natural effective migrants into the GYA, noted that his study's "estimates are conservative minimums" but specifically cautioned against reliance on Hebblewhite's multiplier, stating:

> I suggest not using Hebblewhite et al. 2010 comment that our estimate of effective migration/generation is low by at least 50% … .  I am unaware of any such data or theory to support this specific claim.  In other words, it would not be necessarily accurate (certainly not based on supporting data) to say that because we showed 3 to 5 effective migrants per generation and we sample 30%, then there must be really 6-10 migrants per generation.

AR 5865 (Stahler 2011). [7]

FWS failed even to acknowledge this rejection of the Hebblewhite extrapolation by the agency's own cited geneticist; FWS's assumption of at least 0.84 natural effective migrants per generation based on genetic data therefore was arbitrary and capricious.  See Carlton v. Babbitt, 26 F. Supp. 2d 102, 109-10 (D.D.C. 1998) (FWS's application of research, despite author's caution that such use was "inappropriate," was arbitrary and capricious); see also Defenders of Wildlife v. Babbitt, 958 F. Supp. 670, 685 (D.D.C. 1997) ("Although the Court must defer to an agency's expertise, it must do so only to the extent that the agency utilizes, rather than ignores,

---

[7] Further undermining FWS's reliance on Hebblewhite et al. (2010), Hebblewhite attributed his extrapolation to the vonHoldt et al. (2010) study, which was coauthored by Dr. Stahler, see AR 2875, but the extrapolation did not appear in that study, see AR 11355-370, AR 5865.

the analysis of its experts.").  Further, even assuming that 0.62 effective migrants per generation

(based on tracking data) and 0.42 effective migrants per generation (based on genetic data) are

conservative estimates, FWS failed to support its conjecture that actual genetic connectivity was

approximately three times higher than either set of data indicated.  As in the Montana <u>Defenders</u>

<u>of Wildlife</u> case where FWS claimed that "wolves not sampled" in a genetics study might

demonstrate essential genetic exchange, "[t]he Fish & Wildlife Service's speculation about

genetic exchange is not convincing."  <u>Defenders of Wildlife</u>, 565 F. Supp. 2d at 1169-70.

**B.      Wolf Dispersals Into The GYA Will Diminish Under State Management**

In addition to irrationally concluding that genetic connectivity in the northern Rockies is

<u>currently</u> adequate, FWS failed to rationally justify its conclusion that northern Rocky Mountains

wolves will not be endangered by <u>future</u> inadequate genetic connectivity under state management

of wolves in Idaho, Montana, and Wyoming.  <u>See</u> 77 Fed. Reg. at 55,596.  FWS acknowledged

that "past dispersal data is unlikely to be an exact predictor of future effective migration rates."

<u>Id.</u> at 55,594.  Among other reasons, "after delisting the population will no longer be growing,

the population will likely go through a period [of] reduction before leveling off, and management

will likely result in higher mortality rates for both dispersers and resident wolves."  <u>Id.</u> at 55,593-

94.  Notwithstanding these admissions, FWS concluded that genetic connectivity will be

sufficiently maintained based on three assumptions:

- Despite enforceable state commitments to maintain wolf populations only at FWS's bare-minimum recovery levels, "the overall [northern Rocky Mountains] population is likely to be maintained well above recovery levels (perhaps around 1,000 wolves across the [northern Rocky Mountains] DPS)," <u>id.</u> at 55,594;

- Despite increased killing of potentially dispersing wolves, "[t]he management approaches of all three [northern Rocky Mountains] States take into account and limit hunting impacts during important dispersal periods," <u>id.</u>; and

- "Human-assisted migration," if ever employed, would be sufficient to make up for the lack of natural genetic connectivity, id. at 55,596.

Each of these assumptions was arbitrary and unlawful.

