UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| DEFENDERS OF WILDLIFE, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No.  1:12-CV-01833-ABJ |
| vs. | ) | |
| | ) | |
| SALLY JEWELL, et al., | ) | |
| | ) | |
| Defendants, and | ) | |
| | ) | |
| SAFARI CLUB INT'L, et al., | ) | |
| | ) | |
| Defendant-Intervenors. | ) | |
| _____ | ) | |
| THE HUMANE SOCIETY OF THE UNITED | ) | |
| STATES, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Case No.  1:12-CV-01965-ABJ |
| | ) | |
| vs. | ) | |
| | ) | |
| U.S. FISH AND WILDLIFE SERVICE, et al., | ) | |
| | ) | |
| Defendants, and | ) | |
| | ) | |
| SAFARI CLUB INT'L, et al., | ) | |
| | ) | |
| Defendant-Intervenors. | ) | |
| _____ | ) | |

**PLAINTIFFS' CONSOLIDATED REPLY MEMORANDUM
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

I.   DEFENDANTS CANNOT JUSTIFY WYOMING'S DEFICIENT
     REGULATORY MECHANISMS FOR WOLF MANAGEMENT...................................3

     A.   FWS Unlawfully Relied On Wyoming's Unenforceable Promise To
          Maintain An Essential Buffer Over Minimum Population Levels ........................7

     B.   FWS Disregarded Key Loopholes In Wyoming's Lethal Take Permit
          Program....................................................................................................11

     C.   FWS Approved Unlimited Mortality Of Wolves "Doing Damage To
          Private Property"......................................................................................17

     D.   FWS Dismissed Threats From "Predator" Extermination And
          Flawed Monitoring Based On Wyoming's Unenforceable Promise ...................18

II.  DEFENDANTS' SPECULATION THAT GENETIC CONNECTIVITY WILL
     BE SUFFICIENT DESPITE THE INCREASED ISOLATION OF GYA
     WOLVES UNDER WYOMING'S MANAGEMENT SHOULD BE REJECTED..........20

     A.   FWS Ignored The Limitations Of Its Own Cited Science In
          Multiplying Documented Immigration To The GYA...........................................21

     B.   FWS Unreasonably Assumed That Wolf Population Levels Will
          Remain Well Above Minimum Recovery Levels................................................24

     C.   Increased Mortality Of Dispersing Wolves Will Further Inhibit
          Genetic Connectivity ..............................................................................27

     D.   Trucking Of Wolves Is No Substitute For Wolf Recovery..................................30

III. DEFENDANTS FAIL TO SALVAGE FWS'S IRRATIONAL "SIGNIFICANT-
     PORTION-OF-ITS-RANGE" ANALYSIS.......................................................31

IV.  INTERVENORS' AND AMICUS'S ADDITIONAL ARGUMENTS ARE
     MERITLESS...................................................................................................34

V.   THE PROSPECT OF RELISTING DOES NOT SUPPORT THE
     CHALLENGED RULE .....................................................................................37

CONCLUSION...................................................................................................38

i

# TABLE OF AUTHORITIES

## FEDERAL CASES

Advocates for Hwy. & Auto. Safety v. Fed. Motor Carrier Safety Admin.,
    429 F.3d 1136 (D.C. Cir. 2005) ..................................................................................34

Am. Wildlands v. Norton,
    193 F. Supp. 2d 244 (D.D.C. 2002) ................................................................... 5, 23-24

*Biodiversity Legal Found. v. Babbitt,
    943 F. Supp. 23 (D.D.C. 1996) ............................................................... *passim*

*Carlton v. Babbitt,
    26 F. Supp. 2d 102 (D.D.C. 1998) ..............................................................................23

Chevron U.S.A., Inc. v Natural Res. Def. Council,
    467 U.S. 837 (1984) ..................................................................................................6

*Colo. River Cutthroat Trout v. Salazar,
    898 F. Supp. 2d 191 (D.D.C. 2012) .................................................................3, 5, 7, 15

Cook Inlet Beluga Whale v. Daley,
    156 F. Supp. 2d 16 (D.D.C. 2001) ..............................................................................13

*Ctr. for Biological Diversity v. Morgenweck,
    351 F. Supp. 2d 1137 (D. Colo. 2004) ...................................................................... 3-4

Cutler v. Hayes,
    818 F.2d 879 (D.C. Cir. 1987) ....................................................................................34

Defenders of Wildlife v. Hall,
    565 F. Supp. 2d 1160 (D. Mont. 2008) ........................................................................2

Defenders of Wildlife v. Kempthorne,
    535 F. Supp. 2d 121 (D.D.C. 2008) ..............................................................................6

Defenders of Wildlife v. Salazar,
    651 F.3d 112 (D.C. Cir. 2011) ....................................................................................36

Defenders of Wildlife v. Salazar,
    729 F. Supp. 2d 1207 (D. Mont. 2010) ......................................................................38

*Fed'n of Fly Fishers v. Daley,
    131 F. Supp. 2d 1158 (N.D. Cal. 2000) ........................................................................5

Friends of Blackwater v. Salazar,
    691 F.3d 428 (D.C. Cir. 2012) ......................................................................16, 24, 26

Friends of the Earth v. EPA,
  446 F.3d 140 (D.C. Cir. 2006) ...................................................................................6

Fund for Animals v. Babbitt,
  903 F. Supp. 96 (D.D.C. 1995) ................................................................................36

Fund for Animals v. Clark,
  27 F. Supp. 2d 8 (D.D.C. 1998) ...............................................................................36

*Greater Yellowstone Coal. v. Servheen,
  665 F.3d 1015 (9th Cir. 2011) .........................................................10, 21, 27, 37

Humane Soc'y of U.S. v. Kempthorne,
  481 F. Supp. 2d 53 (D.D.C. 2006), vacated as moot, 527 F.3d 181 (D.C. Cir. 2006) ....... 35-36

In re Polar Bear ESA Listing & Section 4(d) Rule Litig.,
  794 F. Supp. 2d 65 (D.D.C. 2011), aff'd, 709 F.3d 1 (D.C. Cir. 2013) ........................5, 26, 35

Muscogee (Creek) Nation v. Hodel,
  851 F.2d 1439 (D.C. Cir. 1988) ................................................................................14

Nat'l Wildlife Ass'n v. EPA,
  286 F.3d 554 (D.C. Cir. 2002) ............................................................................ 34-35

Natural Res. Def. Council v. EPA,
  571 F.3d 1245 (D.C. Cir. 2009) ...............................................................................38

Norton v. S. Utah Wilderness Alliance,
  542 U.S. 55 (2004) ...................................................................................................13

Oceana v. Evans,
  384 F. Supp. 2d 203 (D.D.C. 2005) ........................................................................26

Office of Commc'n of United Church of Christ v. FCC,
  465 F.2d 519 (D.C. Cir. 1972) .................................................................................35

*Or. Natural Res. Council v. Daley,
  6 F. Supp. 2d 1139 (D. Or. 1998) ........................................................................4, 12

Purepac Pharm. Co. v. Thompson,
  354 F.3d 877 (D.C. Cir. 2004) .................................................................................34

*SEC v. Chenery Corp.,
  332 U.S. 194 (1947) .................................................................................. 12-13, 14, 37

Serono Labs. v. Shalala,
  158 F.3d 1313 (D.C. Cir. 1998) ...............................................................................23

*Sw. Ctr. for Biological Diversity v. Norton,
  2002 WL 1733618 (D.D.C. July 29, 2002)....................................................... *passim*

Trout Unlimited v. Lohn,
  559 F.3d 946 (9th Cir. 2009) ......................................................................31

Tucson Herpetological Soc'y v. Salazar,
  566 F.3d 870 (9th Cir. 2009) ........................................................................4

U.S. Airways, Inc. v. Nat'l Mediation Bd.,
  177 F.3d 985 (D.C. Cir. 1999) ....................................................................34

United States v. Reynolds,
  710 F.3d 434 (D.C. Cir. 2013) ......................................................................3

United States v. Villanueva-Sotelo,
  515 F.3d 1234 (D.C. Cir. 2008) ............................................................. 14-15

Wash. Ass'n for Television & Children v. FCC,
  712 F.2d 677 (D.C. Cir. 1983) ....................................................................35

**FEDERAL STATUTES AND LEGISLATIVE MATERIALS**

16 U.S.C. § 1531 et seq...................................................................................1
      § 1531(b) ............................................................................................31
      § 1532(3) ............................................................................................31
      § 1532(6) ............................................................................................31
      § 1532 (20) .........................................................................................31
      § 1533(a)(1) ........................................................................................37
      § 1533(a)(1)(D) ...........................................................................1, 3, 6, 7
      § 1533(b)(1)(A) .........................................................................4, 23, 31
      § 1533(b)(7) ........................................................................................37
      § 1533(g)(1)-(2) ..................................................................................37
      § 1604(i) .........................................................................................6, 10

H.R. Rep. No. 93-412 (1973).............................................................................7

S. Rep. 93-307 (1973)..................................................................................7, 27

**FEDERAL REGULATIONS AND ADMINISTRATIVE MATERIALS**

74 Fed. Reg. 15,123 (Apr. 2, 2009) ....................................................12, 28, 32, 33

77 Fed. Reg. 55,530 (Sep. 10, 2012) ........................................................... *passim*

**STATE CASES**

Ball v. State ex rel. Wyo. Workers' Safety & Comp. Div.,
 239 P.3d 621 (Wyo. 2010)..........................................................................................14

Scarlett v. Town Council,
 463 P.2d 26 (Wyo. 1969)............................................................................................13

**STATE STATUTES AND LEGISLATIVE MATERIALS**

Wyo. Stat. Ann. § 23-1-302(a)(xxix)..........................................................................18
                § 23-1-304(n) .................................................................11, 13, 14
                § 23-3-115(a) ..............................................................................17
                § 23-3-115(c) .......................................................................8, 14, 37

**STATE REGULATIONS AND ADMINISTRATIVE MATERIALS**

Wyo. Admin. Code GAME HUNT Ch. 21 § 4(a)(ii) ...................................................16
                           § 6(b)..............................................................13
                           § 6(d)..............................................................12
                           § 7(a) .........................................................12, 16
                           § 7(b)(iii) ...................................................12, 16

**OTHER AUTHORITIES**

Oxford English Dictionary (2d ed. 1989) ......................................................................3

v

## GLOSSARY OF ACRONYMS AND SHORT FORMS

| | |
|---|---|
| 1994 FEIS | FWS, The Reintroduction of Gray Wolves to Yellowstone National Park and Central Idaho, Final Environmental Impact Statement (1994) |
| AR | Administrative Record |
| ESA | Endangered Species Act |
| FWS | U.S. Fish & Wildlife Service |
| FWS Mem. | Federal Defendants' Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment |
| GYA | Greater Yellowstone Area |
| Non-Sovereign Intervenors' Mem. | Memorandum of Points and Authorities of Defendant-Intervenors Safari Club International, National Rifle Association of America and Rocky Mountain Elk Foundation in Opposition to Plaintiffs' Motion for Summary Judgment |
| Plaintiffs' Mem. | Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Summary Judgment |
| WWC-2013 | Wyoming Wolf Coalition-2013 |
| WWC-2013 Br. | Brief of Amicus Curiae – Wyoming Wolf Coalition-2013 |
| Wyoming Delisting Rule | Endangered and Threatened Wildlife and Plants; Removal of the Gray Wolf in Wyoming From the Federal List of Endangered and Threatened Wildlife and Removal of the Wyoming Wolf Population's Status as an Experimental Population; Final Rule, 77 Fed. Reg. 55,530 (Sep. 10, 2012) |
| Wyo. Mem. | Memorandum of Points and Authorities in Opposition to Plaintiffs' Motion for Summary Judgment by Defendant-Intervenor State of Wyoming |

## INTRODUCTION

Defendant U.S. Fish and Wildlife Service makes a dramatic overstatement early in its response brief defending the Wyoming Delisting Rule, proclaiming that "[i]t is undisputed that the Wyoming [wolf] population is biologically recovered and the predicate to delisting is satisfied."  FWS Mem. at 5.  Contrary to the agency's assertion, the predicate to delisting wolves in Wyoming under the Endangered Species Act, 16 U.S.C. § 1531 et seq., and the biological recovery of the Wyoming population are vigorously disputed by plaintiffs and directly at issue before this Court.