<blockquote>
1. State Management Will Inhibit Genetic Connectivity By Reducing The Size Of The Northern Rockies Wolf Population
</blockquote>

FWS's conclusion that the northern Rockies wolf population will achieve sufficient genetic connectivity notwithstanding state efforts to significantly reduce its size was unfounded. As FWS acknowledged, "[p]opulation levels across the [northern Rocky Mountains] DPS could affect natural rates of gene flow," 77 Fed. Reg. at 55,594, and "[a] large and well distributed population within the GYA is especially important because it is the most isolated recovery segment." Id. at 55,538.  However, in the wake of delisting, Montana, Idaho, and Wyoming are implementing wolf-management practices designed to reduce the size and range of each of the northern Rocky Mountains wolf subpopulations.  See id. at 55,594.  Indeed, all three states have committed to maintaining only the smallest wolf populations required to satisfy FWS's bare-minimum recovery standards.  Idaho's 2002 wolf management plan established a population objective of only 15 "packs," falling below even FWS's target of 15 breeding pairs in each state. AR 2930.  Likewise, Montana law commits state wolf managers to maintaining only 15 breeding pairs.  See Mont. Admin. R. 12.9.1301(1).  Further, as discussed supra, Wyoming law commits to maintaining only 10 breeding pairs and 100 wolves outside of Yellowstone National Park and the Wind River Reservation, with the goal of (but not commitment to) achieving 15 breeding pairs and 150 wolves statewide, including Yellowstone.  See Wyo. Admin. Code GAME HUNT Ch. 21 § 4(a)(i); Wyo. Stat. § 23-1-304(a); 77 Fed. Reg. at 55,538.

As FWS has recognized, such state commitments to maintain only minimum wolf populations are insufficient to achieve natural genetic connectivity within the northern Rockies wolf population.  FWS stated in its proposed Wyoming delisting rule that, "if the population is

maintained near the minimum recovery target of 150 wolves per State, … [FWS] would expect dispersal to noticeably decrease." 76 Fed. Reg. at 61,815 (emphasis added); see also 74 Fed. Reg. at 15,177 (same). Likewise, in rejecting Wyoming's prior management framework (and delisting northern Rockies wolves outside Wyoming), FWS concluded that "[m]anaging to minimal recovery levels [100-150 wolves per state] … increases the chances of genetic problems developing in the GYA population and would reduce the opportunities for demographic and genetic exchange in the WY portion [of] the GYA." 74 Fed. Reg. at 15,172; see also id. ("a regulatory framework for wolf management at minimum recovery levels is not adequate").

Nevertheless, FWS in the Wyoming Delisting Rule sidestepped any analysis of the potential for insufficient genetic connectivity at the wolf population level reflected in actual state commitments (i.e., a total of 300-450 wolves). Instead, FWS optimistically assumed that Idaho, Montana, and Wyoming will maintain wolf numbers consistently above this recovery minimum—"perhaps around 1,000 wolves across the [northern Rocky Mountains] DPS." 77 Fed. Reg. at 55,594; see also id. at 55,552-53, 55,568 (same). FWS cited no evidence to support this hypothetical future population scenario. See, e.g., id. at 55,552-53, 55,567-68, 55,594. Instead, the agency speculated about the states' perceived incentives:

> [W]hile all three States intend to pursue population reductions, … none of the States have indicated an interest in managing their populations at or very close to minimum agreed-upon targets (although Wyoming will likely be the closest to its minimum management targets). None of the States are likely to manage down to, or very near, minimum management targets because doing so would severely limit State flexibility to address wolf depredation issues, limit wolf harvest opportunities, and increase the risk of relisting. None of the States or any major interest group in the States would like to see any of these scenarios occur.

Id. at 55,567.

This agency reasoning is flawed. As an initial matter, FWS itself elsewhere in the Wyoming Delisting Rule disavowed any reliance on state "incentive[s] to maintain the [northern

Rocky Mountains] DPS and its subpopulations well above minimal population levels," id. at

55,590; FWS's flip-flopping on the significance of state incentives undermines its reasoning.

See New England Coal. on Nuclear Pollution v. Nuclear Regulatory Comm'n, 727 F.2d 1127,

1130 (D.C. Cir. 1984) (agency's adoption of one premise but application of another "is the

essence of arbitrary and capricious action") (quotations omitted).  Further, FWS's optimism

about future state actions in the absence of enforceable commitments to maintain wolf

populations well above minimum recovery standards defies the states' own formal positions.  For

example, Idaho wolf management is guided by the 2002 Idaho Wolf Conservation and

Management plan, which states: "Idaho is on the record asking the federal government to remove

wolves from the state by the adoption in 2001 of House Joint Memorial No. 5.  The position

reflected in House Joint Memorial No. 5 continues to be the official position of the State of

Idaho."  AR 2916.  Idaho's 2002 plan established wolf-population objectives only for purposes

of keeping wolves off the endangered list, see AR 2916, 2930, which is achieved as long as

minimal recovery goals are met.  Likewise, as discussed supra, Wyoming law commits the state

to manage only for a bare-minimum number of wolves and requires issuance of lethal take

permits so long as wolf killing could not drop the state's wolf population outside of Yellowstone

National Park and the Wind River Reservation below 10 breeding pairs and 100 wolves.