Under the ESA, the predicate to delisting includes adequate "existing regulatory mechanisms" to safeguard wolves from threats that would otherwise imperil the species.  16 U.S.C. § 1533(a)(1)(D).  Wyoming's management regime omits essential regulatory mechanisms whose importance was highlighted by FWS itself.  Chief among these is any guarantee for an adequate buffer over Wyoming's minimum required wolf population.  Unlike Montana and Idaho, which were required by FWS to manage for at least 15 breeding wolf pairs and 150 wolves to achieve recovery, Wyoming was required to sustain only 10 breeding pairs and 100 wolves in recognition of the "large portion of [Wyoming's] wolf population in areas outside the State's jurisdiction"—principally, Yellowstone National Park.  77 Fed. Reg. 55,530, 55,538 (Sep. 10, 2012).[1]  "Importantly," however, FWS did not deem it sufficient for Wyoming to maintain only "this minimum population level."  Id. at 55,535.  Rather, FWS determined that Wyoming "must" maintain a sufficient population buffer over the state's 10/100 minimums on lands under state jurisdiction to ensure that Wyoming's liberal provisions for unregulated wolf mortality "do not drop the population below this minimum population level."  Id. at 55,535,

---

[1] Citations to items in the Federal Register are to the official citation; these documents are also available in the Administrative Record.  Citations to the Administrative Record begin with AR.

55,556 (emphasis added).  Nevertheless, Wyoming offered only an unenforceable promise of its intent to maintain an unspecified buffer.  Id. at 55,535.  Wyoming similarly offered only unenforceable promises and vague assurances on other key regulatory issues.  None of these promises and assurances constituted adequate existing regulatory mechanisms under the ESA, but FWS approved the state's management scheme anyway.

As to the alleged biological recovery of wolves in Wyoming, FWS repeats its past mistake of focusing on wolf numbers and current "genetic variability" inherited from the population's founders rather than genetic exchange between subpopulations that is essential to sustain the population into the future under FWS's own wolf-recovery standard.  FWS Mem. at 1; see also Defenders of Wildlife v. Hall, 565 F. Supp. 2d 1160, 1168-72 (D. Mont. 2008) (enjoining FWS wolf delisting due to arbitrary response to lack of genetic exchange).  The Greater Yellowstone Area remains "the most isolated recovery segment" of wolves in the northern Rocky Mountains.  77 Fed. Reg. at 55,538.  Its wolf population lacks adequate current genetic connectivity—a fact that FWS denies only by ignoring the admonitions of the very scientist upon whose work the agency relied in the Wyoming Delisting Rule.  The GYA's future prospects for adequate genetic exchange are dimmed by inevitable wolf population reductions and increasing mortality of dispersing wolves under state management.  Instead of grappling with these problems, FWS relied on unfounded optimism that minimal (and, indeed, inadequate) levels of genetic exchange would somehow persist or improve even as the states implement management plans that actively seek to reduce wolf numbers across the region.

For these and other reasons detailed below, FWS's Wyoming Delisting Rule violated the ESA.  This Court should grant plaintiffs' summary judgment motion, vacate the Wyoming Delisting Rule, and reinstate the prior rule protecting wolves in Wyoming under the ESA.

## I.     DEFENDANTS CANNOT JUSTIFY WYOMING'S DEFICIENT REGULATORY MECHANISMS FOR WOLF MANAGEMENT

In opposing plaintiffs' regulatory-mechanisms argument, FWS does not dispute that adequate regulatory mechanisms are essential to address the threat of human-caused wolf mortality once the Wyoming population is no longer protected by the ESA.  See FWS Mem. at 11 (acknowledging that human-caused wolf mortality "'requires regulation'") (quoting 77 Fed. Reg. at 55,568).  Instead, FWS argues that it was entitled to consider Wyoming's non-binding promises of future action in assessing the adequacy of the state's regulatory mechanisms under ESA § 4(a)(1)(D), 16 U.S.C. § 1533(a)(1)(D).  See FWS Mem. at 7-11.  FWS even attempts to justify its reliance on a legal—and logical—impossibility: "a regulatory mechanism [that] lacks the force of law."  Id. at 9 n.5.

This argument is contrary to the plain meaning of the term "regulatory mechanisms" and applicable case law.  As a matter of plain meaning, a "regulation" demands more than voluntary compliance; to "regulate" is to "control, govern, or direct by rule."  13 Oxford English Dictionary 524 (2d ed. 1989); see United States v. Reynolds, 710 F.3d 434, 435 (D.C. Cir. 2013) (statutory construction begins "with the statutory language and if its meaning is plain and unambiguous as to the disputed issue, that is where we stop") (citations omitted).  Accordingly, adequate "regulatory mechanisms" under ESA § 4(a)(1)(D) must sufficiently control or direct those actions that, absent adequate regulation, would imperil gray wolves.  A "regulatory mechanism [that] lacks the force of law," FWS Mem. at 9 n.5, does not control, govern, or direct anything, and is not a regulatory mechanism at all.

For this reason, courts repeatedly have held that "the FWS cannot rely on promised and unenforceable conservation agreements in evaluating existing regulatory mechanisms."  Colo. River Cutthroat Trout v. Salazar, 898 F. Supp. 2d 191, 208 (D.D.C. 2012); accord Ctr. for

Biological Diversity v. Morgenweck, 351 F. Supp. 2d 1137, 1141 (D. Colo. 2004) (rejecting

FWS reliance on non-binding conservation plans); Sw. Ctr. for Biological Diversity v. Norton,

2002 WL 1733618, at *9 (D.D.C. July 29, 2002) (rejecting reliance on "future and uncertain

actions" under ESA § 4(a)(1)(D), while affirming FWS reliance on binding forest plan); Fed'n of

Fly Fishers v. Daley, 131 F. Supp. 2d 1158, 1165-66 (N.D. Cal. 2000) (rejecting reliance on

promises of "future conservation actions" in listing determination); Or. Natural Res. Council v.

Daley, 6 F. Supp. 2d 1139, 1153-55 (D. Or. 1998) (FWS "should not be able to rely on

unenforceable efforts" to provide needed conservation measures); Biodiversity Legal Found. v.

Babbitt, 943 F. Supp. 23, 26 (D.D.C. 1996) (FWS may not rely on "promises of proposed future

actions" in ESA § 4 analysis).[2]

 This does not mean that "the ESA requires every aspect of state management to be

contained in a 'binding and enforceable' law or regulation." FWS Mem. at 7. That is a straw

man of FWS's own making. In addition to demanding consideration of the adequacy of needed

regulatory mechanisms, the ESA requires FWS to make listing and delisting determinations

"after taking into account those efforts, if any, being made by any State … to protect such

species." 16 U.S.C. § 1533(b)(1)(A). Accordingly, courts have approved FWS's consideration

of non-regulatory measures—but only outside the regulatory-mechanisms inquiry mandated by

ESA § 4(a)(1)(D) and, even then, only where such measures have already been implemented and

have a proven track record of success in conserving a species. See Tucson Herpetological Soc'y

v. Salazar, 566 F.3d 870, 881 (9th Cir. 2009) (cited in FWS Mem. at 10) (upholding FWS's

---

[2] Attempting to distinguish Morgenweck, 351 F. Supp. 2d at 1137, FWS claims that "Wyoming's
statutes and regulations … require management of the wolf population above an acceptable
floor." FWS Mem. at 10 n.8 (emphasis added). As discussed infra, Wyoming's statutes and
regulations contain no such requirement—as FWS itself previously recognized. 77 Fed. Reg. at
55,567 (acknowledging that "State statute and regulations" do not reference "a buffer above
minimum population targets").

consideration of measures implemented under conservation agreement in its "assessment of threats to the species' current range" under ESA § 4(a)(1)(A)); Colo. River Cutthroat Trout, 898 F. Supp. 2d at 208 (same where FWS considered "ongoing management practices" that "contribute to the maintenance of current Trout habitat" under ESA § 4(a)(1)(E)).

In no circumstance, however, may FWS rely on mere "promises of proposed future actions" in making an ESA listing determination.  Biodiversity Legal Found., 943 F. Supp. at 26; see also In re Polar Bear ESA Listing & Section 4(d) Rule Litig., 794 F. Supp. 2d 65, 113 n.56 (D.D.C. 2011) ("[T]he ESA does not permit FWS to consider speculative future conservation actions when making a listing determination."), aff'd, 709 F.3d 1 (D.C. Cir. 2013).  Further, where a threat such as human-caused mortality would justify listing absent sufficient regulation—as FWS admits is the case here, see 77 Fed. Reg. at 55,568, 55,588—the agency may not rely on voluntary assurances to substitute for regulatory guarantees.  See Colo. River Cutthroat Trout, 898 F. Supp. 2d at 207-08 (FWS may not rely on "promised and unenforceable" measures in evaluating "regulatory mechanisms"); see also Am. Wildlands v. Norton, 193 F. Supp. 2d 244, 256 (D.D.C. 2002) ("Having identified hybridization as a threat to [trout subspecies], FWS should have identified whether the regulatory mechanisms in place were adequate to protect a viable population of the subspecies.").  This is especially so in this case, where a history of hostility toward wolves in the northern Rocky Mountains region demonstrates the potential for opportunistic reversal of voluntary wolf-protection measures.  See 77 Fed. Reg. at 55,566 (admitting Idaho's post-delisting abandonment of "stated intention to manage for 520 wolves"); AR 13827 (FWS's long-time wolf-recovery coordinator stating:  "Never underestimate

… the strength of the [agricultural] political pressure in WY to always be to get as close to zero [wolves] outside the Parks as possible and then dare the FWS to relist.").[3]

FWS attempts to evade this conclusion by arguing that the challenged rule reflects a formal effort to interpret ESA § 4(a)(1)(D) that should be accorded <u>Chevron</u> deference.  <u>See</u> FWS Mem. at 8-9.  However, no <u>Chevron</u> deference is warranted where Congress "has directly spoken to the precise question at issue."  <u>Chevron U.S.A., Inc. v Natural Res. Def. Council</u>, 467 U.S. 837, 842-43 (1984).  Congress has done so here by using the term "regulatory" to foreclose the consideration under ESA § 4(a)(1)(D) of a mechanism that "lacks the force of law."  16 U.S.C. § 1533(a)(1)(D); FWS Mem. at 9 n.5.  While FWS points out that the ESA does not use the explicit phrase "'laws and regulations'" in this provision, FWS Mem. at 9, Congress need not "repeat itself or use extraneous words before [the courts] acknowledge its unambiguous intent," <u>Friends of the Earth v. EPA</u>, 446 F.3d 140, 144 (D.C. Cir. 2006).