FWS further suggested that "practical challenges" would prevent excessive wolf killing,

even if the states actively tried to minimize the wolf population.  77 Fed. Reg. at 55,568.

However, this statement is at odds with FWS's separate acknowledgement that "resident packs[']

… locations are easily detected and ranges are easily determined."  Id. at 55,558.  Indeed, on this

basis, FWS predicted that all wolf packs and breeding pairs would be eradicated from

Wyoming's "predator zone."  Id.  FWS failed to reconcile its conclusion on this basic point with

its optimistic prediction that wolves would face better survival odds when subjected to intensive human persecution elsewhere within their range.

However, even if FWS were correct that the northern Rockies wolf population will remain around 1,000 wolves, the agency still had no rational basis to conclude that essential genetic connectivity would be achieved. Only a single effective wolf migration into the GYA was documented during the years when the northern Rockies wolf population was at or below 1,000 wolves (i.e., up until 2005). See 77 Fed. Reg. at 55,593 (discussing effective wolf migration in 2002); AR 9117 (identifying wolf population levels).[8] As discussed supra, this level of migration falls below even FWS's minimal "one-effective-migrant-per-generation" standard. FWS failed to provide any rationale for its apparent conclusion that returning to a population of approximately 1,000 wolves would allow for sufficient gene flow into the GYA.

> 2. State Management Will Inhibit Genetic Connectivity By Increasing The Likelihood That Dispersing Wolves Will Be Killed

Not only will state management impair genetic connectivity by reducing the wolf population size, but mortality of future dispersing wolves is certain to increase under state management. Wolves attempting to enter Wyoming from southern Idaho must run the gauntlet of Wyoming's "predator zone." See 77 Fed. Reg. at 55,595. Unlimited killing is also permitted in Wyoming's "flex zone" for more than half the year—between March 1 and October 14—even though "[m]aintenance of genetic exchange and connectivity" were the purported reasons for establishing this area. Id. Indeed, although FWS claimed this "flex zone" "will benefit natural dispersal," id., its provision for "trophy" management during only a four-and-a-half-month period from October 15 to the end of February overlooks the basic facts that nearly half of all documented wolf dispersal events occurred outside those months and, on average, dispersing

---

[8] The next documented instance of effective migration into the GYA did not occur until 2007, 77 Fed. Reg. at 55,593, when the northern Rockies population reached 1,513 wolves, AR 9117.

wolves took more than five months to reach a new range.  Id. at 55,594.  Accordingly,

Wyoming's "flex-zone" management appears virtually certain to leave the average dispersing

wolf in a free-fire zone for at least part of its journey.  Even during "peak dispersal" months,

wolves in the "flex zone" will be subject to "trophy" hunting.  Id. at 55,594, 55,595.  Further, as

discussed supra, even in the "Trophy Area" wolves are subject to killing under lethal take

permits that cannot be suspended to avoid interfering with genetic exchange.

   While wolves must successfully navigate Idaho or Montana to reach Wyoming, those

states also lack essential wolf-killing controls.  Both states established 2012-13 wolf-hunting

regulations that promote far more aggressive wolf quotas, season lengths, and hunting methods

than FWS previously evaluated.  See 77 Fed. Reg. at 55,567 (observing "that both Idaho and

Montana are moving toward higher harvest and longer seasons," but asserting without citation

that "these approaches are temporary"); see also AR 28072-75 (extending Idaho wolf-hunting

season to March 31 through most of state; no limit on statewide mortality; expanding bag limits);

AR 28101-04 (extending Montana wolf-hunting season to February 28; eliminating all but two

area-specific quotas; allowing wolf trapping).[9]

   In particular, Idaho's wolf hunting regulations for the "Southern Idaho" hunting unit, just

across the border from the Wyoming "flex zone," set no upper limit on hunter-caused wolf

mortality for the six-month period between August 30 and March 31—i.e., during the very

period when Wyoming's adjacent "flex-zone" management is supposed to "facilitate natural

dispersal of wolves between Wyoming and Idaho."  AR 28074; 77 Fed. Reg. at 55,559.