Moreover, if FWS has articulated any statutory interpretation of ESA § 4(a)(1)(D) in the Wyoming Delisting Rule, it is to assert that, "[b]y definition, potential threats only require regulation if they represent a threat in the absence of regulation."  77 Fed. Reg. at 55,588.  In that same discussion, FWS identified human-caused mortality as "the most significant issue" influencing future wolf population levels.  <u>Id.</u>  For that reason, FWS acknowledged that regulation is required to control such mortality, stating that, "<u>if human-caused mortality is adequately regulated and population targets are sufficient to allow for other potential unforeseen</u>

---

[3] Case law cited by FWS, <u>see</u> FWS Mem. at 10, is not to the contrary.  <u>Defenders of Wildlife v. Kempthorne</u>, 535 F. Supp. 2d 121, 131 (D.D.C. 2008), did not address enforceability, reiterated that "it is improper for the Wildlife Service to rely on future or speculative regulatory mechanisms," and found land management plans not to be speculative only where they had a proven track record of "maintaining and preserving habitats."  <u>Biodiversity Legal Foundation v. Babbitt</u>, 943 F. Supp. at 26, addressed a U.S. Forest Service management plan, but those plans are enforceable regulatory mechanisms pursuant to 16 U.S.C. § 1604(i).

or uncontrollable sources of mortality, no other potential threats are likely to compromise the population's viability." Id. (emphasis added). Accordingly, under FWS's own statutory interpretation, adequate regulation of human-caused mortality—not promises and voluntary undertakings—is required.

FWS's reliance on the ESA's legislative history, see FWS Mem. at 9-10, is similarly unsuccessful. Although the Senate Commerce Committee's report on the ESA "caution[ed] against federal pre-emption of efficient state programs," id. at 10, it made clear that "the Federal government should protect [endangered and threatened] species where States have failed to meet minimum Federal standards." S. Rep. No. 93-307, at 3 (1973). ESA § 4 provisions that "allow the Secretary to declare endangered or threatened species any species for any legitimate reason," H.R. Rep. No. 93-412, at 11 (1973) (quoted in FWS Mem. at 9)—including "the inadequacy of existing regulatory mechanisms," 16 U.S.C. § 1533(a)(1)(D)—advance this objective.

In sum, the ESA did not permit FWS to rely on voluntary assurances and promises to address a threat to wolves in Wyoming, such as human-caused mortality, that concededly required a regulatory response. Nevertheless, FWS did just that. Moreover, even if the ESA did allow FWS to rely on Wyoming's non-regulatory assurances—which it did not—FWS relied on assurances here that had no proven record of success and failed even to pledge the explicit measures that FWS deemed necessary.

## A.   FWS Unlawfully Relied On Wyoming's Unenforceable Promise To Maintain An Essential Buffer Over Minimum Population Levels

Although "FWS cannot rely on promised and unenforceable conservation agreements in evaluating existing regulatory mechanisms," Colo. River Cutthroat Trout, 898 F. Supp. 2d at 208, the agency did precisely that here with respect to a central conservation measure that FWS itself deemed "[i]mportant[]," 77 Fed. Reg. at 55,535. The agency's regulatory mechanisms

7

analysis under ESA § 4(a)(1)(D) observed that Wyoming's statutes and regulations "require maintenance of at least 10 breeding pairs and at least 100 wolves," and then added: "To ensure this target is not inadvertently compromised, Wyoming <u>intends</u> to maintain an adequate buffer above minimum population objectives."  <u>Id.</u> at 55,590 (emphasis added); <u>see also</u> <u>id.</u> at 55,567 (stating that FWS's "primary consideration in gauging the adequacy of Wyoming's regulatory framework is … binding State statutes and implementing regulations," but also relying on Wyoming's statement that it "<u>intends</u> to satisfy these statutory and regulatory mandates by maintaining a buffer above minimum population targets") (emphasis added).

FWS attempts to defend this conduct by contending that Wyoming's wolf-management regime is "likely to ensure a population above the minimum 10/100 state goals."  FWS Mem. at 14-15.  FWS claims "Wyoming reversed its prior aggressive management regime," <u>id.</u> at 14, but the state's reform was more cosmetic than substantive; Wyoming in 2012 merely struck the descriptive word "aggressive" from its statute that continues to authorize the same "management techniques including the use of aerial hunting and hazing … and issuance of permits to private landowners" to kill wolves.  <u>See</u> AR 12208.  While Wyoming did increase its wolf-population commitment outside Yellowstone National Park from six to 10 breeding pairs, FWS Mem. at 14, this merely guarantees that the state will sustain its required bare-minimum number of wolves— not a buffer to "ensure uncontrollable sources of mortality do not drop the population below this minimum population level," 77 Fed. Reg. at 55,535.  Regardless of the modest reforms cited by FWS, Wyoming law continues to authorize unlimited killing of wolves across the sprawling "predator zone" and even within the "Trophy Area" in some circumstances.  <u>Id.</u> at 55,586; Wyo. Stat. Ann. § 23-3-115(c).  These provisions for unlimited wolf killing are <u>not</u> "similar to FWS's successful management of wolves while they were under the ESA's protection."  FWS Mem. at

14.  The threat posed by such unlimited mortality is the very reason why FWS itself found that a population buffer is essential.  See 77 Fed. Reg. at 55,587 (finding former "substantial concern" with "predator" management mitigated by Wyoming's intent "to maintain an adequate buffer above minimum population objectives").

Further, although FWS cites Wyoming's "robust" wolf-monitoring program as justification for the agency's determination that the state's mere "intention" to maintain a buffer was sufficient, FWS Mem. at 14-15, that program actually proves the opposite.  In response to peer-review concerns that Wyoming's monitoring program threatens to mask population declines, see Plaintiffs' Mem. at 26-27, FWS concluded that Wyoming's monitoring methods "are likely to always be sufficiently reliable assuming maintenance of an adequate buffer above minimum recovery levels," 77 Fed. Reg. at 55,556 (emphasis added).  Accordingly, FWS's acceptance of Wyoming's monitoring program was contingent on an adequate population buffer; FWS did not conclude that the monitoring program rendered an adequate buffer unnecessary.

FWS also accuses plaintiffs of "ignor[ing] the significant portion of the state's [wolf] population residing in protected National Park jurisdiction."  FWS Mem. at 12-13.  However, FWS itself concluded that park wolves would not be sufficient to secure the population absent Wyoming's maintenance of at least 10 breeding pairs and 100 wolves.  77 Fed. Reg. at 55,538 (10/100 "will satisfy Wyoming's contribution to NRM gray wolf recovery").  FWS further concluded that Wyoming "must … maintain a buffer to consistently meet its minimum management targets" in light of expected killing under Wyoming's provisions authorizing unregulated wolf mortality.  Id. at 55,556 (emphasis added).  Accordingly, a minimum population buffer is essential regardless of the park population.

As for FWS's reliance on Southwest Center for Biological Diversity, 2002 WL 1733618, at *9 (discussed in FWS Mem. at 15-16), that case undermines the agency's position. Southwest Center approved FWS's reliance on conservation measures embodied in a legally enforceable national forest management plan, which constitutes a regulatory mechanism imposing binding requirements on subsequent project activities. See id.; see also Greater Yellowstone Coal. v. Servheen, 665 F.3d 1015, 1031 (9th Cir. 2011) (approving FWS reliance on "legally enforceable National Forest Plans"); 16 U.S.C. § 1604(i) (projects must be consistent with forest plans). Further, Southwest Center stated that the "operative question [under ESA § 4(a)(1)(D)] is whether a set of regulations is concrete and specific enough to ensure that it will in fact be implemented." 2002 WL 1733618, at *9. Here, Wyoming's mere intent to maintain a population buffer is not even embodied in a "set of regulations," much less one that is "concrete and specific." Id. To the contrary, although FWS ignores the issue, see FWS Mem. at 12-16, Wyoming's stated intent to maintain a buffer—embodied in its 2012 wolf-plan Addendum, see AR 12348—offers no assurance that any buffer the state might voluntarily provide would be of adequate size. The Addendum states only that "[t]he size of the buffer will be determined through an adaptive management approach." Id. As FWS's own peer reviewers commented, "[k]nowing the size of this buffer and the justification for it are critical for understanding whether Wyoming's approach to wolf management is likely to maintain Wyoming's wolf population above recovery levels." AR 930 (Vucetich); see also AR 921 (Mills criticizing lack of "commitment to a meaningful population buffer"). FWS's failure even to require a "concrete and specific" assurance on this key issue represents a further ESA violation. Sw. Ctr. for

Biological Diversity, 2002 WL 1733618, at *9.[4]

**B.      FWS Disregarded Key Loopholes In Wyoming's Lethal Take Permit Program**

FWS fails to rehabilitate its approval of Wyoming's mandatory provision for issuance of lethal take permits, which threatens to eliminate any minimum population buffer and open the door to excessive wolf killing.

First, as to Wyoming's provision for mandatory issuance of lethal take permits so long as they "could not reduce" gray wolf numbers below the 10/100 minimums, Wyo. Stat. Ann. § 23-1-304(n), FWS reiterates its ipse dixit that "the 'could not' language gives WGFD the discretion to [limit take permits] well before the population actually approaches the 10/100 numbers." FWS Mem. at 16.  However, the Wyoming statute mandates issuance of permits so long as they "could not" drop the population below 10 breeding pairs and 100 wolves, not so long as they "could not" eliminate an essential buffer.  Wyo. Stat. Ann. § 23-1-304(n).  FWS offers only its own speculation that a Wyoming court would not construe this language to require issuance of lethal take permits any time there are at least 11 breeding pairs and 101 wolves under state jurisdiction.  At a minimum, the statutory language does not offer a regulatory mechanism "concrete and specific enough" in allowing for an adequate buffer "to ensure that it will in fact be implemented."  Sw. Ctr. for Biological Diversity, 2002 WL 1733618, at *9.[5]

---

[4] FWS relies on the "concrete example" of Wyoming's 2012 wolf-hunting season, FWS Mem. at 15, but state action under threat of litigation provides little reliable evidence of future conduct, see 77 Fed. Reg. at 55,566 (discussing Idaho abandonment of wolf-population promise after legislative delisting).

[5] Although FWS dismisses plaintiffs' reading of the lethal take permit statute as "absurd," "crabbed," "tortured," and an "exaggerated hypothesis," FWS Mem. at 16, 18, its own peer reviewer, Dr. Mills, raised the same concern as plaintiffs.  See AR 922.  Further, while Wyoming claims the statute halts permitting whenever lethal take "might possibly" prevent achievement of the 10/100 minimums, Wyo. Mem. at 26, those words do not appear in the statute; Wyoming's need to reconfigure the statutory language highlights the insufficiency of the existing language.