_____

[9] FWS optimistically predicts that wolf killing in Montana and Idaho "will moderate as the [wolf] population stabilizes and the public's current angst and intense interest wanes," 77 Fed. Reg. at 55,567, but an Idaho survey found that "two of the most powerful stakeholders in the state (i.e., big-game hunters and livestock producers) are motivated to kill as many wolves as possible without returning wolves to federal protection" and nothing in the survey "suggests state management will change attitudes toward wolves or increase support for the species."  AR 1707.

Although FWS attempted to downplay the impact of unlimited hunting in this "Southern Idaho" region, see 77 Fed. Reg. at 55,581, the agency's position is irreconcilable with its separate conclusion that seasonal regulation of disperser mortality just across the state boundary in Wyoming's "flex zone" is "biologically substantive and important," id. at 55,559.  In combination, the "Southern Idaho" hunting regulations and Wyoming's "flex-zone" management ensure that there will not be a single day of the year when a wolf can disperse across this part of the Idaho-Wyoming border without being subject to unlimited human-caused mortality.

3.    FWS's Reliance On Human-Assisted Genetic Exchange Was Unlawful

Despite FWS's optimistic—but unfounded—prediction that the northern Rocky Mountains wolf population will achieve adequate natural connectivity following delisting, FWS continued to rely on "human-assisted" migration—i.e., transporting wolves in a truck—as a backstop for achieving essential gene flow.  See, e.g., 77 Fed. Reg. at 55,565, 55,568.

This "trucking-wolves" approach presents no basis for deeming a species recovered under the ESA.  The ESA's purpose is "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved" and "to provide a program for the conservation of such endangered species and threatened species."  16 U.S.C. § 1531(b). The ESA defines "conserve" and "conservation" as meaning "to use and the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary"—i.e., to the point of recovery from their imperiled state.  Id. § 1532(3) (emphasis added).  Such "methods and procedures" to achieve recovery include "live trapping" and "transplantation."  Id.

In sum, the ESA views live trapping and transplantation as tools to recover an imperiled species, but not attributes of a recovered species.  To the contrary, the ESA identifies "conservation"—i.e., recovery—as the point at which ESA recovery actions such as "live

38

trapping" and "transplantation" "are no longer necessary."  Id., see Trout Unlimited v. Lohn, 559 F.3d 946, 957 (9th Cir. 2009) ("[T]he purpose of the ESA is to promote populations that are self-sustaining without human interference.") (quotation omitted); see also 16 U.S.C. § 1539(a)(2)(B)(iv) (before issuing incidental take permit, FWS must find "taking will not appreciably reduce the likelihood of the survival and recovery of the species in the wild"); 59 Fed. Reg. 34,273, 34,274 (July 1, 1994) (FWS policy is to "[d]evelop and implement recovery plans … in a manner that restores, reconstructs, or rehabilitates the structure, distribution, connectivity and function upon which … listed species depend").  Accordingly, FWS's reliance on perpetual human manipulation to demonstrate that the northern Rockies wolf population has recovered was unlawful and betrays the continuing absence of adequate state-management measures to ensure a naturally viable population.

### C.    FWS's Attempt To Dismiss The Importance Of Genetic Connectivity Is Contrary To Science And FWS's Own Recovery Standard

In a last-ditch effort to extricate itself from the continuing genetic threat to the northern Rockies wolf population, FWS stated that "even if no new genes entered the GYA (a near impossibility), genetic diversity is likely many decades, and perhaps a century or more, away from becoming an issue and even then, it would be unlikely to threaten the GYA population." 77 Fed. Reg. at 55,596.  This assertion that inadequate genetic exchange would likely never threaten northern Rockies wolves—for which FWS cited no supporting authority—defies the agency's own recovery standard and highlights FWS's unscientific approach to this issue.  See 16 U.S.C. § 1533(b)(1)(A) (requiring FWS to apply "best scientific … data available").