FWS attempts to bolster its statutory construction by referencing Wyoming's regulations. See FWS Mem. at 17.  However, regulations that limit lethal take "'in time and geography,'" id. (quoting 77 Fed. Reg. at 55,585), are beside the point; regulations are needed to adequately limit lethal take in amount.  See 74 Fed. Reg. 15,123, 15,172 (Apr. 2, 2009) (FWS 2009 partial delisting rule) ("[A] regulatory framework for wolf management at minimum recovery levels is not adequate.").  FWS identifies no regulations unequivocally limiting the amount of lethal take sufficiently to safeguard a population buffer.  Like the lethal take permit statute itself, provisions stating that lethal take permits must be issued if they "'will not prevent'" Wyoming from achieving population minimums, or that permits must be suspended if they "'may prevent'" Wyoming from achieving those minimums, see FWS Mem. at 17 (citing Wyo. Admin. Code GAME HUNT Ch. 21 §§ 6(d), 7(a), 7(b)(iii)), explicitly safeguard only Wyoming's commitment to maintain at least 10 breeding pairs and 100 wolves, not a buffer over those minimums.

Lacking any enforceable statute or regulation explicitly limiting lethal take permits to ensure an essential minimum-population buffer, FWS turns to Wyoming's unenforceable wolf-management Addendum.  See FWS Mem. at 17-18.  However, as a statement of mere "promises of proposed future actions" with no "method of enforcing compliance," the Addendum cannot compensate for deficiencies in Wyoming's actual regulatory mechanisms for lethal take. Biodiversity Legal Found., 943 F. Supp. at 26; Or. Natural Res. Council, 6 F. Supp. 2d at 1155. Moreover, FWS relies on the Addendum's discussion of Wyoming's "real and practical motivations" to maintain a buffer, FWS Mem. at 17, but the Wyoming Delisting Rule recognized that such alleged "strong incentive[s]" have no place in an ESA regulatory-mechanisms analysis, 77 Fed. Reg. at 55,590 (FWS "did not rely upon [state incentives] in making our decision"); see

SEC v. Chenery Corp., 332 U.S. 194, 196 (1947) (court reviewing agency action "must judge the propriety of such action solely by the grounds invoked by the agency").[6]

Ultimately, this Court need not resolve whether FWS justifiably interpreted the lethal take permit statute's "could not" language because, even under FWS's interpretation, at best this language provides Wyoming with some uncertain discretion—but not a specific or enforceable commitment—to manage for an undefined population buffer above the 10/100 minimums. Wyoming's unenforceable promise of future intention to exercise such undefined discretion is not a regulatory mechanism.  Sw. Ctr. for Biological Diversity, 2002 WL 1733618, at *9.[7]

Second, regarding Wyoming's broad authorization for lethal take permits based on the nebulous "harassing" of livestock or pets, Wyo. Stat. Ann. § 23-1-304(n); accord Wyo. Admin. Code GAME HUNT Ch. 21 § 6(b), FWS claims that it relied on "much more than a personal assurance" in approving this provision, FWS Mem. at 20.  Regardless of FWS's characterization, the fact remains that the agency relied on a mere letter from Wyoming's governor promising that "the Department intends to use the meaning of 'harassment' as implied" in Wyoming's separate "doing-damage-to-private-property" statute.  AR 3867 (emphasis added); see 77 Fed. Reg. at

---

[6] Wyoming hints that a court may compel the state to follow its plan—although it stops short of saying so.  See Wyo. Mem. at 23 ("any 'person' with standing can seek judicial review and ask the reviewing court" to enforce plan) (emphases added).  However, Wyoming's Administrative Procedure Act ("APA") is modeled after, and governed by "similar principles" as, the federal APA, Scarlett v. Town Council, 463 P.2d 26, 28 & n.4 (Wyo. 1969), which authorizes courts to compel only agency action "demanded by law," Norton v. S. Utah Wilderness Alliance, 542 U.S. 55, 65 (2004).  Wyoming's plan is not a law.  See 77 Fed. Reg. at 55,567 (Wyoming plan "clarifies" how state will implement "statutory and regulatory mandates").

[7] The court in Cook Inlet Beluga Whale v. Daley, 156 F. Supp. 2d 16, 21-22 (D.D.C. 2001) (quoted in FWS Mem. at 18), held that an agency making a listing decision need not "rule out factors" that were collateral to the principal threat impacting the species.  Here, by contrast, FWS itself identified human-caused wolf mortality as a central threat necessitating a regulatory response, 77 Fed. Reg. at 55,588, and specifically deemed "[i]mportant[]" Wyoming's ability to limit lethal take permits to preserve a population buffer, id. at 55,557.

55,585-86.  FWS's reliance on such "promises of proposed future actions" violates the ESA.

Biodiversity Legal Found., 943 F. Supp. at 26.

Attempting to salvage its decision, FWS for the first time claims it reasonably accepted

the governor's assurance because the two Wyoming statutes at issue are "in pari materia."  FWS

Mem. at 19-20; but see Chenery Corp., 332 U.S. at 196 (agency action must be judged "solely by

the grounds invoked by the agency").  However, the two statutes were not part of the same

enactment; Wyoming authorized lethal take permits for wolves "harassing" livestock in 2007 and

added the cited language to the "doing-damage-to-private-property" statute in 2012.  See Wyo.

Mem. Attachment B at 75, Attachment C at 427.  "Where the words of a later statute differ from

those of a previous one on the same or related subject," courts may conclude that the legislature

intended "a different meaning."  Muscogee (Creek) Nation v. Hodel, 851 F.2d 1439, 1444 (D.C.

Cir. 1988); see also United States v. Villanueva-Sotelo, 515 F.3d 1234, 1248 (D.C. Cir. 2008)

(first factor to consider in determining whether statutes are in pari materia is whether they are

"contained in the same legislative act") (quotations and citation omitted).  This is especially so

here, because Wyoming's legislature amended both statutes in 2012 but offered no indication

that the "doing-damage" language was meant to apply to lethal take permits.  See Wyo. Mem.

Attachment B at 73; Ball v. State ex rel. Wyo. Workers' Safety & Comp. Div., 239 P.3d 621,

630 (Wyo. 2010) (refusing to read language from one section of statute into another section

where language was omitted; "if the legislature had meant to" apply the omitted language, "it

would have done so").  The connection between these statutes is further attenuated because the

language cited by Wyoming's governor does not even define "harassing," which is the term at

issue in the lethal take statute, Wyo. Stat. Ann. § 23-1-304(n), but instead defines the phrase

"doing damage to private property," id. § 23-3-115(c); see Villanueva-Sotelo, 515 F.3d at 1248

14

(courts considering whether statutes are in pari materia ask whether they are "obviously designed to serve the same purpose and objective") (quotations and citation omitted).  At a minimum, the relationship between these two statutes is not so "concrete and specific" as to ensure that the governor's non-binding assurance "will in fact be implemented."  Sw. Ctr. for Biological Diversity, 2002 WL 1733618, at *9.

FWS also points out that Wyoming "will verify harassment" before issuing lethal take permits.  FWS Mem. at 19.  However, as FWS's own regional recovery coordinator observed, such verification offers no check on abuse of the "harassing" provision because "no injury is required and evidence to support or refute claims of harassment would be difficult to generate." AR 24663.  That is why the recovery coordinator said "it is critical this issue is carefully addressed in regulations in a manner that does not compromise Wyoming's ability to meet your management objectives."  Id. (emphasis added).  Instead of regulations, FWS relied on a letter assurance and violated the ESA.  See Colo. River Cutthroat Trout, 898 F. Supp. 2d at 208.[8]

Third, FWS wrongly attempts to dismiss what it previously admitted was a "major concern from a Factor D perspective (adequacy of regulatory mechanisms)," AR 24877 (emphasis in original); see also id. 24880, 24882—the state's mandate for issuance of lethal take permits even where authorized wolf killing would impede essential genetic exchange.  See FWS Mem. at 20.  FWS claims no regulatory mechanism was needed to address this issue because inadequate genetic exchange does not threaten wolves and is unlikely to do so.  See id.  But later in its brief, when FWS addresses the threat of future genetic isolation under state management, it

---

[8] FWS suggests this Court should ignore the recovery coordinator's concern because the agency ultimately "concluded that such a definition was not necessary."  FWS Mem. at 19 n.12. However, the agency deemed a definition of "harassing" unnecessary because Wyoming's governor promised that the state would use a definition "implied in" a separate statute.  AR 3867; 77 Fed. Reg. at 55,585-86.  As discussed above, reliance on such a promise of future action is not permitted under the ESA.  See Biodiversity Legal Found., 943 F. Supp. at 26.

seeks to dismiss this threat by claiming that "Wyoming has regulatory mechanisms in place to provide continued opportunities for successful migration into the GYA," including provisions to regulate "the amounts and timing of mortality." Id. at 36-37.  FWS cannot have it both ways, claiming no regulatory mechanisms are needed to limit lethal take because there is no threat from inadequate genetic exchange, but at the same time claiming there is no threat from inadequate genetic exchange because Wyoming has enacted regulatory mechanisms to limit lethal take.

FWS makes no attempt to untangle these conflicting contentions, but instead claims that plaintiffs seek "'an absurd overabundance of regulation.'"  FWS Mem. at 20 (quoting Friends of Blackwater v. Salazar, 691 F.3d 428, 436 (D.C. Cir. 2012)).  However, unlike Friends of Blackwater, this is not a case where FWS found regulatory mechanisms unnecessary to safeguard a species.  FWS's own Wyoming Delisting Rule concluded that sufficient genetic interchange would be assured because Wyoming "would alter management" if "sufficient interchange is not occurring," "including reducing mortality quotas in dispersal corridors or reducing total mortality quotas over a series of years."  77 Fed. Reg. at 55,596.  Yet Wyoming's lethal-take-permit regulations do not allow for reducing lethal take to promote genetic interchange.  See Wyo. Admin. Code GAME HUNT Ch. 21 §§ 4(a)(ii), 7(a), 7(b)(iii).  FWS ignored Wyoming's inability to take the very step the agency relied on to ensure genetic interchange, and for this reason too violated the ESA.[9]

---

[9] FWS wrongly contends that "Wyoming did add the missing commitment" to address genetic interchange.  FWS Mem. at 20 n.15.  Wyoming added a statement of its intention "to ensure genetic diversity and connectivity issues do not threaten the population," Wyo. Admin. Code GAME HUNT Ch. 21 § 4(a)(ii), but failed to give force to that provision by making it a basis for denying, suspending or canceling lethal take permits, see id. § 7(a), 7(b)(iii).