Contrary to FWS's unsupported statement, the agency has repeatedly reaffirmed the need for genetic connectivity to achieve recovered northern Rockies wolf subpopulations—including even in the challenged Wyoming Delisting Rule.  See 77 Fed. Reg. at 55,538; 73 Fed. Reg. at

10,521-22; AR 7834. Indeed, in developing the current wolf-recovery standard in 1994, FWS explicitly relied on movement of wolves between subpopulations to justify its numeric goal of 10 breeding pairs and 100 wolves in each of the three northern Rockies wolf subpopulations, stating that "ten breeding pairs in isolation will not comprise a 'viable' population." AR 7834 (1994 EIS). The best available science continues to support this position. See AR 11366-67 (VonHoldt et al. 2010). In the Wyoming Delisting Rule, FWS offered no justification for a different conclusion. As the Montana federal district court observed in addressing an identical attempt by FWS to disregard its own genetic-exchange recovery criteria, "[a]lthough the Service now says genetic exchange is unnecessary, it provides no persuasive reasons for this change of course that were not known in 1994, when the new criteria were established, or in 2001 and 2002, when the criteria were reaffirmed." Defenders of Wildlife, 565 F. Supp. 2d at 1170.

In sum, because FWS failed to rationally support its determination that wolves in the northern Rocky Mountains, particularly in Wyoming, are not endangered by inadequate genetic connectivity, FWS's decision to delist wolves in Wyoming was arbitrary and contrary to the best available science in violation of the ESA, 16 U.S.C. § 1533(b)(1)(A).

## IV.    FWS WRONGLY DETERMINED THAT WOLVES ARE NOT IMPERILED THROUGHOUT A "SIGNIFICANT PORTION" OF THEIR RANGE

Even assuming, for the sake of argument, that FWS had rationally determined that gray wolves in Wyoming are not endangered or threatened throughout their range—which FWS did not do—the agency still arbitrarily delisted wolves in Wyoming despite their continuing imperilment throughout a "significant portion" of their range. Under the ESA, a species must remain listed, and subject to the Act's protections, if it is endangered or threatened "throughout all or a significant portion of its range." 16 U.S.C. § 1532(6), (20) (emphasis added). This "significant portion" language justifies continued listing of a species "if there are major

geographical areas in which it is no longer viable but once was." Defenders of Wildlife v.
Norton, 258 F.3d 1136, 1145 (9th Cir. 2001); accord WildEarth Guardians v. Salazar, 741 F.
Supp. 2d 89, 98-99 (D.D.C. 2010).  Further, where a species has suffered historical range
contraction or is unlikely to survive in a "sizeable portion of its current habitat," this statutory
language places a burden on FWS to rationally explain why such lost habitat does not constitute
a "'significant portion of its range.'"  Colo. River Cutthroat Trout v. Salazar, 898 F. Supp. 2d
191, 201-204 (D.D.C. 2012); see also Defenders of Wildlife, 258 F.3d at 1145 (where "area in
which the lizard is expected to survive is much smaller than its historical range, the Secretary
must at least explain her conclusion that the area in which the species can no longer live is not a
'significant portion of its range'"); WildEarth Guardians, 741 F. Supp. 2d at 100-01 (vacating
ESA listing decision where FWS failed to rationally explain why major reduction in species'
range was not significant).

Here, FWS determined that Wyoming's year-round, kill-on-sight "predator zone" for
wolf management—encompassing 83.5% of the state—did not "constitute a threatened or
endangered significant portion of the range of wolves in Wyoming, the GYA, or the [northern
Rocky Mountains] DPS."  77 Fed. Reg. at 55,602-03.  Wyoming's "predator" area encompasses
both lost historical wolf range and occupied wolf habitat in which wolves face elimination due to
delisting.  See id. at 55,535, 55,576.  Nevertheless, FWS deemed the "predator zone" an
insignificant portion of the wolf's range.  Id. at 55,601-03.  In so concluding, FWS interpreted
the ESA phrase "significant portion of its range" to mean that "a portion of the range of a species
is 'significant' if its contribution to the viability of the species is so important that, without that
portion, the species would be in danger of extinction."  Id. at 55,601.  FWS deemed the
Wyoming "predator zone" insignificant because, "[i]f all of the wolves, packs, and breeding

pairs that occupy the predator area were extirpated, the remainder of the Wyoming, the GYA, or

the [northern Rocky Mountains] wolf population would not become endangered." Id. at 55,602.

This finding violated the ESA.  FWS arbitrarily concluded that the loss of every wolf

attempting to traverse Wyoming's "predator zone" would be insignificant for essential genetic

connectivity between the isolated GYA wolf population and other Northern Rockies wolves.