**C.      FWS Approved Unlimited Mortality Of Wolves "Doing Damage To Private Property"**

In addressing Wyoming's statute allowing killing of wolves "doing damage to private property," Wyo. Stat. Ann. § 23-3-115(a), FWS does not deny that this law authorizes unregulated wolf mortality that "is not tied to the minimum population floor," FWS Mem. at 21. Further, FWS makes no attempt to defend the Wyoming Delisting Rule's reliance on a mere email from a Wyoming state official asserting that baiting of wolves under this provision would be unlawful, see Plaintiffs' Mem. at 25; 77 Fed. Reg. at 55,561; indeed, FWS does not dispute that Wyoming law permits landowners to leave "livestock carcasses in their grazing pastures" to attract wolves into situations where they can be shot, FWS Mem. at 21-22.[10]

Instead, FWS argues that any resulting threat to the wolf population is "sheer speculation." Id. at 22. However, FWS's own published research demonstrates that "[w]olves readily scavenge on livestock carcasses." AR 1091 (Bangs 2006). Further, although FWS deems baiting "unlikely" and takes comfort in Wyoming's authority to limit sources of regulated mortality to compensate for unlimited wolf killing under the "doing-damage-to-private-property" law, FWS Mem. at 22-23, FWS fails to grapple with the threat that arises from application of this law when the wolf population falls to or below minimum levels. At that point, Wyoming would have exhausted its ability to "institute emergency adjustments to in-season management," id. at 23, but wolf killing under the "doing-damage" law would remain lawful. Indeed, action under

---

[10] A Wyoming official stated at a public meeting regarding Wyoming's wolf management scheme that it would be lawful to harass a wolf with a dog and then kill the wolf if the dog was attacked. See AR 1675. Nevertheless, FWS and Wyoming now contend that Wyoming law prohibits such conduct. See FWS Mem. at 21; AR 1675. Regardless, FWS does not contest that Wyoming law permits baiting of wolves with livestock carcasses. See FWS Mem. at 22.

this law would become the only legal method by which landowners could continue to kill

wolves, making baiting an even greater threat.  FWS offers no response to this problem.[11]

### D.    FWS Dismissed Threats From "Predator" Extermination And Flawed Monitoring Based On Wyoming's Unenforceable Promise

FWS fails to justify its regulatory-mechanisms analyses of Wyoming's "predator zone"

and wolf-monitoring protocol, both of which relied on the state's unenforceable promise for "an

adequate buffer" above minimum population levels.  77 Fed. Reg. at 55,556, 55,587.

First, regarding the year-round, kill-on-sight "predator zone" through 83.5 percent of

Wyoming, FWS claims plaintiffs' argument "ignores the true 'buffer' of the YNP population."

FWS Mem. at 23.  But FWS itself did not deem the protected park population to be a sufficient

answer to the "predator" extermination of wolves—including some wolves that will temporarily

venture out from the "Trophy Area."  See 77 Fed. Reg. at 55,587.  Instead, FWS stated that,

despite park protections, "[s]uch losses were a substantial concern when State law required

WGFD to aggressively manage the population down to minimal levels."  Id.  FWS found this

"substantial concern" alleviated only because Wyoming deleted its mandate for "aggressive"

management, committed to sustain 10/100 population minimums, and "intends to maintain an

adequate buffer above minimum population objectives to accommodate management flexibility

---

[11] Wyoming—but not FWS—contends that the Wyoming Game and Fish Commission may prohibit killing of wolves under the "doing-damage" law pursuant to the commission's authority "to regulate the number of gray wolves … as necessary to carry out the commission's duties under this act."  Wyo. Stat. Ann. § 23-1-302(a)(xxix) (discussed in Wyo. Mem. at 28-32). However, the referenced "act"—which is the Wyoming Legislature's 2007 wolf-management enactment—provides for the commission to sustain only seven breeding pairs of wolves outside national parks.  See Wyo. Mem. Attachment C at 425.  Further, under Wyoming's theory, there would be no need for any specific regulatory mechanism to safeguard wolves because the generalized language of § 23-1-302(a)(xxix) would cover every need; this was not FWS's conclusion nor is it the law.  See 77 Fed. Reg. at 55,530-55,604 (no reference to § 23-1-302(a)(xxix)); Sw. Ctr. for Biological Diversity, 2002 WL 1733618, at *9 (regulatory mechanism must be "specific" enough to ensure that it "will in fact be implemented").

and to ensure that uncontrollable sources of mortality do not drop the population below this minimum population level." Id. Accordingly, the park wolf population does not eliminate the necessity for an adequate buffer over Wyoming's minimum required wolf population to offset losses in the "predator zone."

The same is true regarding the other measures catalogued by FWS to extoll Wyoming's modified wolf-management regime. See FWS Mem. at 24. Despite the size and location of Wyoming's "permanently affixed" "Trophy Area," id., FWS remained concerned that "some wolves that primarily occupy the Trophy Area will be killed when traveling into the predator area." 77 Fed. Reg. at 55,587. FWS accepted such unregulated wolf mortality only because of the prospect that Wyoming would sustain a sufficient buffer to allow such killing without dropping the population below required minimums. See id. Yet the importance of a buffer to cushion the blow of unregulated "predator" mortality makes it all the more irrational for FWS to leave the buffer to Wyoming's mere intention to take future action. See id. at 55,556 (Wyoming "must … maintain a buffer to consistently meet its minimum management targets")

Second, for much the same reason, FWS fails to justify its analysis of Wyoming's approach to monitoring the wolf population, which—as pointed out by FWS's own peer reviewer, Dr. Mills—"could falsely assert an increasing population, perhaps leading to more aggressive management, when in reality the population could be declining." AR 922. FWS points out that the Wyoming Delisting Rule noted "the superiority of Wyoming's monitoring resources" and observed that "state law requires Wyoming to adjust monitoring techniques." FWS Mem. at 25. However, notwithstanding those measures, the rule said "the importance of this issue and any possible erroneous conclusions about abundance and trends is dependent on how close Wyoming manages to its minimum population targets." 77 Fed. Reg. at 55,556. FWS

again assumed that Wyoming will manage wolves "with a sufficient buffer" to avoid harmful errors, id., but again relied only on Wyoming's unenforceable promise.

FWS's final defense on this issue is to claim that the Court should defer to FWS's determination over Dr. Mills' "competing view of the science."  FWS Mem. at 25.  But FWS did not reject Dr. Mills' critique or offer an alternative scientific view.  Rather, FWS recognized the problem identified by Dr. Mills but found that Wyoming's unenforceable promise to maintain "a sufficient buffer" would offset the potential for erroneous population counts.  77 Fed. Reg. at 55,556.  Accordingly, this case does not call for judicial deference to FWS's scientific judgment, but rather for judicial enforcement of the well-established principle that FWS may not rely on mere "promises of proposed future actions" to offset an acknowledged threat to a species in an ESA listing determination.  Biodiversity Legal Found., 943 F. Supp. at 26.[12]

## II.   DEFENDANTS' SPECULATION THAT GENETIC CONNECTIVITY WILL BE SUFFICIENT DESPITE THE INCREASED ISOLATION OF GYA WOLVES UNDER WYOMING'S MANAGEMENT SHOULD BE REJECTED

FWS fares no better in attempting to defend its irrational dismissal of the persistent threat to the northern Rocky Mountains wolf population posed by genetic isolation of GYA wolves that is certain to worsen under state management.  In the Wyoming Delisting Rule, FWS reaffirmed that genetic connectivity among northern Rocky Mountains wolves is essential to the population's recovery, and concluded that one effective migrant per generation represents "a minimum" level of genetic exchange.  77 Fed. Reg. at 55,538, 55,593 (emphasis added).  FWS's brief again reaffirms these conclusions.  Although contending that "degradation of genetic variation is a long-term conservation issue," FWS Mem. at 39, FWS admits that it "has long

---

[12] FWS notes Wyoming's incentive to manage above population minimums to "allow for a more efficient and cost effective monitoring program," AR 12348 (quoted in FWS Mem. at 25), but, again, the Wyoming Delisting Rule disavowed any reliance on Wyoming's "strong incentive to maintain" the wolf population "well above minimal population levels," 77 Fed. Reg. at 55,590.

recognized that maintaining genetic connectivity is important to the recovery of wolves," id., and that "one migrant entering a population and breeding each generation is an appropriate level of gene flow," id. at 29; see also 77 Fed. Reg. at 55,537 (FWS's selected wolf experts deemed genetic exchange "important to maintaining the metapopulation configuration and wolf population viability"); AR 7834 (1994 FEIS:  "The importance of movement of individuals between sub-populations cannot be overemphasized.").

Nevertheless, FWS's brief irrationally takes for granted that genetic connectivity—already marginal—will not be jeopardized by a diminished wolf population and increased mortality of wolves dispersing into the GYA.  See FWS Mem. at 31-32.  FWS's optimistic assessment impermissibly relies on unsubstantiated speculation about existing levels of genetic exchange, overly optimistic projections of future population levels, and cursory dismissal of the increased mortality threat to dispersing wolves in key corridors that will arise under state management.  FWS's "damn-the-torpedoes" decision to proceed with delisting despite these risks was arbitrary and unlawful under the ESA.  Greater Yellowstone Coal., 665 F.3d at 1030 (noting "the ESA's 'policy of institutionalized caution'") (citation omitted).

A.    FWS Ignored The Limitations Of Its Own Cited Science In Multiplying Documented Immigration To The GYA

Contrary to FWS's suggestion, FWS Mem. at 27, plaintiffs have not argued that GYA wolves are currently threatened by low genetic variability (though this current genetic health is due to past factors that are unlikely to persist given increasing wolf mortality under state management, as it "probably reflect[s] a relatively large and genetically diverse founding population coupled with rapid population expansion," AR 11364 (vonHoldt 2010)).  Rather, plaintiffs argue—consistent with FWS's own findings, 77 Fed. Reg. at 55,537; see also AR 7834 (1994 FEIS), 11366-67 (vonHoldt 2010)—that the population's current genetic health cannot be

21

sustained without adequate connectivity between the GYA and other wolf subpopulations.  See

Pls.' Mem. at 28-29.  The record confirms that the current level of connectivity to the relatively

isolated GYA wolf population is inadequate.  FWS's own studies documented insufficient

effective dispersal into the GYA to satisfy even FWS's bare minimum one-migrant-per-

generation rule.  See 77 Fed. Reg. at 55,593 (documenting 0.42 effective migrants per generation

into GYA).  Two separate analyses—one using dispersal data from radio collared wolves and

one using genetic data—identified wolf dispersal into the GYA well below FWS's minimal

threshold of one effective migrant per generation.  See id.; Plaintiffs' Mem. at 30-31.

Nevertheless, FWS asserts that dispersal studies likely did not capture every dispersing

wolf, and therefore effective-migration numbers are actually higher.  FWS Mem. at 29.

Specifically, FWS multiplied the two wolves known to have dispersed into the GYA and

successfully bred between 1995 and 2008 by three to arrive at "over one effective migrant per

generation," claiming that this was a "conservative[]" extrapolation from data based on the 20-

30% of wolves in the region outfitted with radio collars.  FWS Mem. at 29 (arguing that FWS

could reasonably multiply documented effective migrants by three to five, but "conservatively

assumed the lower end of the range").