This conclusion represents an irrational reversal by FWS of its own past scientific conclusions in

the wolf delisting context.  See Purepac Pharm. Co. v. Thompson, 354 F.3d 877, 884 (D.C. Cir.

2004) (stating that a court may not "sanction agency action when the agency fails to justify

seeming inconsistencies in its approach") (quotations, alterations, and citation omitted).  When

FWS attempted to delist wolves throughout the northern Rocky Mountains DPS except

Wyoming in 2009, the agency explicitly found the entire state of Wyoming—including

Wyoming's 2009 "predator zone"—to constitute a "significant portion" of the DPS wolf range.

See 74 Fed. Reg. at 15,183.  Specifically addressing the "predator zone," FWS relied on

numerous interferences with "natural genetic connectivity" to substantiate that finding:

> Wolf dispersal patterns indicate that dispersing wolves moving into the GYA
> from Idaho or Montana are likely to move through the predatory area (Boyd et al.
> 1995).  Physical barriers (such as high-elevation mountain ranges that are difficult
> to traverse in winter) appear to discourage dispersal through the National Parks'
> northern and western boundaries.  Limited social openings in the National Parks'
> wolf packs also direct dispersing wolves from Idaho and Montana toward the
> predatory area portions of Wyoming.  Finally, Wyoming's winter elk feeding
> grounds attract and could potentially hold dispersing wolves in the predatory area.
> Thus, we believe dispersal is more likely to lead to genetic exchange if dispersers
> have safe passage through the predatory area.

Id.

The science underlying this finding has not changed over the intervening three years.  To

the contrary, even after modest modifications of Wyoming's 2009 regulatory framework, FWS

reiterated the scientific findings that justified its 2009 conclusion.  In the challenged rule, FWS

continued to conclude that "some lone wolves and dispersing wolves from both within the

GYA and from other metapopulations will be killed" in the "predator zone," 77 Fed. Reg. at

55,558, and, indeed, nearly half of all wolf dispersal habitat in Wyoming falls within the

"predator zone," AR 4957 (Oakleaf (2011)).  FWS also restated its view that "physical barriers

(such as high-elevation mountain ranges that are difficult to traverse in winter) appeared to

discourage dispersal through Grand Teton National Park's western boundary."  77 Fed. Reg. at

55,594. FWS again observed "the high density and reproductive output of wolves in YNP" and

that "young dispersing wolves seek to establish territories in less saturated habitats."  Id.  And

FWS found that nine of Wyoming's winter elk-feeding grounds exist "within the permanent

predator area"; "[t]hese areas attract and frequently hold dispersing wolves"; and "[m]any

dispersing wolves in Wyoming … include elk feed grounds as part of their winter home range."

Id. at 55,595.  In short, FWS reaffirmed the scientific reasons why it deemed "safe passage

through the predatory area" important for genetic exchange in 2009.  74 Fed. Reg. at 15,183.[10]

Nevertheless, FWS in the Wyoming Delisting Rule discounted the importance of "wolf

mortality in the predator area" for genetic connectivity among wolf populations.  See 77 Fed.

Reg. at 55,602-03.  In an effort to explain this reversal, FWS offered two rationales, neither of

which justifies the agency's conclusion.  First, while admitting that "wolf mortality in the

---

[10] Regarding dispersal into the Yellowstone National Park population, FWS speculated that "[l]ong term, … at lower population densities, wolves from outside YNP will be increasingly successful at dispersing into and through YNP."  77 Fed. Reg. at 55,594.  FWS failed to explain why wolves would be more successful dispersing into the national park at future reduced park population levels (estimated to "settle between 50 and 100 wolves," id. at 55,552) when an analysis of past years at similar park population levels found that Yellowstone wolves were "genetically isolated," AR 11350 (vonHoldt et al. 2007); see also AR 28131 (charting park wolf population levels).  If anything, as discussed at Point III, supra, dispersal is likely to be less successful in the future than during past periods when the population was growing and dispersing wolves were shielded by the ESA.  See 77 Fed. Reg. at 55,593-94.