FWS's approach was hardly conservative.  The agency adopted a one-effective-migrant-

per-generation standard that represents a "minimum" requirement, see AR 4141 (Mills and

Allendorf 1996), and then tripled documented immigration to satisfy it.  FWS's support for this

approach consists of statements from genetics scientists that actual wolf dispersal is "presumably

greater" than published estimates, AR 11365 (vonHoldt 2010), and that such "estimates are

conservative minimums," AR 5865 (Stahler 2011).  See FWS Mem. at 30.  However, while

published estimates may be "conservative," FWS has provided no support for its conclusion that

the actual data gathered on wolf dispersal was "conservative" by <u>three to five times</u>.

Indeed, the very scientist on whose work FWS relied for its GYA genetic connectivity analysis specifically counseled against assuming <u>double</u> the number of documented effective migrants, let alone <u>triple</u>, as FWS did. Dr. Daniel Stahler, who was a co-author of the important vonHoldt 2010 genetics study and on whose 2011 work FWS relied, <u>see</u> 77 Fed. Reg. at 55,593, stated that "it would not be necessarily accurate (certainly not based on supporting data) to say that because we showed <u>3 to 5 effective migrants per generation</u> and we sample 30%, then there must be really <u>6-10 migrants per generation</u>." AR 5865 (Stahler 2011) (emphases added). Yet, while purporting to rely on Dr. Stahler's work, FWS nevertheless concluded in the Wyoming Delisting Rule that documented levels of effective migration were "almost certainly low <u>by at least half</u>." 77 Fed. Reg. at 55,593 (emphasis added, quotations omitted). FWS dismisses Dr. Stahler's limitation on use of his own research findings on the basis that judicial deference is owed to the agency, "'not to each individual agency employee.'" FWS Mem. at 30 n.21 (quoting <u>Serono Labs. v. Shalala</u>, 158 F.3d 1313, 1321 (D.C. Cir. 1998)). But Dr. Stahler is not even a FWS employee; he is a member of the National Park Service's Yellowstone Wolf Project whom FWS chose to consult on the issue of genetic connectivity, and on whose analysis FWS relied as the best available science on current levels of genetic exchange. 77 Fed. Reg. at 55,593; <u>see</u> 16 U.S.C. § 1533(b)(1)(A) (requirement to use best available science). FWS's misuse of Dr. Stahler's research findings, over his objections, was arbitrary. See <u>Carlton v. Babbitt</u>, 26 F. Supp. 2d 102, 109-10 (D.D.C. 1998) (FWS's application of research, despite author's caution that such use was "inappropriate," was arbitrary and capricious).

Nor did FWS's multiplication of actual dispersal data reflect "expert judgment," FWS Mem. at 30, given that it ignored the limitations of the scientific evidence in the record. See <u>Am.</u>

Wildlands, 193 F. Supp. 2d at 253 (having identified the threat of hybridization to trout species,

FWS arbitrarily dismissed threat entirely based on scientific study finding only that "some

degree of hybridization" was acceptable).  While FWS insists it was entitled to rely on the "'the

best data available to it,'" FWS Mem. at 30 (citing Friends of Blackwater, 691 F.3d at 434-35),

the agency ignores the fact that the "best data available"—which FWS itself identified as the

Stahler 2011 information, see 77 Fed. Reg. at 55,593—incorporated a key limitation on doubling

of documented effective migration values that FWS disregarded.[13]

### B.   FWS Unreasonably Assumed That Wolf Population Levels Will Remain Well Above Minimum Recovery Levels

FWS also fails to justify its conclusion that future genetic exchange will be adequate to

avoid genetic threats to the wolf population under Wyoming's management scheme.  Both FWS

and the experts upon which it relied recognized that a declining GYA wolf population would

reduce effective natural dispersal below even current levels.  See 77 Fed. Reg. at 55,594

("Population levels across the NRM DPS could affect natural rates of gene flow" and "past

dispersal data is unlikely to be an exact predictor of future effective migration rates."); accord

AR 3277-78 (Jimenez 2011); AR 11365-67 (vonHoldt 2010); see also AR 806 (Vucetich) ("The

rate of effective migration is importantly influenced by abundance and mortality.  Moreover,

state management will almost certainly lead to reduced abundance and increased mortality.").

Even so, FWS concluded that future genetic connectivity will be adequate based on its beliefs

that the NRM wolf population would stabilize around 1,000 wolves (just over half the estimated

2011 population), 77 Fed. Reg. at 55,594, and the GYA population is likely to contain over 300

---

[13] FWS's brief does not even attempt to defend the Wyoming Delisting Rule's reliance on Hebblewhite 2010, see 77 Fed. Reg. at 55,593, which originated the extrapolation from Dr. Stahler's work that was rejected by Dr. Stahler himself, and which attributed that extrapolation to vonHoldt 2010, where no such extrapolation appears.  See Plaintiffs' Mem. at 31 & n.7.

of those wolves, id. at 55,568.

    FWS's conclusion should be rejected, first, because even if FWS had adequate basis to conclude that 1,000 wolves will persist in the region, FWS failed to demonstrate that this number is sufficient to address genetic requirements.  FWS documented inadequate effective wolf migration into the GYA when the northern Rocky Mountains wolf population was at or below 1,000 wolves (i.e., until 2005)—even though dispersing wolves were protected by the ESA.  See Plaintiffs' Mem. at 36; 77 Fed. Reg. at 55,593 (discussing effective wolf migration in 2002); AR 09117 (identifying wolf population levels).  FWS fails to address this problem.

    Second, as even FWS's citations make clear, 1,000 wolves are more than twice the number the relevant states have actually stated any intention to maintain.  See FWS Mem. at 33-34.  Yet, rather than contending with the fact that no state has committed to maintain a wolf population above FWS's bare-minimum recovery standards, FWS rests its argument on the point that no state has actually committed to affirmatively reduce populations to minimum levels.  Id. at 33.  This is cold comfort.  While FWS makes a "prediction" that the population will be maintained around 1,000 wolves, past experience indicates that FWS has not accurately predicted the actions of the northern Rocky Mountains states following wolf delisting.  See id. at 55,566 (admitting Idaho's post-delisting abandonment of "stated intention to manage for 520 wolves").  Further, contrary to FWS's claim, the governing wolf management plan in Idaho states the official position of Idaho that the federal government should remove all wolves from that state, see AR 2916, and commits only to managing for a minimal population of wolves sufficient "to prevent the wolf from being relisted under the Endangered Species Act," AR 2930.  Given this record, FWS may not choose to rely on mere unsubstantiated optimism to ensure

25

essential genetic connectivity.[14]

FWS repeatedly argues that the agency is entitled to deference when making predictions about future population numbers, citing Friends of Blackwater, 691 F.3d at 428, Oceana v. Evans, 384 F. Supp. 2d 203 (D.D.C. 2005), and In re Polar Bear, 709 F.3d at 1.  FWS Mem. at 31, 34.  However, each of these rulings was predicated on a judicial finding that the record contained adequate scientific evidence supporting the agency's position and analysis.  In Friends of Blackwater, the Court upheld FWS's reliance on documented species persistence data demonstrating that the species continued to occupy its historic range and offering no indication of a declining population.  691 F.3d at 434-5.  FWS cites Oceana for the holding that "'[t]here is nothing inherently problematic about using predictions of population trends,'" FWS Br. at 34 (quoting 384 F. Supp. 2d at 221 n.21), but omits the qualification that the predictions in that case were based on "a scientifically valid model, which takes into account the effects of a proposed action and determines that a species' population will stabilize or increase," Oceana, 384 F. Supp. 2d at 221 n.21.  And, in In re Polar Bear, the Court held that FWS's reliance on polar bear population models to "confirm[] the general direction and magnitude of the population trends already forecast on the basis of other record evidence," while at the same time "explain[ing] the models' limitations and … why its limited reliance on the models was justified," was not arbitrary.  709 F.3d at 13-14.  None of these cases is analogous to the situation here, where the agency's delisting decision fundamentally relied on optimistic speculation that, at least with respect to Idaho, defies the actual positions and past actions of relevant state actors.  Indeed, in

---

[14] FWS's brief further predicts that hunting will not significantly reduce the wolf population due to the difficulty of hunting wolves in certain areas of Idaho, diminished interest in hunting wolves over time, and the increased difficulty in finding wolves to shoot as the number of wolves diminishes.  FWS Mem. at 31, 34.  FWS ignores the fact that a small population and difficult terrain did not historically prevent humans from hunting wolves to near extinction.  See 77 Fed. Reg. at 55,535.

citing these other cases affirming the agency's thoroughness in reaching a decision, FWS only highlights the lack of scientific or rational basis for its population projection here.[15]

While courts defer to an agency's rational decision making, courts also must carefully evaluate the agency's predictions to ensure they are not arbitrary.  For instance, the court in Greater Yellowstone Coalition required FWS to do more in the face of scientific uncertainty than simply to predict the success of a species after delisting; it required FWS to rationally explain why uncertainty counsels in favor of delisting because otherwise the court "might as well be deferring to a coin flip."  665 F.3d at 1028.  The same admonition applies here.  FWS acted arbitrarily by basing its population projection on unsubstantiated speculation about future state management actions and ignoring actual state management commitments.

### C.     Increased Mortality Of Dispersing Wolves Will Further Inhibit Genetic Connectivity

FWS's dismissive response to concerns about increased mortality of dispersing wolves in Wyoming and Idaho is similarly flawed.  FWS's brief asserts that wolves are "extraordinary" dispersers, traveling long distances through unsuitable habitat, and that wolves can withstand high levels of human-caused mortality, see FWS Mem. at 7, 28—as though these facts obviate the need to limit disperser mortality.  To the contrary, despite wolves' dispersal ability, genetic connectivity to the GYA remains inadequate and the GYA remains the most isolated wolf subpopulation in the northern Rocky Mountains.  Plaintiffs' Mem. at 30-31; 77 Fed. Reg. at 55,593.  Given these facts, FWS has not rationally explained why connectivity will not be

---

[15] FWS also cites legislative history stating that the ESA "'gives effect to the Secretary's ability to forecast population trends,'" FWS Mem. at 34 (quoting S. Rep. No. 93-307, at 3 (1973)), but the cited report also states that this power, used here in the listing context, is necessary to allow the Secretary to "regulate these animals before the danger becomes imminent while long-range action is begun" and the listing determination should be made "in full consideration of the forces which acted to bring about such endangerment."  S. Rep. 93-307, at 3.

unacceptably impacted by state management that will admittedly result in higher mortality than the population experienced while listed under the ESA, see 77 Fed. Reg. at 55,594, much less why already insufficient genetic connectivity will not be further compromised.