predator area could affect successful migration between subpopulations," FWS asserted that "such mortality … [i]s expected to be opportunistic and minimal." Id. at 55,602-03. This finding echoed FWS's speculation elsewhere in the Wyoming Delisting Rule that "roaming dispersers" in the "predator zone" "will be less prone to removal than resident packs, whose locations and ranges are easily detected." Id. at 55,595. Such agency statements essentially postulate that some dispersing wolves will successfully navigate the "predator zone" to reach the GYA. However, FWS explicitly predicated its "significant-portion-of-the-range" conclusion on a determination that the "predator-zone" wolf range remains insignificant even "[i]f all of the wolves, packs, and breeding pairs that occupy the predator area were extirpated." Id. at 55,602 (emphasis added). FWS cannot have it both ways, deeming the "predator zone" insignificant even if all wolves in the area are destroyed, but then discounting the genetic-exchange impacts of "predator-zone" management by speculating that some wolves may run the "predator-zone" gauntlet and contribute to the GYA gene pool. If wolf dispersal through the "predator zone" is needed for genetic exchange to the GYA population, then extirpation of all wolves from the "predator zone" threatens that population and the larger DPS, and, under FWS's statutory interpretation, the predator zone constitutes a "significant portion" of the wolf's range.

Second, FWS asserted that killing of dispersing wolves in the "predator zone" "is not expected to affect genetic factors to the point that it could cause the remainder of the range to become endangered." Id. at 55,603. However, this conclusion merely relied on FWS's more extensive discussion in the Wyoming Delisting Rule of the genetic-exchange prerequisite for wolf delisting. See id. (stating that this issue is "discussed in more detail" elsewhere in challenged rule). For the reasons stated at Point III, supra, that discussion failed to rationally account for existing inadequate genetic flow from the Montana and Idaho populations into the

GYA, much less the reduction in genetic exchange that FWS itself deemed inevitable under state wolf management in Wyoming, Idaho and Montana.  Nothing in FWS's terse "significant-portion-of-the-range" analysis salvages the agency's position on that issue.  In sum, FWS failed to rationally explain its new-found conclusion that the Wyoming "predator zone" does not constitute a "significant portion" of the wolf's range in the northern Rocky Mountains DPS because of its importance for genetic connectivity to the GYA population, and for this reason too the agency violated the ESA.[11]

### CONCLUSION

For the foregoing reasons, plaintiffs in these consolidated cases respectfully request that this Court grant their motion for summary judgment and vacate and remand FWS's unlawful Wyoming Delisting Rule.  See Humane Soc'y of U.S. v. Kempthorne, 579 F. Supp. 2d 7, 21 (D.D.C. 2008) (holding that "the ESA's preference for protecting endangered species counsels strongly in favor of vacating" delisting rule pending remand).  Further, this Court should reinstate the prior rule protecting wolves in Wyoming under the ESA.  See Georgetown Univ. Hosp. v. Bowen, 821 F.2d 750, 757 (D.C. Cir. 1987) ("[T]he effect of invalidating an agency rule is to reinstate the rules previously in force.") (quotations and alteration omitted).

---

[11] FWS cannot legitimately argue that it was forced to disregard impacts to wolf dispersal in the "predator zone" because of the Wyoming district court's 2010 decision regarding the agency's 2009 partial delisting.  The Wyoming court found it arbitrary and capricious for FWS to insist that all of Wyoming be designated a "Trophy Area," but left it to FWS to determine how large the state's "Trophy Area" must be to "ensure that YNP is not totally isolated from the other recovery areas," and specified that FWS should "consider whether the contours of the trophy game area should be expanded to include additional portions of northwestern Wyoming where wolves are currently treated as predators."  Wyoming v. U.S. Dep't of Interior, 2010 WL 4814950, at * 45.  Indeed, while the Wyoming court "suggest[ed] that a more limited area, less than the entire state of Wyoming, may achieve" ESA requirements, including "genetic connectivity," it explicitly rested this suggestion on a recommendation by FWS for a "Trophy Game" area much larger than that ultimately adopted by Wyoming.  Id. at *43 (citing map reproduced as second figure in Appendix A to Wyoming ruling).

Respectfully submitted this 3rd day of June, 2012.


                                   /s/  Timothy J. Preso
                                   Timothy J. Preso
                                   Earthjustice
                                   313 East Main Street
                                   Bozeman, MT 59715
                                   (406) 586-9699
                                   Fax: (406) 586-9695
                                   tpreso@earthjustice.org

                                   *Attorney for Plaintiffs*


## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was today served via the Court's CM/ECF system on all counsel of record.


                                   /s/  Timothy J. Preso
                                   Timothy J. Preso