FWS first attempts to dismiss concerns about potentially high mortality of dispersing wolves by focusing on the potential for wolves to immigrate to the GYA through allegedly "easily traversable areas" other than Wyoming's "predator zone" (where wolf killing is unregulated). FWS Mem. at 36. However, FWS itself previously concluded that "wolf dispersal patterns indicate that dispersing wolves moving into the GYA from Idaho or Montana tend to move through the predatory area," and that "[p]hysical barriers such as high elevation mountain ranges that are difficult to traverse in winter appear to discourage dispersal through the National Parks' northern and western boundaries." 74 Fed. Reg. at 15,176. While FWS in the Wyoming Delisting Rule offered a different conclusion, 77 Fed. Reg. at 55,564, it offered no different facts about wolf dispersal to support that conclusion and, to the contrary, reaffirmed that "physical barriers (such as high elevation mountain ranges that are difficult to traverse in winter) appeared to discourage dispersal through Grand Teton National Park's western boundary," id. at 55,594. Absent any evidence to justify its position, FWS's unsupported assertion should be rejected.[16]

FWS next points to Wyoming's "regulatory mechanisms … to provide continued opportunities for successful migration into the GYA and between recovery areas," FWS Mem. at 36, but, as discussed, FWS fails to acknowledge that Wyoming law offers no mechanism to limit lethal take permits to promote genetic connectivity. See Section I.B, supra. This is contrary to

---

[16] FWS attempts to support its "multiple access points" argument by referencing Figure 2 in the Wyoming Delisting Rule. See FWS Mem. at 36 (citing 77 Fed. Reg. at 55,564, which references Figure 2). Figure 2 depicts only wolf pack locations, does not identify dispersal corridors or physical barriers to dispersal such as mountain ranges, and in fact emphasizes the lack of suitable habitat between the GYA and the other recovery areas by demonstrating the low density of wolves in all areas surrounding the GYA. See 77 Fed. Reg. at 55,540.

the direction of FWS's peer reviewers and experts, who conditioned their analysis of future

genetic connectivity on specific management to promote natural wolf dispersal.  See AR 3278

(Jimenez 2011) ("[S]pecific management for natural wolf dispersal to foster natural genetic

exchange is likely … necessary in the GYA."); AR 781 (Mills) ("wolf connectivity should be

high as long as mortality in connectivity zones is not excessive"); AR 11367 (vonHoldt 2010)

("[A] management challenge for long-term viability of wolves in the NRM will continue to be

the maintenance of adequate population size and effective dispersal to maintain long-term

genetic health.  Encouraging natural dispersal throughout the NRM and Canada should remain a

priority for future conservation of the NRM wolf population.").  FWS relies on the fact that

Wyoming regulates wolf mortality in the "Trophy Area" and modestly expands "trophy" wolf

management into the "flex zone" during times when around half of wolf dispersals occur.  FWS

Mem. at 36-37.   However, FWS fails to confront the fact that the "flex zone's" "trophy"

management will be in place for less time than is required for an average wolf to disperse.  See

Plaintiffs' Mem. at 36-37.

FWS also wrongly accuses plaintiffs of making a "blatantly false statement" that there is

not a single day of the year during which wolves will be protected from unlimited killing if they

attempt to disperse through Idaho's "Southern Idaho" hunting unit and the adjacent Wyoming

"flex zone."  FWS Mem. at 37 & n.25.  From October 15 to the end of February, wolves are

subject to trophy game management in the Wyoming "flex zone."  See AR 12358 (Wyo. Gray

Wolf Mgmt. Plan).  During that same period, Idaho's wolf hunting season is underway, with no

quota on the number of wolves that can be killed in the adjoining "Southern Idaho" unit.  AR

28072, 28074.  By the time hunting season closes in "Southern Idaho" at the end of March,

Wyoming's "flex zone" reverts to "predator" management with unlimited human-caused

29

mortality.  AR 12358, AR 28074.  Accordingly, on one side of the Wyoming-Idaho border or the other, wolves attempting to migrate through this area that FWS deemed "biologically substantive and important" for genetic connectivity, 77 Fed. Reg. at 55,559, will be subject to unlimited mortality at all times of the year.[17]

### D.    Trucking Of Wolves Is No Substitute For Wolf Recovery

Given the likelihood of inadequate wolf dispersal into the GYA under state management, "human-assisted migration"—i.e., trucking wolves—between subpopulations, which defendants call a "last resort," Wyo. Mem. at 35-36, and a "stop-gap measure," FWS Mem. at 39 (quotations omitted), is likely to become standard practice.  Indeed, FWS's continuing need to include this practice among its post-delisting management strategies belies the agency's asserted confidence that such measures are unlikely to be needed.  FWS Mem. at 39-40.  In the absence of concrete measures to guard against the dual threats to genetic connectivity from dwindling population numbers and increased disperser mortality, wolf trucking could become the primary means for maintaining the genetic health of the GYA subpopulation—if any measures are undertaken at all. See AR 12350-51 (Wyoming Addendum identifying translocation as one of its "general adaptive management actions" if monitoring detects insufficient genetic exchange).[18]

FWS argues that translocation is an "acceptable management technique."  FWS. Mem.  at

---

[17] Instead of defending its conclusions about the importance of the "flex zone," FWS's brief seeks to divert attention to management of Idaho's "Island Park" hunting unit.  FWS Mem. at 37. However, while "Island Park" may well be important for wolf dispersal, the Wyoming Delisting Rule did not conclude that it was sufficient to address connectivity concerns; rather, the rule identified the "flex zone" as integral to allaying FWS's prior "concern that the size of the Trophy Area would affect natural connectivity and genetic exchange."  77 Fed. Reg. at 55,534; see id. at 55,552 ("flex zone" addresses "concerns about gene flow"), 55,564 ("flex zone" "will benefit dispersal").  FWS cannot now disregard impediments to "flex-zone" connectivity.

[18] Wyoming has not committed to any particular management action or identified a triggering threshold for such action, see AR 12350-51, nor has FWS identified inadequate genetic exchange as a trigger for relisting or a status review of the species, see 77 Fed. Reg. at 55,603.

39.  While plaintiffs agree that translocation is acceptable, and often necessary, for genetic rescue of a struggling population, the need for such management belies the contention that such a population has recovered and may be delisted.  The ESA seeks to "promote populations that are self-sustaining without human interference," not to sustain them indefinitely on human-assisted life support.  Trout Unlimited v. Lohn, 559 F.3d 946, 957 (9th Cir. 2009) (quotation omitted).  A statute that aims "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved," 16 U.S.C. § 1531(b), cannot be deemed to be satisfied where ecosystem functions are too shattered by human-caused mortality to provide necessary life-support services such as genetic connectivity.  Thus, while FWS argues that the ESA does not preclude the use of translocations "to manage a recovered species," FWS Mem. at 40,  the ESA may not reasonably be construed to permit a finding that a species has "recovered" if perpetual human management is needed to support that finding.[19]

## III.   DEFENDANTS FAIL TO SALVAGE FWS'S IRRATIONAL "SIGNIFICANT-PORTION-OF-ITS-RANGE" ANALYSIS

In addressing whether gray wolves in Wyoming remain endangered or threatened throughout a "significant portion" of their range because of the Wyoming "predator zone's" impact on dispersing wolves needed for natural genetic connectivity, 16 U.S.C. § 1532(6), (20), FWS does not contest the key factual points that render the agency's 2009 and 2012 listing determinations logically irreconcilable.  FWS does not contest that (1) dispersing wolves will be killed in the "predator zone"; (2) physical migration barriers and saturated park wolf habitats will funnel dispersers into the "predator zone"; and (3) Wyoming's winter elk feeding grounds will

---

[19] ESA §§ 4(a)(1)(D) and (b)(1)(A) are not to the contrary.  See FWS Mem. at 40 (quoting 16 U.S.C. §§ 1532(3), 1533(b)(1)(A)).  While these provisions require FWS to consider regulatory mechanisms and conservation practices, they do not alter the ESA's directive to undertake conservation efforts to bring imperiled species to the point at which the statute's "measures … are no longer necessary."  16 U.S.C. § 1532(3) (emphasis added).

attract and hold dispersing wolves in the "predator zone."  <u>See</u> Plaintiffs' Mem. at 42-43; <u>see</u> <u>also</u> FWS Mem. at 42 (acknowledging that "predator zone" "contribut[es] to connectivity between NRM subpopulations").  Based on these factors, FWS in 2009 determined that wolves remain imperiled throughout a "significant portion" of their range, reasoning that "wolves are unlikely to survive where they are classified as predatory animals" and "dispersal is more likely to lead to genetic exchange if dispersers have safe passage through the predatory area."  74 Fed. Reg. at 15,183.  Yet, despite the persistence of these factors in 2012, <u>see</u> Plaintiffs' Mem. at 43, FWS reached the opposite conclusion in the Wyoming Delisting Rule, finding that "the predator portion of Wyoming does not represent 'a significant portion of range.'"  77 Fed. Reg. at 55,603.

Attempting to defend this inconsistent conduct, FWS points out that, "even while the species was listed, [the 'predator zone'] did not support resident packs contributing to wolf recovery."  FWS Mem. at 42.  This argument is beside the point:  FWS in 2009 did not deem "predator-zone" extermination to imperil wolves within a "significant portion" of their range because of its impact on resident packs, but rather because of its impact on dispersing wolves that are important for "natural genetic connectivity."  74 Fed. Reg. at 15,183.

As to the impact on dispersers, FWS falls back on its new definition of "significant portion," under which the agency would deem the loss of dispersers in the "predator zone" to be significant only if, "without the predator area, the entire NRM would be placed 'in danger of extinction.'"  FWS Mem. at 42-43 (citation omitted).  However, FWS did not rationally adhere to its new definition.  FWS said in the Wyoming Delisting Rule that "the NRM wolf population would not become endangered" even if "all of the wolves, packs, and breeding pairs that occupy the predator area were extirpated."  77 Fed. Reg. at 55,602.  But, when it addressed the "predator" extermination of dispersing wolves, FWS dismissed the resulting impact because such

mortality "[i]s expected to be opportunistic and minimal"—essentially positing that some dispersing wolves in the "predator zone" will <u>not</u> be extirpated, <u>id.</u>  Accordingly, while FWS notes that it "did not apply its current interpretation of the statutory 'significant portion of its range' language in 2009," FWS Mem. at 43, the more important point is that FWS did not rationally apply its current interpretation even in the Wyoming Delisting Rule.

FWS next relies on changes to Wyoming wolf management within the "Trophy Area," asserting that the "more protective" management of gray wolves in this area "means that there are different impacts associated with the predator area from those identified in 2009," and that the agency consistently viewed the "Trophy Area" as principally conserving wolves.  FWS Mem. at 43-44.  However, FWS's 2009 analysis was not based on defects in Wyoming's "Trophy-Area" management, but rather upon FWS's conclusion that "wolves are unlikely to survive where they are classified as <u>predatory animals</u>."  74 Fed. Reg. at 15,183 (emphasis added).  FWS offers no explanation why the difference between "predator" management applying to wolves in 88 percent of Wyoming in 2009 versus 83.5 percent in 2012 alleviates any threat from extermination of dispersing wolves.  Further, regardless whether the 2009 and 2012 rules consistently determined that the "Trophy Area" "meaningfully contributes" to wolf conservation, FWS Mem. at 43, the two rules inconsistently determined the impacts of the "predator zone" on dispersing wolves needed for genetic connectivity.  <u>Compare</u> 74 Fed. Reg. at 15,183 <u>with</u> 77 Fed. Reg. at 55,602-03.  Such unjustified "inconsistencies in [the agency's]

approach" warrant invalidation of FWS's action.  Purepac Pharm. Co. v. Thompson, 354 F.3d

877, 884 (D.C. Cir. 2004) (quotations and citation omitted).[20]

## IV.   INTERVENORS' AND AMICUS'S ADDITIONAL ARGUMENTS ARE MERITLESS

Intervenors and amicus curiae offer several additional arguments in an effort to sustain

the Wyoming Delisting Rule.  None has merit.

First, Wyoming—but not FWS—contends that plaintiffs waived certain arguments by

failing to raise them in written comment letters.  Wyo. Mem. at 27, 34, 37.  FWS's failure to join

in this argument undermines Wyoming's position, "since the only litigant with an institutional

interest in such an exhaustion requirement has not argued for it."  U.S. Airways, Inc. v. Nat'l

Mediation Bd., 177 F.3d 985, 995 (D.C. Cir. 1999) (rejecting exhaustion argument); see Cutler v.

Hayes, 818 F.2d 879, 891 & n.95 (D.C. Cir. 1987) (rejecting intervenor's exhaustion argument in

part because agency did not press the issue).[21]

In any case, there has been no waiver.  Comments to the agency by plaintiffs and others

specifically raised issues concerning inadequate existing genetic connectivity to the GYE

population, see AR 24293-94, and FWS's irrational departure from its 2009 conclusion that

wolves remained imperiled throughout a "significant portion" of their range due to "predator"

extirpation of needed dispersers, see AR 24223-25; cf. Nat'l Wildlife Ass'n v. EPA, 286 F.3d

---

[20] Wyoming invokes the Wyoming district court's 2010 ruling regarding FWS's 2009 partial delisting rule because it "rejected the Service's conclusion that the entire state of Wyoming constitutes a significant portion of the range for the Wyoming wolf population."  Wyo. Mem. at 37.  True, but more importantly the Wyoming court left it to FWS to determine on remand how large the "Trophy Area" must be to safeguard against genetic isolation.  See Plaintiffs' Mem. at 45 n.11.  The question before this Court is whether FWS's remand decision on that point is lawful; the Wyoming ruling sheds no light on that issue.

[21] "The distinction between 'issue exhaustion' and 'issue waiver' is illusive, to say the least.  Indeed, both terms appear in the case law without apparent distinction, and they are sometimes treated as if synonymous."  Advocates for Hwy. & Auto. Safety v. Fed. Motor Carrier Safety Admin., 429 F.3d 1136, 1149 (D.C. Cir. 2005).

554, 562 (D.C. Cir. 2002) (finding waiver where "neither [plaintiff] nor any other party before the agency raised" pertinent issues); see also Wash. Ass'n for Television & Children v. FCC, 712 F.2d 677, 682 n.10 (D.C. Cir. 1983) ("[I]t would almost surely be futile for a party to raise an objection already made by someone else.").  Regarding Wyoming's mandate to issue lethal take permits even where wolf killing would frustrate essential genetic exchange, Wyo. Mem. at 27, FWS itself identified this problem as a "Major Issue" during the rulemaking process, AR 24877, 24880, 24882.  Given that the agency "in fact considered the issue," the issue has not been waived.  Wash. Ass'n for Television & Children, 712 F.2d at 682; Office of Commc'n of United Church of Christ v. FCC, 465 F.2d 519, 523-24 (D.C. Cir. 1972) (finding no waiver where agency officials "raise[d] the very argument pressed here" by plaintiff).

Second, defendant-intervenors Safari Club International, National Rifle Association, and Rocky Mountain Elk Foundation offer a policy argument about the importance of "wolf harvest and predator management" to "long term wolf conservation," Non-Sovereign Intervenors' Mem. at 1, but their argument is irrelevant given that the primary existing threats to the wolf population—human-caused mortality and inadequate genetic connectivity—are not addressed by sport hunting, see In re Polar Bear, 709 F.3d at 16-17 (upholding FWS determination that purported benefits of sport hunting "do not offset or reduce the overall threat to polar bears from loss of sea ice habitat" and thus did not undermine ESA listing determination).  Further, intervenors' argument is misguided.  Intervenors assert that "wolf harvesting and lethal control" are a "benefit" to wolves because they boost "social tolerance," Non-Sovereign Intervenors' Mem. at 1 (emphasis in original), 7-8, but, in similar contexts, two judges of this Court have questioned the logic of "the notion you kill the wolves to save the wolves," Humane Soc'y of U.S. v. Kempthorne, 481 F. Supp. 2d 53, 63 (D.D.C. 2006) (Kollar-Kotelly, J., quoting Huvelle,

J., regarding "social tolerance") (quotations and citation omitted), <u>vacated as moot</u>, 527 F.3d 181

(D.C. Cir. 2006).  While intervenors also suggest that hostile "predator management" "hold[s]

the key to wolves' sustainability in Wyoming," Non-Sovereign Intervenors' Mem. at 7, their

position defies the North American Model of Wildlife Conservation that they themselves extoll,

<u>see</u> <u>id.</u> at 14-21; AR 2506 (Geist 2006) ("Wildlife can only be killed for cause" under North

American model; "[t]his policy outlaws wanton slaughter which was once not uncommonly

practi[c]ed").[22]

  <u>Third</u>, amicus curiae Wyoming Wolf Coalition-2013 suggests that it has been the victim

of a "'bait and switch'" because the goal of wolf reintroduction from the outset was to restore

wolves "<u>to the Park and surrounding federal lands</u>."  WWC-2013 Br. at 3-4 (emphasis in

original).  However, FWS made clear in its 1994 FEIS proposing the wolf reintroduction that

"[n]ot all wolves will remain on federal or other public lands, so the analysis areas include

adjacent lands, including those privately owned, where wolves may occur and potentially cause

some impacts."  AR 7449.  Indeed, FWS's "analysis area" in the 1994 FEIS included six

Wyoming counties surrounding Yellowstone National Park.  <u>See</u> AR 7449-50.  WWC-2013 also

insists that ultimately the only relevant question is "whether the Wyoming Plan protects 15

breeding pairs and 150 wolves."  WWC-2013 Br. at 19.  This is incorrect.  Given the expected

Yellowstone National Park wolf population, FWS required Wyoming to sustain "at least 10

breeding pairs and at least 100 wolves at mid-winter" on lands within its jurisdiction.  77 Fed.

---

[22] Although non-sovereign intervenors disparage plaintiffs for "valu[ing] wolves above other wildlife species in Wyoming," Non-Sovereign Intervenors' Mem. at 14, plaintiffs' long record of advocacy for conservation of numerous wildlife species in Wyoming puts the lie to this claim. <u>See, e.g.</u>, <u>Defenders of Wildlife v. Salazar</u>, 651 F.3d 112 (D.C. Cir. 2011) (challenging elk and bison feeding program that spreads wildlife disease); <u>Fund for Animals v. Clark</u>, 27 F. Supp. 2d 8 (D.D.C. 1998) (challenging planned bison hunt on park and refuge lands); <u>Fund for Animals v. Babbitt</u>, 903 F. Supp. 96 (D.D.C. 1995) (challenging grizzly bear recovery plan that failed to address habitat needs).

Reg. at 55,538.  Because Wyoming law authorizes unlimited wolf killing in the "predator zone" and even in the "Trophy Area" where wolves are deemed to threaten private property,[23] FWS determined that Wyoming "must" maintain a buffer over that bare-minimum population "to consistently meet its minimum management targets."  Id. at 55,556.  Thus, Wyoming is not required to provide "a 'cushion' upon a 'cushion,'" WWC-2013 Br. at 5; rather, Wyoming is required to take sufficient steps to ensure that its minimum required wolf population is not sacrificed to unregulated killing, yet its regulatory mechanisms fail to do so.

## V.   THE PROSPECT OF RELISTING DOES NOT SUPPORT THE CHALLENGED RULE

FWS closes its brief with an assurance that wolves in Wyoming will be monitored and "FWS will make prompt use of the Act's emergency listing provisions if necessary."  FWS Mem. at 45 (quotations omitted) (citing 16 U.S.C. § 1533(b)(7), (g)(1)-(2)).  However, the prospect of monitoring and relisting cannot justify the Wyoming Delisting Rule.  As an initial matter, FWS disavowed any reliance on "the threat of relisting" in the rule itself and cannot now offer a new basis for its decision.  77 Fed. Reg. at 55,591; Chenery Corp., 332 U.S. at 196.  More fundamentally, the ESA does not permit delisting on the ground that relisting would be considered if monitoring reveals that the species is not adequately conserved.  If that were all the ESA required, a species could always be delisted upon achieving sufficient numbers regardless of the imminence of threats to its persistence or the inadequacy of existing regulatory measures to ensure its continued viability.  This is not the law, see 16 U.S.C. § 1533(a)(1), and it offers no basis to sustain the Wyoming Delisting Rule.  See Greater Yellowstone Coal., 665 F.3d at 1029 (rejecting argument that possibility of relisting "can operate as a reasonable justification for

---

[23] WWC-2013 errs in contending that "Wyoming's defense of property laws only affect wolves that are in the predatory areas."  WWC-2013 Br. at 18.  Wyoming's "doing-damage-to-private-property" law applies statewide.  See Wyo. Stat. § 23-3-115(c).

delisting"; "Whatever comfort may be taken in relisting as a safety net, it is no answer to conclude that a species is not threatened simply because it can be relisted if it is threatened.").

**CONCLUSION**

For the foregoing reasons, as well as the reasons stated in plaintiffs' opening brief, plaintiffs in these consolidated cases respectfully request that this Court grant their motion for summary judgment, vacate and remand FWS's unlawful Wyoming Delisting Rule, and reinstate the prior rule protecting wolves in Wyoming under the ESA.  See Natural Res. Def. Council v. EPA, 571 F.3d 1245, 1279 (D.C. Cir. 2009) (because agency rule "cannot be remedied by further explanation … , it must be vacated").[24]

Respectfully submitted this 20th day of August, 2013.


        /s/  Timothy J. Preso
Timothy J. Preso
Earthjustice
313 East Main Street
Bozeman, MT 59715
(406) 586-9699
Fax: (406) 586-9695
tpreso@earthjustice.org

*Attorney for Plaintiffs Defenders of Wildlife, Natural Resources Defense Council, Sierra Club, and Center for Biological Diversity*

---

[24] Wyoming suggests the Court should invite "supplemental briefs on the issue of whether the 2012 delisting rule should be vacated" because the state does not know "the specific nature of any errors this Court may find."  Wyo. Mem. at 38.  However, plaintiffs have set forth all of their merits argument in detail; if Wyoming had reasons to offer why they do not warrant vacatur, it should have presented them in its response brief.  Having failed to do so, it should not be permitted to delay restoration of ESA protections to Wyoming wolves.  See Defenders of Wildlife v. Salazar, 729 F. Supp. 2d 1207, 1228 n.15 (D. Mont. 2010) (rejecting request for further briefing on remedy in wolf delisting case where defendants "did not offer a reason why they could not have briefed the issue in the first place, or otherwise why further briefing is necessary").

        /s/ Ralph Henry
Ralph Henry
D.C. Bar No. 982586
The Humane Society of the United States
2100 L Street, N.W.
Washington, DC 20037
(202) 676-2324
rhenry@humanesociety.org

*Attorney for Plaintiffs The Humane Society of the United States and the Fund for Animals*

## CERTIFICATE OF SERVICE

    I hereby certify that a copy of the foregoing was today served via the Court's CM/ECF system on all counsel of record.

        /s/  Timothy J. Preso
Timothy J. Preso